**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

WILDBIRD LLC,

    *Plaintiff*,

    v.

WILDRIDE B.V., and WILDRIDE USA CORP.,

    *Defendants*.

Civil Action No: 1:25-cv-05993

**MEMORANDUM OF LAW IN SUPPORT OF
<u>PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER</u>**

1

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................... 1

II. FACTUAL BACKGROUND......................................................................... 2

    A.  Plaintiff ................................................................................................. 2
    B.  Plaintiff's WILDBIRD-Brand Products ............................................. 3
    C.  Plaintiff's WILDBIRD Trademarks ..................................................... 4
    D.  WILDBIRD-Brand Products Offered Under the WILDBIRD Marks Enjoy Widespread Consumer Recognition and Goodwill.................................. 5
    E.  Defendants and Their Infringing WILDRIDE Trademarks................................ 6
    F.  The Parties Offer the Same Products: Baby Carriers and Toddler Carriers .......... 7
    G.  May 2025 Was the First Time that Plaintiff Was Aware of Defendants' Using Their WILDRIDE Marks Within the United States ................................ 9
    H.  May 2025 Was the First Time that Plaintiff Became Aware of Actual Confusion.................................................................................................... 9
    I.  Plaintiff Learned in the Evening of September 17, 2025, That Defendants Intend to Expand Their WILDRIDE Brand in the United States by Offering WILDRIDE-Branded Products in Target's Stores................................ 10

III. LEGAL STANDARD............................................................................... 11

IV. LEGAL ANALYSIS................................................................................. 12

    A.  Wildbird is Likely to Prevail on the Merits of its Claims..................................... 13

        1.  Wildbird is Likely to Prove Trademark Ownership and Validity…………………………………………………………………..13
        2.  Wildbird is Likely to Prove that the Infringing WILDRIDE Marks Create a Likelihood of Confusion With the WILDBIRD Marks........................ 16

            i.  Plaintiff's WILDBIRD Marks are Strong.................................... 16

                a.  The WILDBIRD Marks are Conceptually Strong ............ 16

                b.  The WILDBIRD Marks are Commercially Strong........... 17

            ii.  The Parties' Marks Create the Same Overall Impression on Consumers....................................................................... 18
            iii.  The Parties Offer Identical and Closely Related Products........... 19
            iv.  Actual Confusion Has Occurred ................................................. 20
            v.  Defendants Entered the U.S. Marketplace in Bad Faith .............. 21
            vi.  Products Offered Under Defendants' WILDRIDE Marks Are Inferior to Products Offered Under Plaintiff's WILDBIRD Marks ..................................................................... 22

vii.    The Eighth *Polaroid* Factor—Like the First, Second, Third, Fifth, Sixth, and Seventh Factors, Respectively—Favors Preliminarily Enjoining the Use of Defendants' WILDRIDE Marks....................................................................... 23

B.    Plaintiff Will Suffer Irreparable Harm in the Absence of a Preliminary Injunction ............................................................................................. 24

C.    The Balance of Equities Favors Plaintiff............................................. 25

D.    A Preliminary Injunction Would Protect the Public From Additional Confusion ............................................................................................. 26

V.   CONCLUSION................................................................................................. 26

ACTIVE 714800301v1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*725 Eatery Corp. v. City of New York*,
   408 F. Supp. 3d 424 (S.D.N.Y. 2019) ................................................................. 13

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
   537 F.2d 4 (2d Cir. 1976) ................................................................................... 15

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F. 3d 887 (2d Cir. 2015) .............................................................................. 12

*Celine S.A. v. Hongkong CSSBUY E-Commerce Co. Ltd.*,
   2024 WL 4627666 (S.D.N.Y. Oct. 30, 2024) ...................................................... 26

*City of New York v. Lopez*,
   2021 WL 6063839 (S.D.N.Y. Dec. 21, 2021) ...................................................... 14

*Goat Fashion Ltd. 1661, Inc.*,
   2020 WL 5758917 (S.D.N.Y. Sept. 28, 2020) ............................................. *passim*

*Hope Organics LLC v. Preggo Leggings LLC*,
   2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021)
   ....................................................................................................................... *passim*

*Lexington Mgmt. Corp. v. Lexington Capital Partners*,
   10 F. Supp. 2d 271 (S.D.N.Y. 1998) .................................................................. 13

*Mobil Oil Corp. v. Pegasus Petroleum Corp.*,
   818 F.2d 254 (2d Cir. 1987) ............................................................................... 16

*Museum of Modern Art v. MOMACHA IP LLC*,
   339 F. Supp. 3d 361 (S.D.N.Y. 2018) ......................................................... *passim*

*NES Baseball & Softball Facility, Inc. v. Northeast Angels Softball, LLC, et al.*,
   2022 WL 17370117 (S.D.N.Y. Dec. 2, 2022)
   ....................................................................................................................... *passim*

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010) ......................................................... *passim*

*NYP Holdings v. New York Post Pub. Inc.*,
   63 F. Supp. 3d 328 (S.D.N.Y. 2014) ............................................. 12, 20, 24, 25

*Palm Bay Imports, Inc. v. Vueve Clicquot Ponsardin Maison Fondee En 1772*,
   396 F.3d 1369 (Fed. Cir. 2005) .......................................................................... 19

iii

*Polaroid Corp. v. Polarad Electronics Corp.*,
    287 F.2d 492 (2d Cir. 1961)...................................................................................16

*Really Good Stuff, LLC v. BAP Investors, L.C.*,
    813 Fed. Appx. 39 (2d Cir. 2020) ................................................................24, 25

*Roller Rabbit LLC v. Yiulangde Clothing Store*,
    2025 WL 2592349 (S.D.N.Y. Sept. 8, 2025) ...............................................11, 12

*TushBaby, Inc. v. Jinjang Kangbersi Trade Co. Ltd.*,
    2024 WL 4627452 (S.D.N.Y. Oct. 30, 2024) ................................................ *passim*

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011)...........................................................12, 26

**Statutes**

15 U.S.C. § 1072 ..................................................................................................22

15 U.S.C. § 1115 ..................................................................................................13

15 U.S.C. § 1116 ..................................................................................................24

15 U.S.C. § 1125 ..................................................................................................14

**Other Authorities**

Fed. R. Civ. P. 65..................................................................................................11

McCARTHY ON TRADEMARKS AND UNFAIR COMPETITION ...........................................14

iv

## I.    PRELIMINARY STATEMENT

To maintain the parties' status quo between now and the October 30, 2025, hearing on Plaintiff's preliminary-injunction motion, Plaintiff respectfully requests that this Court temporarily restrain the use of Defendants' "WILDRIDE" trademarks in the United States in connection with advertising and selling carriers (for babies and toddlers) at Target stores; on Target's website; and in any other third-party retail store or retailer's website other than Nordstrom.

