UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILDBIRD, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>WILDRIDE B.V., and WILDRIDE USA CORP.,<br><br>    Defendants. | Case No. 1:25-cv-05993 (DLC) |

**DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF
<u>WILDBIRD LLC'S MOTION FOR A TEMPORARY RESTRAINING ORDER</u>**

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................... 1
BACKGROUND ............................................................................................................................ 3
ARGUMENT .................................................................................................................................. 8
    I.    There is No Change in the Status Quo Warranting Emergency Relief .............................. 8
    II.    The Court Should Consider Whether Sanctions Are Warranted ................................... 12
CONCLUSION ............................................................................................................................. 13

## TABLE OF AUTHORITIES

**Cases**

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
  600 U.S. 412 (2023) ............................................................................................................... 7

*Blakeman v. James*,
  2024 U.S. Dist. LEXIS 115441 (E.D.N.Y. Apr. 2024) ........................................................... 9

*Carter v. Sewell*,
  2023 U.S. Dist. LEXIS 194682 (S.D.N.Y. Oct. 31, 2023) .................................................. 8, 9

*Emmon v. Prospect Capital Corp.*,
  675 F.3d 138 (2d Cir. 2012) ................................................................................................. 12

*Hancock v. Essential Resources, Inc.*,
  792 F. Supp. 924 (S.D.N.Y. 1992) ....................................................................................... 10

*Jackson v. Johnson*,
  962 F. Supp. 391 (S.D.N.Y. 1997) ......................................................................................... 8

*JTH Tax, LLC v. Agnant*,
  62 F.4th 658 (2d Cir. 2023) .................................................................................................... 9

*Omnistone Corp. v. Cuomo*,
  485 S. Supp. 3d 365 (E.D.N.Y. 2020) .................................................................................... 9

*Pisarri v. Town Sports Int'l LLC*,
  758 F. App'x 188 (2d Cir. 2019) .......................................................................................... 10

*Playtex Prods. v. Georgia-Pacific Corp.*,
  390 F.3d 158 (2d Cir. 2004) ................................................................................................... 7

*Riseandshine Corp. v. PepsiCo, Inc.*,
  2024 U.S. Dist. LEXIS 32182 (2d Cir. 2024) ........................................................................ 6

*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) ..................................................................................................... 8

*Spencer Trask Software & Info Servs., LLC v. RPost Int'l, Ltd.*,
  190 F. Supp. 2d 577 (S.D.N.Y. 2002) .................................................................................... 9

*Stringer v. Simon & Schuster, Inc.*,
  2025 U.S. Dist. LEXIS 172398 (S.D.N.Y. Sept. 4, 2025) .................................................... 10

*Windpower USA, Inc. v. Jacksonville Energy Park, LLC*,
  2012 U.S. Dist. LEXIS 55552 (D. Vt. Apr. 18, 2012) ......................................................... 11

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................................... 9

*Woodstock Ventures, LC v. Woodstock Roots LLC*,
  837 F. App'x 837 (2d Cir. 2001) ............................................................................................ 9

**Statutes**

28 U.S.C. § 1927 ........................................................................................................................ 13

Defendants Wildride B.V. and Wildride USA Corp. (collectively, "Defendants") respectfully submit this Memorandum of Law in opposition to Plaintiff Wildbird LLC's ("Plaintiff") Motion for a Temporary Restraining Order (ECF No. 36) (the "Motion"). This Memorandum is accompanied by the declarations of Leo M. Lichtman ("Lichtman Decl.") and Britt Schoorl ("Schoorl Decl.") and exhibits thereto.