Plaintiff filed this lawsuit and its preliminary-injunction motion on July 22, 2025, to protect its customers and the carefully curated reputation and goodwill of its WILDBIRD brand from further confusion with Defendants' competing WILDRIDE brand in the United States.   In July 2025, a consumer "tagged" Plaintiff's Instagram account even though it was wearing *Defendants*' WILDRIDE-brand carrier in the image.   This was the first time in Plaintiff's 11-year-existence that it was aware of any consumer mistakenly tagging Plaintiff's Instagram account.   July 2025 also was the first time that Plaintiff's WILDBIRD-brand carriers and Defendants' WILDRIDE-brand carriers were advertised and sold by a common retailer in the United States, *i.e.*, Nordstrom.   Evidence produced during the preliminary-injunction-related phase of this lawsuit confirms that additional instances of actual confusion have occurred in the weeks following the filing of this lawsuit—and unsurprisingly so.   The parties use nearly identical marks to advertise and sell identical goods—carriers for babies and carriers for toddlers—in overlapping marketing and trade channels in the United States.   This final point—trade channels—is why Plaintiff brings this interim motion for a temporary restraining order against Defendants.

In the evening of September 17, 2025, Plaintiff learned for the first time that Defendants will advertise and sell their WILDRIDE-brand carriers in Target's retail stores in the United States.  Plaintiff currently sells its WILDBIRD-brand carriers and other baby products through Target.com, and has done so since at least as early as late-2020.  Defendants' entrance into Target

1

constitutes a seismic shift in the parties' status quo since the filing of this lawsuit and Plaintiff's motion for a preliminary injunction on July 22, 2025. Indeed, from July 22, 2025 – September 16, 2025, Plaintiff was only aware of one retailer—*i.e.*, Nordstrom—in the United States that advertised and sold both parties' carriers. As referenced above, the record evidence confirms that actual confusion has occurred when a single retailer advertises and sells both parties' products in the United States. This evidence of actual confusion demonstrates that confusion is likely to continue to occur—at an increasing rate—if Defendants are allowed to continue with their rapid expansion plans in the United States and enter retail locations at Target or any other third-party retailer or third-party website in the United States.

Accordingly, to protect Plaintiff's customers and the reputation and goodwill of its carefully curated WILDBIRD brand, Plaintiff respectfully requests that this Court maintain the parties' status quo up to, and including, September 16, 2025, by temporarily restraining Defendants' use of their WILDRIDE mark in connection with advertising or selling any carrier products (whether for babies, toddlers, or otherwise) at any Target location or any other third-party retailer (or third-party retailer's website) in the United States (other than Nordstrom) until the Court can rule on Plaintiff's pending motion for a preliminary injunction against the use of Defendants' WILDRIDE mark in the United States in general.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff

Founded in 2014 by first-time parents, Tayler and Nate Gunn, WILDBIRD is an award-winning brand of children and parental accessories and clothing. *See* Dkt. 10, ¶ 4. Wildbird's founders felt the nurturing and protective nature of a mother bird. *Id.* As part of that nurturing, Tayler and Nate wanted to keep their newborn child close enough to their bodies to soothe their child with their breathing. *Id.* Unable to "wear" their newborn child, Tayler and Nate developed

ACTIVE 714800301v1

a ring-sling carrier, which allowed them to carry/wear their child.  *Id*.  A representative example of a WILDBIRD-brand ring sling is below:



*Id*.

### B.    Plaintiff's WILDBIRD-Brand Products

As of 2014, Tayler and Nate were not aware of any other baby brand in the United States that had "wild" or "bird" in its name.  Dkt. 10, ¶ 5.  That fact, combined with the nurturing and protective nature of a mother bird that Tayler and Nate felt for their newborn, led them to adopt Wildbird as the name of their company in 2014.  *Id*.

Tayler and Nate launched the WILDBIRD brand in November 2014 with the brand's ring sling, which was—and remains—suitable for carrying babies and toddlers.  Gunn Decl., ¶ 8[1].  Since Wildbird's founding in 2014, it has expanded its product offerings from ring slings to include a full range of accessories and clothing for children and their parents.  Dkt. 10, ¶ 6.  Today, Wildbird offers: (i) ring slings; (ii) "wrap" baby carriers; (iii) pajamas; (iv) sleep sacks; (v) pregnancy pillows; (vi) playmats; (vii) blankets; (viii) pillows; (ix) crib sheets; (x) swaddles; (xi) hats; and (xii) teethers.  *Id*.; *see also id*. at Ex. 1.  Wildbird currently plans to expand its

---

[1] "Gunn Decl." refers to the September 19, 2025, Declaration of Nate Gunn.

3

product offerings to include: (i) additional carriers; (ii) stroller wagons; (iii) bouncers; (iv) bath products; (v) nursery products; (vi) additional clothing; and (vii) play items.  *Id*. at ¶ 7.

C.    **Plaintiff's WILDBIRD Trademarks**

To identify and distinguish WILDBIRD-brand products in the marketplace, Plaintiff uses (i) the "WILDBIRD" word mark (the "WILDBIRD Word Mark") and (ii) the inset logo (the "WILDBIRD Logo," together with the WILDBIRD Word Mark, the "WILDBIRD Marks"):



Dkt. 10, ¶ 8.

Wildbird owns U.S. Trademark Registration No. 7,798,495 (the "'459 Registration"), which covers the WILDBIRD Word Mark for, *inter alia*: (i) back packs for carrying babies; baby carriers worn on the body in Class 18 and (ii) on-line retail store services featuring baby related consumer products, namely baby carriers, baby pajamas, baby bedding, baby playmats, toddler pajamas, and baby sleep sacks in Class 35.  Dkt. 10, Ex. 2.   Wildbird also owns U.S. Trademark Application Serial No. 99/068,040, which seeks registration of the WILDBIRD Logo for, *inter alia*, the Class 18 and Class 35 goods and services covered by Plaintiff's '549 Registration.  *Id*. at Ex. 3.

Wildbird strengthens and maintains its rights in its WILDBIRD Marks by monitoring the marketplace and enforcing its Marks against infringers.  Dkt. 10, ¶ 11.  For example, Plaintiff sent a cease-and-desist letter to a company that formerly did business as "WildBird Designs."  *Id*.