## PRELIMINARY STATEMENT

As will be explained in Defendants' forthcoming opposition to Plaintiff's preliminary-injunction motion, this lawsuit is baseless. To wit, this lawsuit is premised on Defendants' use of a mark that indisputably has nothing in common with Plaintiff's mark, other than the shared use of a word, already used as a source indicator by countless others. A word that is naturally associated with the parties' respective markets. A word that Plaintiff itself admitted, *under oath*, to being "obviously a generic word." Further underscoring the generic nature of this word, *both* parties' brand strategies involve heavy emphasis on the *other* word in their mark respective marks, i.e. the words "**bird**" and "**ride**," which Plaintiff admits hold different meanings. Plaintiff furthermore *admittedly* offers a premium product to a group of consumers that is already highly discerning as it is: parents that have newborns or are expecting. But perhaps most telling, Plaintiff misleadingly omits that the "actual confusion" which forms the basis for Plaintiff's suit in the first place is nothing other than a *de minimis* handful of statements comprised of unauthenticated hearsay by declarants that Plaintiff does not—because it cannot—even identify. Even if admitted, however, *the statements do not evidence consumer confusion*.

More fundamentally however, Plaintiff's "gotcha" request for emergency relief can easily be dispensed with because it is not premised on any emergency. To be clear: ***Defendants do not intend to sell WILDRIDE-brand carriers in Target stores until March 2026***. In other words,

1

there is no "emergency." There is, however, a preliminary injunction motion pending, which will be fully briefed and heard by this Court *months* before any in-store Target roll-out, giving the parties and this Court ample opportunity to find legal certainty in the interim.

In addition to being baseless, this Motion was entirely avoidable. The purportedly "new" information was always discoverable, Defendants were *never hiding it*, and Plaintiff is misguided if it believes that this Motion will paint Defendants as deceitful. Had Plaintiff's counsel simply asked Defendants at their deposition on September 15 about its plans, they would have answered. Had Plaintiff's counsel simply picked up the phone and called Defendants' counsel upon making this "discovery" the evening of September 17, the parties could have sorted out any misunderstanding. Instead of doing either of those things, Plaintiff raced to the courthouse on the Friday before a major Jewish holiday to cry wolf over **the unsubstantiated hearsay of an unidentified declarant**, needlessly multiplying the proceedings and driving up fees better devoted to sorting out a resolution, something Defendants have emphasized their willingness to explore repeatedly both in and out of settlement conference, notwithstanding the meritless nature of this lawsuit.[1]

Plaintiff's Motion, which could have been avoided with a simple phone call, should be denied, and this Court should consider whether sanctions are warranted for this willful waste of resources.

---

[1] It is additionally worth noting that this "emergency" Motion is being brought only one day after counsel for Defendants notified Plaintiff's counsel that he had improperly instructed Plaintiff not to divulge communications on the basis of privilege, even though Plaintiff admittedly divulged such communications to a third-party, Jason Somerville. Defendants present a declaration of Jason Somerville, who misleadingly refers to himself as "Fractional Chief Financial Officer" for Plaintiff (ECF No. 40 ¶ 2) while omitting that he is in fact *not employed* by Plaintiff (he is employed by an outside agency), works part-time for Plaintiff on a project-by-project basis, does not hold himself out to the public as an employee of Plaintiff, and does not maintain any separate office space with Plaintiff, as Plaintiff admitted at its deposition.

**BACKGROUND**

A more fulsome background with citations to the record including depositions—much of which has been designated "CONFIDENTIAL" and "HIGHLY CONFIDENTIAL" under the stipulated protective order (ECF No. 26)—will be provided in connection with Defendants' forthcoming opposition to the Plaintiff's preliminary-injunction motion.[2]

Briefly, however, this case involves two consumer brands that both start with the word "WILD" and are targeted towards young parents, and little else in common. Since 2014, Plaintiff has offered products geared towards parents of newborns, with its WILBIRD-branded "Baby Carriers," *see* Lichtman Decl. ¶ 3, Ex. A, such as its ring sling carrier, being core product offerings. The brand is built off of slogans that put emphasis on the word "BIRD," such as "[a] happy place for your little bird," and "WildBird Takes Flight" (ECF No. 10-5), and the stylized mark, which is what consumers see an overwhelming majority of the time, includes a clean, sans-serif typeface, and the silhouette of a bird over the word "BIRD" in its branding, which is of course a clear nod to the word "bird," and gives more weight to the right side of Defendants' mark:



---

[2] Given that the parties' depositions took place only last week, certified deposition transcripts have not yet been circulated or reviewed. Notably, the recent joint request to extend the Court's scheduling order was something *prompted by Plaintiff's counsel*, based on the need to reschedule Plaintiff's deposition to September 17. In a show of courtesy, Plaintiff's counsel offered to agree to push back the preliminary injunction schedule to accommodate Plaintiff's later deposition date, noting to Defendants' counsel, "[w]e don't want to short-change your clients' opposition time frame." Lichtman Decl. ¶ 4, Ex. B. This Motion, filed only two days after Plaintiff's deposition and before a certified transcript could be prepared, apparently walks back from counsel's prior representation.