Other than Defendants' infringing WILDRIDE brand, Plaintiff is not aware of any other company or brand in the United States that advertises or sells a carrier—whether for babies, toddlers, or otherwise—that includes the word "wild" in the brand name or mark.  Gunn Decl.,

ACTIVE 714800301v1

¶ 8.  Relatedly, during discovery, Defendants produced, *inter alia*, printouts of third-party websites that (i) included "wild" in their name and (ii) sold clothing and accessories for children and/or arranged activities and parties for children.  *See, e.g.*, Thomas Decl., Ex. 1[2].  Of those third parties, only one appears to advertise and sell carriers—and the *only* carrier they advertise and sell that has "wild" in the brand name is *Plaintiff's* WILDBIRD-brand carrier.  *See id.* at Ex. 2, p.2.

### D.    WILDBIRD-Brand Products Offered Under the WILDBIRD Marks Enjoy Widespread Consumer Recognition and Goodwill

Since 2014, Wildbird has spent substantial time, money, and effort on creating a unique association in consumers' minds in the United States between products offered under the WILDBIRD Marks, on the one hand, and Plaintiff, on the other hand.  Dkt. 10, ¶ 13.  For example, Wildbird has spent millions of dollars on advertising and promoting products under its WILDBIRD Marks.  *Id.*  These efforts, include, for example: (i) advertising on Wildbird's website; (ii) advertising on Wildbird's social-media accounts; and (iii) advertising via social-media influencers.  *Id.*; *see also id.* at Exs. 5-7.

Wildbird prominently uses and displays its WILDBIRD Marks on its website and social-media accounts, which, combined, have more than half-a-million followers.   Dkt. 10., Exs. 5-7.  Products offered under the WILDBIRD Marks have received widespread, unsolicited media coverage throughout the United States in national publications, such as: *Vogue*; *Glamour*; *Strategist*; and *The Bump*.  *Id.* at ¶ 14. Products offered under the WILDBIRD Marks also have appeared on the widely watched *Today* Show.  *Id.* at ¶ 15.

Consumers also receive widespread exposure to products offered under Plaintiff's WILDBIRD marks throughout the United States in national retailers, such as: Target; Babylist; and Nordstrom; as well as on Amazon.com.  Dkt. 10, ¶ 16; *see also* Thomas Decl., Exs. 3, 4.

---

[2] "Thomas Decl." refers to the September 19, 2025, Declaration of Jonathan W. Thomas, Esq.

Plaintiff and its products offered under its WILDBIRD Marks also have received critical acclaim. Dkt. 10, ¶ 17.  For example, in 2025, Plaintiff's WILDBIRD-brand Aerial Buckle Wrap received Parents.com's "Best Baby Wrap" Award.  *Id*.; *see also* Ex. 8.  Products offered under the WILDBIRD Mark also have been a commercial success.  *See id*. at ¶ 18.  For example, Plaintiff has sold millions of dollars' worth of products offered under the WILDBIRD Marks.  *Id*.

### E.    Defendants and Their Infringing WILDRIDE Trademarks

According to documents filed with the United States Patent and Trademark Office ("PTO"), Defendant Wildride B.V. is a Netherlands besloten vennootschap with a principal place of business located at Donkere Spaarne 44, 2011 JH, Haarlem NETHERLANDS.  *See* Dkt. 11, Exs. 1-2.  According to the website us.wildridecarrier.com, Defendant Wildride USA Corp. is a Delaware corporation and maintains its principal place of business at 228 East 45th Street, Suite 9E, New York, New York 10017.  *See id*. at Exs. 3-4.

According to the PTO's database, Defendant Wildride B.V. owns U.S. Trademark Application Serial No. 79/375,825 (the "'825 Application"), which seeks registration of the word mark WILDRIDE in, *inter alia*, the following Classes for the following goods and services:

a.     18: Baby and children carriers worn on the body; pouch baby and infant carriers; baby and infant carriers; sling bags for carrying babies and infants; slings for carrying babies and infants; baby and infant carrying bags, and

b.     35: Retailing services and wholesale services featuring baby and children carriers worn on the body, pouch baby and infant carriers, baby and infant carriers, carrier bags, slings for carrying babies and infants, sling bags for carrying babies and infants; shop services, business intermediary services, selling and buying and business advice relating to baby and children carriers worn on the body, pouch baby and infant carriers, baby and infant carriers, carrier bags, slings for carrying babies and infants, sling bags for carrying babies and infants.

Dkt. 11, Ex. 1.

According to the PTO's database, Defendant Wildride B.V. owns U.S. Trademark Application Serial No. 98/558,373 (the "'373 Application"), which seeks registration of the word mark WILDRIDE in Class 18 for Baby and children carriers worn on the body; pouch baby and

6

infant carriers; baby and infant carriers worn on the body; sling bags for carrying babies and infants; slings for carrying babies and infants; baby and infant carrying bags. Dkt. 11, Ex. 2. The WILDRIDE word mark, as set forth in the '825 Application and the '373 Application, is referred to hereinafter the "WILDRIDE Word Mark."

In the '825 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark in, *inter alia*, the same Classes covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, 18 and 35. Dkt. 11, Ex. 1. In the '825 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark for goods and services that are identical to goods and services covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, baby carriers and retail store services concerning, among other things, baby carriers. *Compare id*. *with* Dkt. 10, Ex. 2.

In the '373 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark in same Class covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, 18. Dkt. 11, Ex. 2. In the '373 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark for goods that are identical to goods covered by Plaintiff's '459 Registration, namely, baby carriers. *Compare id*. *with* Dkt. 10, Ex. 3.

Wildride B.V. based the '825 Application on an International Registration Date of May 12, 2023 for International Registration No. 1743929. Dkt. 11, Ex. 1. In the '373 Application, Wildride B.V. claimed a first-use date of the WILDRIDE Word Mark of January 2021. *Id*. at Ex. 2. As set forth in the '459 Registration, Plaintiff began using its WILDBIRD Word Mark in United States commerce in November 2014 for baby carriers and retail store services. Dkt. 10, Ex. 1.

On information and belief, Defendant Wildride USA owns, operates, and is responsible for the content displayed on the website located at https://us.wildridecarrier.com ("Defendants' U.S.

Website").  Dkt. 11, Exs. 3-4.  Defendants' U.S. Website and social-media accounts display the Infringing WILDRIDE Word Mark and inset logos (together with the WILDRIDE Word mark, the "Infringing WILDRIDE Marks"):



*Id*.; *see also id*. at Ex. 7.