Since 2021, Defendants have offered WILDRIDE-branded products, and have used their mark in commerce around the world since that time, including in the United States. Schoorl Decl. ¶¶ 3, 11, 13. They hold registered trademarks in dozens of other territories around the world. *Id.* ¶¶ 16-20. Their brand is already sold in over 5,000 stores across more than 90 countries, ranging from luxury department stores to online retailers and specialty boutiques, and has been since well before Plaintiff filed suit. *Id.* ¶ 21. Defendants also offer a carrier product, but the product is designed to ergonomically hold toddlers weighing 18 to 44 lbs. *Id.* ¶ 4. Defendants do not offer any product marketed as a "baby carrier." *Id.* ¶ 5. They do, however, offer products not offered by Plaintiff, such as a leopard-print scarf and sunglasses for "bold little explorers." *Id.* ¶ 10, Ex. B. Like Plaintiff, Defendants also position their branding around the second part of their mark (i.e. WILD**BIRD** and WILD**RIDE**), and their marketing initiatives have developed around the notion that carrying a toddler (as opposed to a newborn) can, quite literally, be described as a "wild ride." *Id.* ¶ 6. Defendants include marketing taglines on their product packaging and displays such as "ENJOY THE RIDE!" and publish a blog series titled *A Wildride With*, which showcases active mothers. *Id.* ¶ 7, Ex. A. Playing into the more adventurous connotation of the word "wild" and segment of the market they target, Defendants often pair their mark (which is in a serif typeface) with a stylized image of a wild cat, and the tagline: "THE TODDLER SWING CARRIER":



Besides the parties to this lawsuit, countless other third-parties use the word "WILD" as part of their mark, to market products with children in mind. For instance, there are hundreds of live registrations and applications of marks that include the word "WILD" and either the word "baby" or "children" in the description of goods and services offered. Lichtman Decl. ¶ 5, Ex. C.

4

This is a natural consequence of the fact that "WILD" is commonly associated with young children. Innumerable number of stores sell baby rompers and "onesies" with phrases like "Born Wild." *Id.* ¶ 6, Ex. D. A common theme for a baby shower is "Wildflower" shower. *Id.* ¶ 7, Ex. E. A common theme for a child's first birthday is a "Wild One" party. *Id.* ¶ 8, Ex. F. Wild animal motifs are a staple in the bedrooms of young children. *Id.* ¶ 9, Ex. G. And of course, the iconic children's book *Where the Wild Things Are* by Maurice Sendak, later adapted into a feature film, plays off this same theme. Plaintiff itself sells its products in boutique baby stores with names like *The Wild*. *Id.* ¶ 10, Ex. H. Plaintiff itself referred to the word "wild" as "obviously a generic word." *See* Lichtman Decl. ¶ 11, Ex. I, Transcript of Plaintiff's Sept. 17, 2025 30(b)(6) Deposition ("Pl. Tr.") 219:5-24.[3]

      Plaintiff brought this suit and sought injunctive relief on a non-emergency basis on July 22, 2025. (ECF No. 7-8.) It alleged that Defendants recently entered the United States market, and that almost immediately, Plaintiffs faced, and are continuing to face, actual confusion. None of this is true. Defendants have been in the United States market *for years*, Schoorl Decl. ¶¶ 11, 13-14, and while it recently formed Wildride USA Corp. to establish a physical presence in the United States, this was a result of the continually growing demand in the United States that Defendants had steadily built over the last five years. *Id.* ¶ 15. With respect to "actual confusion," Plaintiff has identified, in total, the following, and nothing else[4]:

---

[3] Because the Rule 30(b)(6) deposition of Plaintiff was provisionally designated HIGHLY CONFIDENTIAL – ATTORNEY'S EYES ONLY, Defendants share only limited excerpts from the rough transcript that cannot reasonably be argued fall under the protective order, with certain portions in the excerpts redacted. Defendants intend to provide more complete records once the certified transcripts are prepared, under seal if necessary, in support of their opposition to Plaintiff's preliminary-injunction motion.