### F.    The Parties Offer the Same Products: Baby Carriers and Toddler Carriers

Products offered under Plaintiff's WILDBIRD Marks and products offered under Defendants' WILDRIDE Marks include the same types of products: baby carriers and toddler carriers.  For example, both parties' carriers are offered in the "Baby Carriers" section of Nordstrom's website.  Thomas Decl., Ex. 4.  As another example, consumer reviews of both parties' carriers refer to them as "newborn to toddler" (Plaintiff; *id*. at Ex. 5, p. 3) and "baby/toddler" (Defendants; *id*. at Ex. 6, p. 9).  Additional examples of the parties advertising and selling baby carriers and toddler carriers include:

-    Both parties advertise and sell carriers for toddlers on their respective websites (*see* Thomas Decl., Exs. 7-9);

-    Plaintiff advertises and sells carriers for babies on its website (Dkt. 10, Ex. 1);

-    Defendants' U.S. Website describes its carrier as the "best baby carrier […]" (Thomas Decl., Ex. 8, p. 6);

-    Defendants' U.S. Website has an article that indicates children progress from babies to toddlers at the age of 1 year (Thomas Decl., Ex. 10);

8

- Defendants' U.S. Website describes its carrier as "fit[ting] children from **9 months** to 4 years […]" (Thomas Decl., Ex. 8 at p. 6) (emphasis added); and

- In May 2025, Plaintiff and Defendants attended the ABC Kids Expo in Las Vegas, Nevada, which states on its website that is an exhibition "where leading brands showcase their newest collections and innovations in baby gear, toys, apparel, gifts, and more." (Thomas Decl., Ex. 11).

### G.    May 2025 Was the First Time That Plaintiff Was Aware of Defendants' Using Their WILDRIDE Marks Within the United States

Prior to May 2025, Plaintiff understood that Defendants shipped a *de minimis* amount of WILDRIDE-branded products into the United States from the Netherlands.  Thomas Decl., Ex. 12, pgs. 4-5.  For example, as of December 2024, Defendants' U.S. Website was not advertising or selling any of Defendants' WILDRIDE-branded products.   Thomas Decl., Ex. 13.

In May 2025, Plaintiff discovered, for the first time, that Defendants were using their WILDRIDE Mark while physically present in the United States.  Dkt. 10, ¶¶ 19, 20; *see also* Thomas Decl., Ex. 12, pgs 4-5.  Plaintiff made this discovery while attending the 2025 ABC Kids Expo in Las Vegas, Nevada, which Plaintiff and Defendants attended from May 21-23, 2025.  *Id.* at ¶ 20; *see also* Thomas Decl., Ex. 12, pgs 4-5.

### H.    May 2025 Was the First Time Plaintiff Became Aware of Actual Confusion

On Day 2 of the ABC Kids Expo, a buyer for Nordstrom asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand.  Dkt. 10, ¶ 21.  On Day 3 of the ABC Kids Expo, multiple suppliers confused Plaintiff's WILDBIRD brand with the Defendants' WILDRIDE brand.  *Id.* at ¶ 22.  For example, one supplier said to Plaintiff's representative: "oh, yes; I saw your booth"—but they were referring to Defendants' booth.  *Id.*  As another example, one supplier asked Plaintiff's representative: "You are Wildride, yes"?  *Id.*

ACTIVE 714800301v1

In June 2025, Plaintiff and Defendants attended a brand showcase for Nordstrom, which included only 6-to-8 other brands. Dkt. 10, ¶¶ 23-4. At least four category leads for Nordstrom stores throughout the United States asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand or if Plaintiff's WILDBIRD brand was the same as Defendants' WILDRIDE brand. *Id*.

In July 2025, Plaintiff began to notice for the first time that consumers were confusing Plaintiff and Defendants on social media. Dkt. 10, ¶ 26. For example, as shown in the inset image, consumers are "tagging" Plaintiff's Instagram account when posting about Defendants' products:



*Id*. Plaintiff is aware of five additional instances of actual confusion that have occurred on social media since the filing of this lawsuit. Thomas Decl., Exs. 14-19.

## I.    Plaintiff Learned in the Evening of September 17, 2025, that Defendants Intend to Expand Their WILDRIDE Brand in the United States by Offering WILDRIDE-Branded Products In Target's Stores

From July 22, 2025, through and including September 16, 2025, Plaintiff was aware of only one retailer in the United States that advertised and sold both WILDBIRD-brand carriers and WILDRIDE-brand carriers, namely, Nordstrom. Gunn Decl., ¶ 4. As stated above, Nordstrom's website includes the parties' carriers in the same product category, namely, Baby Carriers. The

ACTIVE 714800301v1

parties' products also appear side-by-side in searches on Nordstrom's website.  *See* Thomas Decl., Ex. 4.

In the evening of September 17, 2025, Plaintiff learned for the first time that Defendants are planning to expand their operations within the United States by advertising and selling their WILDRIDE-branded carriers in Target's retail locations.  Gunn Decl., ¶ 6; Somerville Decl., ¶ 7[3]. Plaintiff has been selling its WILDBIRD-branded products at Target for approximately five years. Gunn Decl., ¶¶ 5, 9. Defendants' apparent path directly to Target's stores is unconventional and creates the possibility that Defendants' WILDRIDE-branded products could be advertised and offered for sale in Target's stores and/or on Target's website at any time.  *See* Somerville Decl., ¶¶ 4-6; 8.

Given that actual confusion has increasingly occurred since a single retailer (*i.e.*, Nordstrom) in the United States began advertising and selling the parties' carriers in July 2025, Plaintiff brings this motion for a temporary restraining order to prevent the inevitable likelihood of confusion and irreparable harm if a *second*, national retailer begins advertising and selling the parties' carriers in the United States.

## III.    LEGAL STANDARD

In the Second Circuit, the same standard governs motions for temporary restraining orders and motions for preliminary injunctions—the difference being that a temporary restraining order "preserves the status quo and prevent[s] irreparable harm from just so long as is necessary to hold a hearing, and no longer," which is the precise relief that Plaintiff seeks in this motion.  *Roller Rabbit LLC v. Yiulangde Clothing Store*, 2025 WL 2592349, at *3 (S.D.N.Y. Sept. 8, 2025).

---

[3] "Somerville Decl." refers to September 19, 2025, Declaration of Jason Somerville.