[4] Plaintiff's verified response to Defendants' Interrogatory No. 1, which prompted the lines of questioning concerning Plaintiff's "actual confusion" evidence, is attached as Exhibit J to the Lichtman Decl.

1.      Two (2) in-person events (identified as the ABC Expo and the Nordstrom brand showcase) where a total of six (6) declarants—only one of whom Plaintiff could identify at its deposition—asked whether Plaintiff was connected to Defendants. Plaintiff answered in the negative, and no one gave it a second thought. Plaintiff further admitted that these were business-to-business (B2B) events, and not directed towards consumers. *See* Pl. Tr. 139:25-173:1; 176:14-177:6; *see Riseandshine Corp. v. PepsiCo, Inc.*, 2024 U.S. Dist. LEXIS 32182, at *3 (2d Cir. 2024) ("We note that [plaintiff's] anecdotal evidence of actual confusion, which is largely centered on the perceptions of industry professionals, does little to show likelihood of *consumer* confusion") (emphasis in original). Finally, Plaintiff admitted that the "confusion" it was so concerned about was simply that it did not want to make the "extra effort that it takes to identify who we are," because "[t]here's just too many brands. There's too much going on for these professionals to digest who all the Wilds are and who all the yadda, yadda, yadda brands are." Pl. Tr. 160:17-161:9.

2.      Five (5) social media posts on Instragram where an unknown user apparently "tagged" or "mentioned" Plaintiff's Instagram handle @wildbird while appearing to hold Defendants' product. Though Plaintiff testified that it gets at least "20-plus" tags *per day*, Pl. Tr. 209:7-15, it produced only five instances *over the course of Defendants' five-year existence* in which Plaintiff has ever been mistakenly tagged with Defendants' product. Plaintiff could not even authenticate these five social media posts (some of which were transparently cropped) let alone identify who even captured them, and could not identify any of the users that purportedly tagged @wildbird, *let alone whether any of them were*

6

*even U.S.-based consumers*.[5] *See* Pl. Tr. 182:12-206:7, 232:13-20. Plaintiff did not reach out to any of these users, or ask why they may have mistakenly tagged @wildbird, but speculated that countless other handles starting with "wild" might auto-fill when a user types "wild" into Instagram's search prompt, given that "wild" is "obviously a generic word." Pl. Tr. 219:5-24.[6] Tellingly, Plaintiff has not identified any instance in which users on TikTok accidentally tagged its TikTok handle, @mywildbird. *See* Pl. Tr. 207:23-208:1.[7]

Though Plaintiff initially sought non-emergency injunctive relief, knowing full well that the Court would hear that motion on October 30 (ECF No. 33), Plaintiff now asks for *emergency* relief. It brings this Motion because an unidentified declarant at "Keystone Partners" purportedly told Plaintiff that Defendants "intend to advertise and sell their WILDRIDE-branded carriers at Target stores in the United States." (ECF No. 38, ¶ 6; *see also* ECF No. 37, at 11.) If this unidentified declarant provided Plaintiff with any kind of timeline for when Defendants would purportedly be "advertising and selling their WILDRIDE-branded carriers in Target's retail locations" —a timeline that might have prompted Plaintiff to represent to the Court that it needs immediate intervention—Plaintiff apparently did not believe it worth bringing to the Court's attention.

---

[5] It is well established that trademark rights are territorial, such that each country is empowered to grant trademark rights and police infringement only within its borders. *See Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426 (2023).

[6] *See, e.g., Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) ("[T]he fact that the computer associates" a search for one mark with the other mark "reflects little, if anything, about whether consumers are actually confused").