ACTIVE 714800301v1

To obtain a temporary restraining order or preliminary injunction, Wildbird must "establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor […]; and (3) that a preliminary injunction is in the public interest." *TushBaby, Inc. v. Jinjang Kangbersi Trade Co. Ltd.*, 2024 WL 4627452, at *2 (S.D.N.Y. Oct. 30, 2024) (granting temporary restraining order and preliminary injunction in trademark case); *see also NES Baseball & Softball Facility, Inc. v. Northeast Angels Softball, LLC, et al.*, 2022 WL 17370117 at *4; (S.D.N.Y. Dec. 2, 2022) (*same*); *Roller Rabbit LLC*, 2025 WL 2592349, at *3 (granting temporary restraining order in trademark case; applying above-quoted factors) (citing *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015)).

## IV.   LEGAL ANALYSIS

Courts in this District regularly issue temporary restraining orders and preliminary injunctions in trademark cases. *See*, *e.g.*, *TushBaby, Inc.*, 2024 WL 4627452; *Roller Rabbit LLC*, 2025 WL 2592349; *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117; *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011); *NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328 (S.D.N.Y. 2014); *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361 (S.D.N.Y. 2018); *Goat Fashion Ltd. 1661, Inc.*, 2020 WL 5758917 (S.D.N.Y. Sept. 28, 2020); and *Hope Organics LLC v. Preggo Leggings LLC*, 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021).

This Court should issue one, too, as Wildbird establishes all four factors necessary to obtain a temporary restraining order.  Wildbird is likely to succeed on the merits of its claims.  Defendants use their nearly identical WILDRIDE Marks to advertise and sell the same types of products that Plaintiff advertises and sells—carriers for babies and carries for toddlers—in the same marketing

and trade channels that Plaintiff uses to the same categories of customers—and Defendants intend to expand those commonalities by offering its products in Target. Wildbird's likelihood of success on the merits, combined with the likelihood of Defendants' WILDRIDE Marks injuring the reputation and goodwill of Plaintiff's carefully curated WILDBIRD brand and Marks, constitutes irreparable harm. This irreparable harm, combined with the public's interest in not being confused about the source of goods and services, tips all four factors in Plaintiff's favor and warrants temporarily restraining the use of Defendants' WILDRIDE Marks until this Court's ruling on Plaintiff's preliminary-injunction motion.

### A.    Wildbird is Likely to Prevail on the Merits of its Claims

Wildbird must establish a likelihood of success on the merits of only one of its claims to obtain a temporary restraining order. *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019). Nonetheless, because the same standard governs Wildbird's claims for trademark infringement, unfair competition, false association, and false designation of origin under Sections 32 and 43(a)(1)(A) of the Lanham Act, and New York common law (collectively, the "Claims"), Wildbird analyzes these Claims together for purposes of the instant motion.

For Wildbird to prevail on its Claims, it must prove: (i) it owns its WILDBIRD Marks; (ii) its WILDBIRD Marks are valid; and (iii) Defendants are using the WILDRIDE Marks in a manner that creates a likelihood of confusion with Plaintiff's WILDBIRD Marks. *See Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998) (applying the same standard to Section 32 and 43(a)(1)(A) claims; granting preliminary injunction).

### 1.    Wildbird is Likely to Prove Trademark Ownership and Validity

Wildbird's '549 Registration constitutes *prima facie* evidence of its ownership of the WILDBIRD Word Mark and its validity. *See* 15 U.S.C. § 1115(a); *see also City of New York v. Lopez*, 2021 WL 6063839, at *2 (S.D.N.Y. Dec. 21, 2021) (*accord*).

13

Wildbird also is likely to prove ownership and validity of its unregistered WILDBIRD Logo. *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *5 ("The Lanham Act (the 'Act') protects both registered and unregistered trademarks, as well as trade dress") (citing, *inter alia*, 15 U.S.C. § 1125(a)(1)(A)).

To prove ownership and validity of the unregistered WILDBIRD Logo, Plaintiff must prove: (i) it was "the first to use a particular mark to identify [its] goods or services in a given market," *i.e.*, trademark priority and (ii) its Logo is distinctive—either inherently or acquired—of Plaintiff's goods and services. *Id.*; *see also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:1.50 ("[I]n the United States, the rule of priority is that ownership and priority of a trademark go to the party who was first-to-use"); § 11:2 ("Without achieving distinctiveness, either inherently or through the acquisition of secondary meaning, then a designation does not have the legal status of a 'trademark' or 'service mark.' No distinctiveness—no mark").

To establish priority, Wildbird must demonstrate that it used its WILDBIRD Logo in United States commerce before Defendants began using the Infringing WILDRIDE Marks and that Wildbird's use of the Logo "has been deliberate and continuous, not sporadic, casual or transitory." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *5. Wildbird is likely to establish both. As discussed *supra*, Wildbird began using its WILDBIRD Logo for carriers (ring slings) in November 2014; whereas, Defendants' claimed priority and/or first-use dates of the Infringing WILDRIDE Marks was 2021 and 2023. Wildbird also has been using its WILDBIRD Logo continuously for more than a decade to advertise, promote, offer for sale, and sell its products throughout the United States. Accordingly, Wildbird is likely to establish priority.

14

*See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (priority and continuous use based on only "at least two years" of use).

To establish distinctiveness, Wildbird must demonstrate where its WILDBIRD Logo falls on the spectrum of trademark distinctiveness, *i.e.*, whether the Logo is "generic, descriptive, suggestive, arbitrary, or fanciful." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (referencing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)). For context:

> "Generic marks, which are those consisting of words identifying the relevant category of goods or services have no inherent distinctiveness and are not protectable. Descriptive marks are those consisting of words identifying qualities of the product. […] Suggestive marks are those that are not directly descriptive but do suggest a quality or qualities of the product, through the use of 'imagination, thought and perception' and are inherently distinctive. Arbitrary or fanciful marks, which are ones that do not communicate any information about the product either directly or by suggestion, are inherently very distinctive."

*NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (internal quotations and citations omitted.

The WILDBIRD Logo is inherently distinctive. Wildbird is not aware of any other company in the United States using a logo that consists of "wild" or "bird" or those words together with the image of a bird in connection with children's clothing and accessories. Dkt. 10, ¶ 12. Thus, the WILDBIRD Logo is not generic. The WILDBIRD Logo also does not describe or identify any qualities of Plaintiff's products, which have nothing to do with birds (wild or otherwise). Accordingly, whether classified as suggestive, arbitrary, or fanciful, the WILDBIRD Logo is inherently distinctive and, therefore, valid. *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (unregistered logo was inherently distinctive).

Based on the foregoing, Plaintiff is likely to prove ownership and validity of its WILDBIRD Marks. Plaintiff also is likely to prove that Defendants' use of the Infringing WILDRIDE Marks creates a likelihood of confusion with Plaintiff's WILDBIRD Marks.