[7] By contrast, consumers can clearly differentiate the two brands, as evidenced by inquiries Defendants have received from marketers who have expressed interest in working with Defendants, notwithstanding that they had also worked with Plaintiff previously. Schoorl Decl. ¶ 23, Ex. C.

Notably, Plaintiff was well aware that Defendants were in retail stores when it brought its *non-emergency* motion, arguing at the onset that it needs injunctive relief because the parties' products "are sold in the same channels." (ECF No. 7, at 18.) In fact, Plaintiff represented to this Court on July 22, 2025 that it believed Defendants would not stop using the WILDRIDE trademark based on a purported meeting Plaintiff's CEO had "*with our contact at Target*." (ECF No. 10, ¶ 25) (emphasis added.) So Plaintiff was well aware from the inception of this lawsuit that Defendants were going to continue offering its products—including possibly in Target—when it knowingly sought *non-emergency* relief nearly two months ago. It is unclear why Plaintiff believes that Defendants' continued sales in those "same channels" presents a "seismic shift in the parties' status quo" (*see* ECF No. 37, at 2) warranting the need for immediate relief from the Court. However, to the extent Defendants' sales into Target stores somehow does present a "seismic shift" in the status quo, that event—which is what prompted this emergency hearing—will not culminate until well into next year. ***Defendants are not releasing their products into Target stores until March 2026***. Schoorl Decl. ¶ 25.

This is information that Plaintiff would have learned had its counsel simply asked Defendants at their deposition on September 15. Schoorl Decl. ¶ 26. He did not do so. *Id.* This is also information that Plaintiff could have learned if its counsel simply picked up the phone and called Defendants' counsel to confirm. Lichtman Decl. ¶¶ 12-14. He did not do so. *Id.*

## ARGUMENT

I.   **There is No Change in the Status Quo Warranting Emergency Relief**

"A temporary restraining order . . . is an extraordinary remedy that will not be granted lightly." *Carter v. Sewell*, 2023 U.S. Dist. LEXIS 194682, at *1 (S.D.N.Y. Oct. 31, 2023) (citing *Jackson v. Johnson*, 962 F. Supp. 391, 392 (S.D.N.Y. 1997)). It requires "a clear showing that the plaintiff is entitled to such relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting

8

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)); *see also Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2001) (Issuing preliminary injunctions requires that "the movant, *by a clear showing*, carries the burden of persuasion.") (citation omitted, emphasis in original). A showing of irreparable harm is "the single most important prerequisite." *Blakeman v. James*, 2024 U.S. Dist. LEXIS 115441, at *51 (E.D.N.Y. Apr. 2024) (citing *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023)).

Critically, the purpose of a temporary restraining order in particular is "limited to preserving 'an existing situation *in statu[s] quo* until the court has an opportunity to pass upon the merits of the demand for a preliminary injunction." *Carter*, 2023 U.S. Dist. LEXIS 194682, at *1 (citing *Spencer Trask Software & Info Servs., LLC v. RPost Int'l, Ltd.*, 190 F. Supp. 2d 577, 580 (S.D.N.Y. 2002)). Accordingly, a plaintiff "must show that without a temporary restraining order, 'they will suffer an injury that is neither remote nor speculative, but *actual and imminent*.'" *Id.* (emphasis added). "In other words, the Court must examine whether the movants have demonstrated a threat of irreparable harm that will occur *immediately* to justify a temporary restraining order, while the temporal context of a preliminary injunction takes a longer view." *Omnistone Corp. v. Cuomo*, 485 S. Supp. 3d 365, 367-68 (E.D.N.Y. 2020) (emphasis added).