15

###### 2.     Wildbird is Likely to Prove that the Infringing WILDRIDE Marks Create a Likelihood of Confusion With the WILDBIRD Marks

To assess likelihood of confusion, "courts in this Circuit apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) […]." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *8. Those factors "are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Id*.

While "no single *Polaroid* factor is determinative, [] the first three factors are 'perhaps the most significant.'" *New York City Triathlon, LLC*, 704 F. Supp. 2d at 341 (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)); *see also Museum of Modern Art*, 339 F. Supp. 3d at 380. Here, not only do the critically important first, second, and third *Polaroid* factors favor Plaintiff but also the fifth, sixth, seventh, and eighth factors do, too.

###### i.     Plaintiff's WILDBIRD Marks are Strong

For purposes of the first *Polaroid* factor, a trademark's "strength" refers to "its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public." *Hope Organics LLC*, 2021 WL 5919367, at *3. When assessing strength, "courts will consider: (1) the mark's 'inherent distinctiveness' and (2) the mark's distinctiveness in the marketplace." *Id*.

###### a.     The WILDBIRD Marks are Conceptually Strong

Both of Plaintiff's WILDBIRD Marks are inherently distinctive and conceptually strong. The PTO's registration of the WILDBIRD Word Mark without proof of secondary meaning creates a rebuttal presumption of inherent distinctiveness. *See Hope Organics LLC*, 2021 WL 5919367,

16

at *4; *Goat Fashion Ltd.*, 2020 WL 5758917, at *10. But even if the WILDBIRD Word Mark was not registered, it is inherently distinctive for the same reasons discussed above concerning the WILDBIRD Logo's inherent distinctiveness, namely, the word "wildbird": (i) is not a commonly used term in the children's accessories-and-apparel industry in general; (ii) is not a commonly used term for baby carriers or toddler carriers specifically; and (iii) does not describe any qualities of the children's accessories and apparel that Plaintiff advertises and sells under its WILDBIRD Marks. Accordingly, the WILDBIRD Marks are conceptually strong marks. *Accord Hope Organics LLC*, 2021 WL 5919367, at *4; *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6.

### b.  The WILDBIRD Marks are Commercially Strong

The WILDBIRD Marks also are commercially strong marks. When assessing a mark's distinctiveness in the marketplace, "the court considers six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Hope Organics LLC*, 2021 WL 5919367, at *5.

For more than a decade, Plaintiff has invested substantial sums in creating a unique association in consumer' minds between the WILDBIRD Marks, on the one hand, and Plaintiff, on the other hand. Plaintiff has spent millions of dollars on advertising that prominently features its WILDBIRD Marks. Products advertised and sold under the WILDBIRD Marks have enjoyed over $60 million in sales and receive unsolicited media coverage in *hundreds of* national publications, such as *Vogue* and *Glamour*; and receive awards. Consumers also receive widespread exposure to products advertised and sold under the WILDBIRD Marks at national retailers, such as: Target, Nordstrom, and Amazon.com, as well as on Plaintiff's social-media accounts. Plaintiff also has enforced the WILDBIRD Marks by sending protest letters, including

to "Wildbird Designs," and is not aware of any other company or brand in the United States (other than Defendants) that advertises or sells carriers under a brand name or mark that includes the word "wild."

Based on the foregoing, the WILDBIRD Marks are commercially strong identifiers of and for Plaintiff and products offered under the WILDBIRD Marks. *See Hope Organics LLC*, 2021 WL 5919367, at *5 (finding commercial strength where, as here, plaintiff sold millions of dollars' worth of products each year under its marks; invested millions of dollars into advertising; received media coverage in, *inter alia*, *Glamour*; and promoted its marks on social media); *Goat Fashion Ltd.*, 2020 WL 5758917, at *10 (finding commercial strength where, as here, plaintiff used mark continuously for over a decade; received media coverage in, *inter alia*, *Glamour*; and enforced its marks); *TushBaby, Inc.*, 2024 WL 4627452, at *4 (finding commercial strength where, as here, plaintiff invested millions into advertising; had sales in the millions of dollars; and enforced its marks).

This commercial strength, combined with the WILDBIRD Marks' conceptual strength, tips the first *Polaroid* factor in Plaintiff's favor.

### ii. The Parties' Marks Create the Same Overall Impression on Consumers

When assessing the similarities between parties' marks under the second *Polaroid* factor, "the court evaluates the overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Hope Organics LLC*, 2021 WL 5919367, at *6 (internal quotations and citations omitted); *see also NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *8 ("[A] court does not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace").

Here, the parties use their marks and logos on their websites; social-media accounts; and products.  The parties' retailers also use their marks in advertisements for the parties' products. These uses of the parties' marks create the same overall impression on consumers in the marketplace.  The parties' marks and logos begin with "W-I-L-D," which is the dominant portion of the marks and logos and is what consumers are likely to recall when seeing the marks and logos in the marketplace.  *See Palm Bay Imports, Inc. v. Vueve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (first word is a "prominent feature" because it is "the first word in the mark and the first word to appear on the label"); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 333-34 (in a logo or mark that "contains both a design and a word, the word is generally considered to be dominant and is therefore accorded greater weight"); *Goat Fashion Ltd.*, 2020 WL 5758917, at *11 (finding mark similarity; "[t]he average consumer, seizing on the memorable word 'GOAT,' would likely perceive these caprine marks as similar and have difficulty distinguishing the brands").  The parties' marks also sound similar when spoken aloud.  *See Hope Organics LLC*, 2021 WL 5919367, at *6 ("'[M]arks are considered similar when they are similar in appearance, sound and meaning'"; "when spoken, MTHR and MUTHA are almost indistinguishable in sound") (quoting *Museum of Modern Art*, 339 F. Supp. 3d at 375).

Based on the foregoing, the second *Polaroid* factor favors Plaintiff.

### iii.    The Parties Offer Carriers for Babies and Toddlers

Under the third *Polaroid* factor, the court considers "to what extent the two products compete with each other [] accounting for the market proximity and geographic proximity." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *9.  The former "asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products."  *Id*.  Combined, "[b]oth elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion."  *Id*.

19

Here, consumers are likely to be confused when they encounter the parties' WILD-formative, WILD-dominant marks and logos on the same types of products: baby carriers and toddler carriers. What is more, Nordstrom carries both parties' products—and, unless temporarily restrained, Target will, too. To the extent Defendants argue that the parties do not use their marks for competitive goods because Defendants' brand is a "toddler" carrier brand and Plaintiff's brand is a "baby" carrier brand, the evidence confirms otherwise: both parties advertise and sell carriers for babies and carriers for toddlers; Nordstrom places the parties' carriers in the same category; and consumer reviews refer to the parties' carriers as being baby carriers and toddler carriers.