Here, Plaintiff has already moved for injunctive relief on a non-emergency basis (ECF No. 8), which is subject to a briefing and hearing schedule *that Plaintiff approved*. (ECF Nos. 18, 33.) That schedule was pushed back by one week at the urging of *Plaintiff*, to accommodate a deposition schedule that worked for it. (ECF No. 33.); Lichtman Decl. ¶ 4, Ex. B. Plaintiff now accuses Defendants of trying to create a "seismic shift" in the status quo, because an ***unidentified third party*** purportedly told Plaintiff that Defendants would, ***at an unidentified point in the future***, start offering its product in Target retail locations. (ECF No. 38, ¶ 6.) In a remarkable

9

display of gamesmanship, Plaintiff now contends—two days after admitting under oath at its deposition that it has no real evidence of actual confusion and before any certified transcript could be prepared—that it deserves to *immediately* obtain injunctive relief in the form of *immediately* preventing Defendants from offering their product under their mark in any retail store, with the exception of Nordstrom.[8] It does so, despite admitting in July, when it moved for *non-emergency* relief, that it was *already in contact* with Target about Defendants' products. (ECF No. 10, ¶ 25.)

At bottom, Plaintiff fails to explain why its alleged harm is not sufficiently addressed by the preliminary-injunction motion, which it knowingly brought on a non-emergency basis, and which is subject to a schedule that it knowingly approved. It offers nothing but hypothetical alleged harm with no clear timeline, well short of the burden it must meet to obtain the extraordinary relief it now seeks. *See Hancock v. Essential Resources, Inc.*, 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("[I]njunctive relief cannot rest on mere hypotheticals."); *Pisarri v. Town Sports Int'l LLC*, 758 F. App'x 188, 190 (2d Cir. 2019) ("The irreparable injury prerequisite . . . requires proof of harm that is 'actual and imminent' and 'not remote or speculative.'"); *see also Stringer v. Simon & Schuster, Inc.*, 2025 U.S. Dist. LEXIS 172398, at *8-9 (S.D.N.Y. Sept. 4, 2025) (explaining that a plaintiff must do more than simply "assert that [consumer] confusion

---

[8] Plaintiff's Motion does not seek to restrain Defendants from selling its goods in Nordstrom (ECF No. 36, at 2) presumably because it had already identified Nordstrom when it requested *non-emergency* injunctive relief months earlier. (ECF No. 9, at 8; ECF No. 38, ¶ 4.) This merely underscores the fact that there is no emergency, begging the question why Plaintiff is willing to agree to a months-long discovery and briefing schedule over Defendants' sales of their goods in Nordstrom, but suddenly needs *immediate* injunctive relief with respect to *all other retailers* because Defendants might begin selling their product in Target at some unidentified point in the future.

10

[resulting from infringement] will irreparably injure them" and must provide more than "conclusory statements of loss of reputation and goodwill").

Critically, Plaintiff does not meet its burden because it simply cannot do so. Plaintiff tellingly does not give the Court any details about the timeline of the alleged rollout of Defendants' products in Target because the fact is that while Defendants have had discussions with Target, those discussions have culminated in a timeline that will not place Defendants' products in Target stores until well into next year, Schoorl Decl. ¶ 25, *months* after full briefing and a hearing on the already pending preliminary-injunction motion. (ECF No. 33.)[9]

To make matters worse, the proposed temporary restraining order goes wildly beyond addressing the purportedly "seismic shift" that Plaintiff is so concerned about. *See, e.g., Nordic Windpower USA, Inc. v. Jacksonville Energy Park, LLC*, 2012 U.S. Dist. LEXIS 55552, at *53 (D. Vt. Apr. 18, 2012) ("Because injunctive relief is an extraordinary remedy, it must be no broader than necessary to avert the alleged irreparable harm."). Despite premising this "emergency" Motion on the alleged roll-out of Defendants' products at Target stores, Plaintiff asks this Court to temporarily and *immediately* restrain Defendants from using their WILDRIDE mark in "any third-party store or any third-party website in the United States." (ECF No. 36.) Plaintiff's Motion does not even bother providing a basis for why such a sweeping restraint is necessary to avert the alleged harm that prompted this Motion, particularly where it was clearly aware, or could have easily learned months earlier, that Defendants were in other stores or had plans to be, including Target for that matter. *See* Schoorl Decl. ¶ 21 (noting that Defendants'

---

[9] The fact that Target has had extensive discussions with Defendants about rolling out their products further underscores that there is no likelihood of confusion. It strains credulity to suggest that, if the brands really were practically identical as Plaintiff suggests, and if there really was a concern that consumers could not tell the brands apart as Plaintiff suggests, Target would willingly enter deals with *both* brands to carry *both* brands' products in their retail stores.