In sum, the parties' products fall into the identical category: carriers—for babies and toddlers. Accordingly, the third *Polaroid* factor favors Plaintiff and the fourth is inapplicable because there is no gap in the parties' offerings for Plaintiff to bridge. *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *9 (third and fourth *Polaroid* factors favored plaintiff where, as here, the parties' goods "are of the same type and function, and that the marks at issue serve to promote these goods. Thus, there is 'no gap to bridge'"); *Hope Organics LLC*, 2021 5919367, at *7 (although not identical, parties' products were competitive where products fell into same category and "aimed at new and expecting mothers"; fourth *Polaroid* factor neutral where, as here, "the parties' products are already in direct competition […]").

### iv.    Actual Confusion Has Occurred

Under the fifth *Polaroid* factor, "actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *Museum of Modern Art*, 339 F. Supp. 3d at 378. "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 318. "This is particularly true when [as here] an infringing product or service has been on the market for only a

20

short time." *Id*. Nonetheless, if there is evidence of actual confusion, then that "is particularly relevant," as its "indicates a likelihood of confusion" occurring. *TushBaby, Inc.*, 2024 WL 4627452, at *7 (internal quotations and citations omitted); *see also Goat Fashion Ltd.*, 2020 WL 5758917, at *13 ("Although actual confusion need not be shown to prevail under the Lanham Act, *Lois Sportswear*, [t]here can be no more positive or substantial proof of the likelihood of confusion") (internal quotations and citations omitted).

Here, Defendants' Infringing WILDRIDE Marks caused actual confusion almost immediately upon Defendants' expansion within the United States marketplace. Attendees at the 2025 ABC Kids Expo in May 2025 expressed actual confusion. Nearly half a dozen representatives of Nordstrom expressed actual confusion in June 2025. Notably, this confusion occurred despite the representatives interacting—at that time—with only 6-to-8 other brands. In July 2025, Plaintiff began noticing that consumers were expressing actual confusion on social media—and several instances of actual confusion have occurred on social media in the weeks following the filing of this lawsuit. This evidence of anecdotal actual confusion tips the fifth *Polaroid* factor in Plaintiff's favor—especially given the short period of time that Defendants have used their Infringing WILDRIDE Marks within United States interstate commerce. *Accord New York City Triathlon*, *LLC*, 704 F. Supp. 2d at 319 (actual confusion occurred only months after defendant's entrance to the marketplace); *see also Museum of Modern Art*, 339 F. Supp. 3d at 361 (actual confusion evidence included confusion on social media); *TushBaby, Inc.*, 2024 WL 4627452, at *7 (*same*).

### v.    Defendants Entered the U.S. Marketplace in Bad Faith

Under the sixth *Polaroid* factor, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." *Hope Organics LLC*, 2021 WL

5919367, at *9.   When evaluating the defendant's intent, actual or constructive knowledge of the senior user combined with "similarities so strong that it seems plain that deliberate copying has occurred, [courts] have upheld findings of bad faith."   *Id*.   (internal quotations and citations omitted).  That is precisely the case here.

Prior to Defendants' entrance to the U.S. marketplace, Plaintiff had been using its WILDBIRD Marks to advertise and sell, *inter alia*, carriers for babies and carriers for toddlers throughout the United States for nearly a decade. Even if Defendants were not actually aware of Plaintiff's WILDBIRD Marks despite Plaintiff using them throughout the United States for over a decade, the '459 Registration for Plaintiff's WILDBIRD Word Mark gave Defendants constructive notice of Plaintiff's trademark rights for a WILD-formative mark for carriers.   *See* 15 U.S.C. § 1072 (Registration of a mark on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof").   This constructive knowledge, combined with Defendants' decision to enter the U.S. marketplace with nearly identical marks for identical products, allows this Court to infer bad faith by Defendants.  *See Hope Organics LLC*, 2021 WL 5919367, at *9.

### vi.    Products Offered Under Defendants' WILDRIDE Marks Are Inferior to Products Offered Under Plaintiff's WILDBIRD Marks

Under the seventh *Polaroid* factor, the court has "weigh cross-cutting considerations." *Goat Fashion Ltd.*, 2020 WL 5758917, at *14.   "On the one hand, the court must determine whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two."  *Id*.  On the other hand, if the products are roughly equal in quality, the court must also consider whether that very similarity of quality may tend to create confusion as to source by bringing the products into even closer proximity."   *Id*.  (internal quotations citations omitted).

Products offered under Plaintiff's WILDBIRD Marks have received numerous awards and favorable customer reviews. *See* Dkt. 10, Ex. 9. Products offered under Defendants' WILDRIDE Marks have already received negative customer reviews in the United States. For example, a customer on Nordstrom's website gave one of Defendants' products only 3 out of 5 stars; complained about its design; and described the product as "[o]verall, it's ok —not a must have." Dkt. 10, Ex. 10.

Accordingly, the seventh *Polaroid* factor favors Plaintiff. *See Goat Fashion Ltd.*, 2020 WL 5758917, at *14 (customer complaints about defendant's products tipped seventh *Polaroid* factor in plaintiff's favor).

### vii.    The Eighth *Polaroid* Factor Favors Plaintiff

Under the eighth *Polaroid* factor, "courts are to consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *TushBaby, Inc.*, 2024 WL 4627452, at *8. Plaintiff acknowledges that, generally speaking, parents purchasing accessories and clothing for their children are careful and discerning. *See id.* Nonetheless, Defendants' WILDRIDE Marks have confused parents and experienced retail buyers of the parties' products.

Accordingly, the eighth *Polaroid* factor—like the first, second, third, fifth, sixth, and seventh factors, respectively—favors temporarily restraining the use of Defendants' WILDRIDE Marks to prevent a likelihood of more confusion occurring until this Court can rule on Plaintiff's pending preliminary-injunction motion. *See Hope Organics LLC*, 2021 WL 5919367, at *11 (eighth factor favored preliminary injunction; "when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion"); *TushBaby, Inc.*, 2024 WL 4627452, at *8 (granting preliminary injunction where six of the eight *Polaroid* factors favored Plaintiff); *Museum of Modern Art*, 339 F. Supp. 3d

at 380 (*same*); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 342 (*same*); *Goat Fashion Ltd.*, 2020 WL 5758917, at *15 (granting preliminary injunction where five of the eight *Polaroid* factors favored Plaintiff); *NYP Holdings*, 63 F. Supp. 3d at 338 (*same*); and *NSE Baseball & Softball Facility, Inc.*, 2022 WL 1737011, at *11 (of the four relevant factors, three favored plaintiff).