11

WILDRIDE products have been sold in thousands of stores since before this lawsuit was filed); (ECF No. 10 ¶ 25) (averring in July that Plaintiff was already in contact with Target concerning Defendants' activities). In fact, other than the allegation that Defendants will, *at some unspecified time*, sell their products in Target stores, Plaintiffs offer no basis at all for why the relief it seeks cannot wait until after Defendants have had an opportunity to respond to Plaintiffs' preliminary-injunction motion.

At bottom, Plaintiff is well aware that its case has no legs to stand on, and is transparently lashing out in a desperate attempt to strong-arm Defendants before they can have an opportunity to be fully heard on the merits. Plaintiff's Motion is meritless and should be denied.

## II.     The Court Should Consider Whether Sanctions Are Warranted

Beyond a lack of merit, Plaintiff's Motion represents an egregious waste of judicial resources. It serves no purpose other than an attempt to force a ruling on the merits of Plaintiff's preliminary-injunction request before its own damning testimony could be memorialized in a certified deposition transcript. The lack of any good-faith basis for bringing this "emergency" Motion could not be more apparent, given the fact that Plaintiff—on the Friday before a Jewish high holiday and merely two days after referring to the shared word in the parties' marks as "obviously a generic word," Pl. Tr. 219:13-19—is now seeking an "emergency" ruling squarely intended to have a devastating impact on Defendants' business before it can be heard on Plaintiff's underlying preliminary-injunction request, knowing full well that it lacks any factual basis to treat this as a purported "emergency." *See, e.g., Emmon v. Prospect Capital Corp.*, 675 F.3d 138, 143 (2d Cir. 2012) (explaining that "bad faith" means "motivated by improper purposes such as harassment or delay" and upholding imposition of sanctions in connection with an improperly filed TRO request).

12

Indeed, its Motion is entirely devoid of such basis. The sole reason given for why Plaintiff is treating this as an emergency is that its CEO, Nate Gunn, was purportedly informed by someone—who Plaintiff refuses to even identify—that "Defendants intend to advertise and sell their WILDRIDE-branded carriers at Target stores in the United States," and **nothing else**. (ECF No. 38, ¶ 6.) Of course, Plaintiff already *admitted* to being in contact with Target about Defendants months earlier, when it moved for *non-emergency* relief, so this is nothing new (ECF No. 25 ¶ 10.) But more importantly, if Plaintiff had any evidence at all to suggest that this alleged expansion was immediate enough to warrant *emergency* relief, it would have provided it. Finally, if Plaintiff truly had some concern that this expansion was immediate, it could have, and would have, learned that it was not, if it simply asked. Its counsel notably had seven hours to do so when it deposed Defendants last week, and two days between the purported September 17 "discovery" and the filing of this Motion to contact Defendants' counsel and clear any up any misunderstandings. Plaintiff's counsel did none of those things, but instead, chose to lie in wait before ambushing Defendants with a wholly manufactured "emergency."

This Motion was utterly avoidable, and lacks any semblance of a good-faith basis for bringing it now—particularly when there is already a preliminary injunction schedule *that Plaintiff approved* and utterly no basis to depart from it. Accordingly, Defendants respectfully contend that this Court should consider whether a monetary sanction is appropriate pursuant to 28 U.S.C. § 1927 or the Court's inherent power to deter such vexatious litigation conduct.

## **CONCLUSION**

For the foregoing reasons, Plaintiff's Motion should be denied, and this Court should consider the imposition of sanctions against Plaintiff and/or Plaintiff's counsel.

Dated: September 22, 2025

        Respectfully submitted,

        */s/ Leo M. Lichtman*
        Leo M. Lichtman
        James M. Slater (admitted *pro hac vice*)
        ESCA Legal LLC
        1177 6th Avenue, 5th Floor
        New York, NY 10036
        Tel: 347-745-2535
        leo@esca.legal
        james@esca.legal

        *Attorneys for Defendants Wildride B.V. and Wildride USA Corp.*