Based on the foregoing, Plaintiff is likely to succeed on the merits of its Claims.

### B.  Plaintiff Will Suffer Irreparable Harm in the Absence of a Temporary Restraining Order

Plaintiff establishing a likelihood of success on the merits of its Claims creates a rebuttable presumption of irreparable harm. *See* 15 U.S.C. § 1116. Plaintiff also has *proven* irreparable harm. *See* Dkt. 10; *see also* Gunn Decl., ¶¶ 7-9. As background, "[i]rreparable harm is 'harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 Fed. Appx. 39, 44 (2d Cir. 2020) (internal quotations and citations omitted). In the trademark context, "[i]t is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 325; *see also Really Good Stuff, LLC*, 813 Fed. Appx. at 44 ("The loss of reputation and goodwill constitutes irreparable harm"). "And for good reason […] 'loss of control over one's reputation is neither calculable nor precisely compensable.'" *TushBaby, Inc.*, 2024 WL 4627452, at *8 (quoting *NYP Holdings*, 63 F. Supp. 3d at 342).

Here, Plaintiff has spent more than a decade investing substantial resources into its carefully curated WILDBIRD brand, which the WILDBIRD Marks identify in the marketplace. Defendant is freeriding off the reputation and goodwill of the WILDBIRD Marks by using the Infringing WILDRIDE Marks for the same and competitive products in the same marketing and trade channels to appeal to the same categories of customers. Unsurprisingly, Defendants'

WILDRIDE Marks have already caused actual confusion, which is likely to continue if Defendants expand their presence within the United States by offering their carriers at Target's stores.

Moreover, Plaintiff cannot control the use of Defendants' WILDRIDE Marks or monitor the quality of products offered thereunder, which already have received negative customer reviews. *See* Dkt. 10, ¶¶ 28-9; Gunn. Decl., ¶ 10. This lack of control, combined with consumers mistakenly associating Plaintiff with Defendants, leaves the reputation and goodwill of Plaintiff's carefully curated WILDBIRD Marks and brand in Defendants' hands. *See id.* This is textbook irreparable harm. *See also New York City Triathlon, LLC.*, 704 F. Supp. 2d at 325; *see also TushBaby, Inc.*, 2024 WL 4627452, at *8 ("Courts have consistently found irreparable harm to exist in situations where there is a likelihood of confusion between the marks, and where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement"); *Hope Organics LLC*, 2021 WL 5919367, at *12 ("Plaintiff has demonstrated the likelihood of confusion between the MUTHA and MTHR marks, and, therefore, absent a preliminary injunction, 'the reputation and goodwill cultivated by [Hope Organics] would be out of its hands'") (quoting *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 541)); *accord NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *11.

## C.    The Balance of Equities Favors Plaintiff

As discussed *supra*, Plaintiff will suffer irreparable harm in the absence of a temporary restraining order. *Accord Tushbaby, Inc.*, 2024 WL 4627452, at *9; *Hope Organics LLC*, 2021 WL 5919367, at *13. In stark contrast, temporarily restraining the use of Defendants' Infringing WILDRIDE Marks would not adversely affect Defendants. Defendants could still sell their products in the United States—just not under the Infringing WILDRIDE Marks. To the extent Defendants argue that a temporary restraining order would cause Defendants to lose money, that

is a crisis of Defendants' own making; not infringing is not a "hardship.[4]" *See Tushbaby, Inc.*, 2024 WL 4627452, at *9 ("And although a preliminary injunction is likely to carry economic costs for Appearing Defendants, such harms are largely self-inflicted given that [Appearing] Defendants took a calculated risk in launching a product with a trade dress virtually identical to the trade dress associated with TushBaby"); *accord Hope Organics LLC*, 2021 WL 5919367, at *13.

Based on the foregoing, the balance of hardships favors Plaintiff.

### D.    A Temporary Restraining Order Would Protect the Public From Additional Confusion

Temporarily restraining the use of Defendants' Infringing WILDRIDE Marks would benefit the public by preventing additional confusion.   *See Celine S.A.*, 2024 WL 4627666, at *4 ("'[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods or unknown origin or quality'") (quoting *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 344)); *see also Tushbaby, Inc.*, 2024 WL 4627452, at *9 ("The consuming public has a protectable interest in being free from confusion, deception and mistake"); *Goat Fashion Ltd.*, 2020 WL 5758917, at *16 ("Customer confusion has resulted from 1661's use of its GOAT mark in connection with apparel, and preventing this confusion would benefit the public").

## V.    CONCLUSION

Based on the foregoing, Plaintiff respectfully requests that this Court grant its motion for a temporary restraining order and enter the Proposed Order submitted herewith.

---

[4] For this reason, Plaintiff also respectfully submits that a bond is not warranted.  *See Goat Fashion Ltd.*, 2020 WL 5758917, at *16, n.6.

ACTIVE 714800301v1

Dated: September 19, 2025

Respectfully submitted,

GREENBERG TRAURIG, LLP

*/s/ Jonathan W. Thomas*
Jonathan W. Thomas (JT1016)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9219
Email: jonathan.thomas@gtlaw.com

Molly R. Littman-Johnson (*pro hac vice*)
90 South 7th St., Suite 3500
Minneapolis, Minnesota 55402
Tel:  (612) 259-9669
Fax: (612) 259-9700
Email: Molly.Littman@gtlaw.com

*Attorneys for Plaintiff Wildbird LLC*

ACTIVE 714800301v1

## **LOCAL RULE 7.1(C) CERTIFICATION**

The undersigned certifies that the foregoing document was prepared using Microsoft Word on a computer.  According to the word-count feature in Microsoft Word, the foregoing document contains 8,726 words, which is less than 8,750-word maximum under Local Rule 7.1(c).

*/s/ Jonathan W. Thomas*
Jonathan W. Thomas

*Attorney for Plaintiff Wildbird LLC*

28

ACTIVE 714800301v1

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on September 19, 2025, I served a true and correct copy of the foregoing document on the following counsel of record for Defendants via ECF and electronic mail:

Leo M. Lichtman
James M. Slater
ESCA LEGAL
Leo@esca.legal
James@esca.legal
1177 6th Avenue, 5th Floor
New York, New York 10036


<u>*/s/ Jonathan W. Thomas*</u>
Jonathan W. Thomas

*Attorney for Plaintiff*

29