UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

WILDBIRD, LLC,

      Plaintiff,

v.

WILDRIDE B.V., and WILDRIDE USA CORP.,

      Defendants.

Case No. 1:25-cv-05993 (DLC)

**DEFENDANTS' MEMORANDUM OF LAW IN
<u>OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

LEGAL STANDARD .................................................................................................................... 4

ARGUMENT .................................................................................................................................. 4

I.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS ................................... 4

   a.    Plaintiff's Lanham Act Claims are Unlikely to Succeed ................................................. 4

     i.    Plaintiff's Marks are Weak, Meriting Narrow Protection ......................................... 5

       1.    Plaintiff premises this lawsuit on the shared use of a widely-used word. .............. 6

       2.    Plaintiff has not shown acquired distinctiveness in the marketplace...................... 8

     ii.    The Parties' Marks Give Markedly Different Commercial Impressions.................. 11

     iii.    The Parties' Goods and Services Do Not Overlap.................................................... 15

     iv.    Plaintiff Offers No Evidence of Bridging the Gap .................................................. 17

     v.    Plaintiff Lacks Any Evidence of Actual Confusion. ................................................. 18

       1.    Plaintiff's In-Person Conversations With Industry Professionals Do Not Evidence Actual Confusion............................................................................................................. 19

       2.    Plaintiff's "Evidence" of Five Mistaken "Tags" Is Not Evidence of Actual Confusion ............................................................................................................................ 21

       3.    Nordstrom's Search Results are Not Evidence of Actual Confusion ................... 22

       4.    There is Ample Evidence that Consumers See the Parties as Two Separate Brands ……………………………………………………………………………………23

     vi.    Defendants Adopted the WILDRIDE Mark in Good Faith ...................................... 24

     vii.    The Respective Quality of the Parties' Goods and Services Does Not Favor a Finding of Infringement.................................................................................................... 24

     viii.    Consumers in the Relevant Markets can Tell the Difference ............................... 25

   b.    Plaintiff's State Law Claims Are Unlikely to Succeed ................................................. 25

     i.    General Business Law § 360-l ................................................................................... 25

     ii.    Trademark Infringement and Unfair Competition.................................................... 26

II.    OTHER FACTORS WARRANT DENIAL OF INJUNCTIVE RELIEF ......................... 26

   a.    Plaintiff Has Not Demonstrated Irreparable Harm ........................................................ 26

   b.    The Balance of Hardships Weighs Heavily in Defendants' Favor ................................ 28

   c.    The Requested Relief Disserves the Public.................................................................... 29

III.    IN THE ALTERNATIVE, A SIZABLE BOND IS WARRANTED ............................ 29

CONCLUSION.............................................................................................................................. 29

## TABLE OF AUTHORITIES

**Cases**

*24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*,
   447 F. Supp. 2d 266 (S.D.N.Y. 2006) ........................................................ 6

*Abitron Austria GmbH v. Hetronic Int'l, Inc.*,
   600 U.S. 412 (2023) ........................................................................... 21

*Am. Cyanamid Corp. v. Connaught Labs., Inc.*,
   800 F.2d 306 (2d Cir. 1986) .................................................................. 7

*Benihana, Inc. v. Benihana of Tokyo, LLC*,
   784 F.3d 887 (2d Cir. 2015) .................................................................. 4

*Blackrock Allocation Target Shares v. Wells Fargo Bank*,
   247 F. Supp. 3d 377 (S.D.N.Y. 2017) ..................................................... 17

*Bobcar Media, LLC v. Aardvark Event Logistics*,
   554 F. Supp. 3d 606 (S.D.N.Y. 2021) ..................................................... 10

*Car-Freshner Corp. v. Am. Covers, LLC*,
   980 F.3d 314 (2d Cir. 2020) .................................................................. 9

*Citibank, N.A. v. Citytrust*,
   756 F.2d 273 (2d Cir. 1985) .................................................................. 27

*Coscarelli v. ESquared Hosp. LLC*,
   364 F. Supp. 3d 207 (S.D.N.Y. 2019) ..................................................... 27

*Dana Braun, Inc. v. SML Sport Ltd.*,
   2003 U.S. Dist. LEXIS 21349 (S.D.N.Y. Nov. 25, 2003) ............................. 6

*Easy Spirit, LLC v. Skechers U.S.A., Inc.*,
   571 F. Supp. 3d 185 (S.D.N.Y. Nov. 16, 2021) ........................... 9, 11, 14, 25, 26

*Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*,
   2021 WL 1372658 (S.D.N.Y. Apr. 12, 2021) ........................................... 26

*Estee Lauder Inc. v. The Gap, Inc.*,
   108 F.3d 1503 (2d Cir. 1997) ................................................................ 5

*Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*,
   897 F.3d 413 (2d Cir. 2018) .................................................................. 5

*Fed. Express Corp. v. Fed. Espresso, Inc.*,
   201 F.3d 168 (2d Cir. 2000) .................................................................. 14

*Gameologist Grp., LLC v. Sci Games Int'l, Inc.*,
   838 F. Supp. 2d 141 (S.D.N.Y. 2011) ..................................................... 10

*General Cigar Co. v. G.D.M. Inc.*,
   988 F. Supp. 647 (S.D.N.Y. 1997) ......................................................... 25

*Giggle, Inc. v. netFocal Inc.*,
   856 F. Supp. 2d 625 (S.D.N.Y. 2012) ............................... 6, 11, 14, 15, 19, 23

*Hershey Foods Corp. v. Voortman Cookies Ltd.*,
   367 F. Supp. 2d 596 (S.D.N.Y. 2005) ..................................................... 15

*Hope Organics LLC v. Preggo Leggings LLC*,
   2021 U.S. Dist. LEXIS 239779 (S.D.N.Y. Dec. 15, 2021) ............................. 24

*Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*,
    335 F. Supp. 3d 566 (S.D.N.Y. 2018) ................................................................ 17

*Interlink Int'l Fin. Servs., Inc. v. Block*,
    145 F. Supp. 2d 312 (S.D.N.Y. 2001) ................................................................ 29

*Jackpocket, Inc. v. Lottomatrix NY LLC*,
    645 F. Supp. 3d 185 (S.D.N.Y. 2022) .................................................................. 6

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
    58 F.3d 27 (2d Cir.1995) ................................................................................... 29

*Kalamata Capital Grp., LLC v. Newco Capital Grp., LLC*,
    2023 U.S. Dist. LEXIS 189156 (S.D.N.Y. Oct. 20, 2023) ..................................... 8

*Lang v. Retirement Living Publ'g Co.*,
    949 F.2d 576 (2d Cir.1991) ............................................................................ 7, 18

*Lebewohl v. Heart Attack Grill LLC*,
    890 F. Supp. 2d 278 (S.D.N.Y. 2012) ............................................................... 18

*Limited v. Macy's Merch. Grp. Inc.*,
    2016 U.S. Dist. LEXIS 101151 (S.D.N.Y. Aug. 2, 2016) ....................................... 6

*Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*,
    641 F. Supp. 1005 (E.D.N.Y. 1986) .................................................................. 29

*Lopez v. Gap, Inc.*,
    883 F. Supp. 2d 400 (S.D.N.Y.  2012) ........................................................... 10, 11

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
    426 F.3d 532 (2d Cir. 2005) ............................................................................. 11

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
    454 F.3d 108 (2d Cir. 2006) ............................................................................. 11

*LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ............................................................... 22

*Medici Classics Prds., LLC v. Medici Grp. LLC*,
    683 F. Supp. 2d 304 (S.D.N.Y. 2010) ........................................................... 15, 18

*MidCap Bus. Credit, LLC v. MidCap Fin. Trust*,
    2023 U.S. Dist. LEXIS 17953 (S.D.N.Y. Feb. 2, 2023) ....................................... 14

*Mondo, Inc. v. Sirco Int'l Corp.*,
    1998 U.S. Dist. LEXIS 18996 (S.D.N.Y. Dec. 3, 1998) ......................................... 6

*Nabisco v. Warner-Lambert Co.*,
    32 F. Supp. 2d 690 (S.D.N.Y. 1999) .............................................................. 6, 11

*Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*,
    198 F. Supp. 2d 474 (S.D.N.Y. 2002) ............................................................... 10

*New World Sols., Inc. v. NameMedia Inc.*,
    150 F. Supp. 3d 287 (S.D.N.Y. 2015) ............................................................... 26

*Nike, Inc. v. B&H Customs Servs.*,
    565 F. Supp. 3d 498 (S.D.N.Y. 2021) ................................................................. 5

*Nora Bevs., Inc. v. Perrier Grp. Of Am., Inc.*,
    269 F.3d 114 (2d Cir. 2001) ............................................................................. 20

*Playtex Prods. v. Georgia-Pacific Corp.*,
  390 F.3d 158 (2d Cir. 2004) ................................................................................ 22
*Polaroid Corp. v. Polarad Elecs. Corp.*,
  287 F.2d 492 (2d Cir. 1961) .................................................................................. 5
*Reply All Corp. v. Gimlet Media, LLC*,
  843 F. App'x 392 (2d Cir. 2021) ................................................... 18, 22, 25, 26
*RiseandShine Corp. v. PepsiCo, Inc.*,
  41 F.4th 112 (2d Cir. 2022) .............................................................................. 7, 12
*RiseandShine Corp. v. PepsiCo., Inc.*,
  2024 U.S. App. LEXIS 32182 (2d Cir. Dec. 19, 2024) ..................................... 7, 19
*Salinger v. Colting*,
  607 F.3d 68 (2d Cir. 2010) .................................................................................... 4
*Savin Corp. v. Saving Grp.*,
  391 F.3d 439 (2d Cir. 2004) ................................................................................ 23
*Star Indus. v. Bacardi & Co.*,
  412 F.3d 373 (2d Cir. 2005) .......................................................................... 19, 24
*Steelite Int'l U.S.A., Inc. v. McManus*,
  2021 U.S. Dist. LEXIS 80528 (S.D.N.Y. Apr. 27, 2021) ..................................... 29
*Strange Music, Inc. v. Strange Music, Inc.*,
  326 F. Supp. 2d 481 (S.D.N.Y. 2004) ................................................................. 15
*Streetwise Maps v. VanDam, Inc.*,
  159 F.3d 739 (2d Cir. 1998) .................................................................................. 6
*Stringer v. Simon & Schuster, Inc.*,
  2025 U.S. Dist. LEXIS 172398 (S.D.N.Y. Sept. 4, 2025) .................................... 27
*Sunenblick v. Harrell*,
  101 F.3d 684 (2d Cir. 1996) ................................................................................ 15
*Swanson v. Georgetown Collection*,
  1995 WL 72717 (N.D.N.Y. Feb. 14, 1995) ........................................................ 15
*Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*,
  964 F. Supp. 733 (S.D.N.Y. 1997) ...................................................................... 20
*USPTO v. Booking.com B.V.*,
  591 U.S. 549 (2020) ............................................................................................ 12
*Weight Watchers Int'l, Inc. v. Luigino's, Inc.*,
  423 F.3d 137 (2d Cir. 2005) ................................................................................ 27
*Windpower USA, Inc. v. Jacksonville Energy Park, LLC*,
  2012 U.S. Dist. LEXIS 55552 (D. Vt. Apr. 18, 2012) ......................................... 27
*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) .................................................................................................. 4
*Wizkids/NECA, LLC v. TIII Ventures, LLC*,
  2019 WL 1454666 (S.D.N.Y. Mar. 31, 2019) .................................................. 5, 15
*Woodstock Ventures, LC v. Woodstock Roots LLC*,
  837 F. App'x 837 (2d Cir. 2001) ........................................................................... 4

**Statutes**

15 U.S.C. § 1114..............................................................................................................5
15 U.S.C. § 1125..............................................................................................................5
N.Y. Gen. Bus. L. § 360-l...............................................................................................25

**Rules**

Fed. R. Civ. P. 65(c) ......................................................................................................29

Defendants Wildride B.V. ("Wildride") and Wildride USA Group ("Wildride USA") (collectively, "Defendants") respectfully submit this Memorandum of Law in opposition to Plaintiff Wildbird LLC's ("Plaintiff") Motion for a Preliminary Injunction (Dkt. 9) (the "Motion").

## INTRODUCTION

This is a meritless lawsuit for trademark infringement, built on nothing other than the shared use of a widely-used word that is *admittedly* generic. To support its request, Plaintiff asks this Court to accept a narrative that is blatantly contradicted by the record. Plaintiff paints Defendants as a small-time foreign seller and recent U.S. market entrant, yet the record demonstrates that Wildride is a global brand that has acquired substantial goodwill in the U.S. through *years* of advertising and sales here. Plaintiff claims Defendants are offering a nearly identical product under a nearly identical mark, yet the record demonstrates that Defendants sell different products under a mark with far more differences than similarities. Plaintiff represents that it noticed confusion earlier this year and that such confusion will continue absent an injunction, yet the record demonstrates that there has not been even a single instance of proven consumer confusion in the five years since Defendants entered the U.S. market.

Plaintiff already tried to bypass the record when it unsuccessfully sought a temporary restraining order on a concocted "emergency." (Dkt. 36, 45.) This is because when Plaintiff is forced to confront the record, its case falls apart. The Motion should be denied.

## BACKGROUND

### A.    Defendants

Joost Hultink and Britt Schoorl founded Wildride in 2021 to offer a smart, safe, and fashionable product to carry their toddlers who have outgrown traditional baby carriers. *See* Declaration of Britt Schoorl ("Schoorl Decl.") ¶¶ 3-6.  Taking inspiration from Ms. Schoorl's

prior children's clothing brand "Wildrose," Wildride's founders conceived of the brand-name WILDRIDE to convey the sense of "wild" energy and adventure inherent in toddlers; and the notion that carrying a toddler anywhere can, quite literally, be described as a "wild ride." *Id*. ¶ 10. Wildride's marketing is built around these themes. For example, the stylized mark, in a bold, serif typeface, is often paired with Wildride's house cheetah-head logo, along with the brand tagline, "THE TODDLER SWING CARRIER:"



*Id.* ¶ 16.  Product packaging and advertising includes phrases like "ENJOY THE RIDE!" and social media hashtags like #itsawildride. *Id.* ¶ 11.  A blog series on Defendants' website, titled *A Wildride With,* showcases adventurous parents*. Id.*

Wildride has used its WILDRIDE mark around the world, including the United States, since 2021, and sales have only continued to grow. *Id.* ¶¶ 22, 31-32. ██████████████

████████████████████████████████████████████

████████████████████████. *Id.* ¶ 39. Its products are in over 5,000 stores across 90 countries. *Id.* ¶¶ 33. Wildride has always sought to be a global brand, and has registered its marks in dozens of other countries to protect its rights. *Id.* ¶¶ 22-26. It extended its international registration for WILDRIDE to the U.S. with a priority filing date of May 12, 2023, and applied more recently for a U.S. trademark on May 20, 2024. *Id*. ¶¶ 23-25, 27, 29. The USPTO did not cite any of Plaintiff's marks against Wildride's application as a potential likelihood of confusion. *Id*. ¶ 30.

In addition to its website wildridecarrier.com, which has been live and accessible in the U.S. since 2021, Wildride has also maintained a steady presence on Instagram under the username @wildride_official and several others starting with "wildride" since 2021. *Id.* ¶¶ 31, 40-44. Prompted by the significant success and brand presence Wildride had achieved through many years of growth in the U.S. market, Wildride formally incorporated Wildride USA in January 2024. *Id.* ¶ 45.

### B.    Plaintiff

Since 2014, Plaintiff has offered products geared towards newborns, with its WILBIRD-branded "Baby Carriers," *see* Declaration of Leo Lichtman ("Lichtman Decl.") Ex. 2[1], being core product offerings. The brand is intended to evoke "the nurturing and protective nature of a mother bird," (Dkt. 10 ¶ 4) and its marketing puts emphasis on this, with slogans like "[a] happy place for your little bird," and "WildBird Takes Flight." (Dkt. 10-5). Its stylized mark includes a clean, sans-serif typeface, and a bird silhouette over the word "BIRD," a clear nod to the word "bird," that is intended to give more weight to the right side of the mark:

WILDBIRD

Plaintiff almost never presents its mark without the bird logo. DX17 (WILDBIRD0003392); DX6 (37:5-38:21).

### C.    "Wild" is Widely Used By Others

Though Plaintiff argues that WILDBIRD is distinctive, Motion, at 8, the word "wild" (the only shared word between the parties' marks) has long been used as a source indicator for goods marketed with children in mind. There are thousands of live registrations and applications for "wild"-formative marks with the USPTO, at least hundreds of which are in connection with

---

[1] Citations to Lichtman Decl. exhibits are hereinafter referred to as "DX_."

overlapping classes of goods or services. *See* Lichtman Decl. ¶¶ 4-8, DX1, & Section I.a.i.1., *infra*.

**D.    Plaintiff Files this Lawsuit**

On July 18, 2025, Plaintiff emailed Defendants directly to speak urgently about perceived trademark confusion between the parties' marks. Schoorl Decl. ¶ 62. The parties exchanged emails to connect, but on July 22, merely four days later, Plaintiff filed this case seeking a non-emergency preliminary injunction. *Id.* ¶ 63; (Dkt. 1.). On September 19, Plaintiff sought an emergency temporary restraining order, which was denied. (Dkt. 36, 45.)

## LEGAL STANDARD

Plaintiff must demonstrate (1) a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction. *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal citations and alteration omitted). "[I]njunctive relief [is] an extraordinary remedy" that requires "a clear showing that the plaintiff is entitled to such relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). "[T]he movant, *by a clear showing*, carries the burden of persuasion." *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2001) (citation omitted, emphasis in original).

## ARGUMENT

**I.    PLAINTIFF HAS NOT SHOWN A LIKELIHOOD OF SUCCESS**

**a.  Plaintiff's Lanham Act Claims are Unlikely to Succeed**

To prevail, Plaintiff must show its marks are "entitled to protection," and Defendants' use of its marks is "likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (2d Cir. 2018). This requires a ***probability of confusion***: "it is not sufficient if confusion is merely possible." *Wizkids/NECA, LLC v. TIII Ventures, LLC*, 2019 WL 1454666, at *4 (S.D.N.Y. Mar. 31, 2019) (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997)). In other words, a "large number of purchasers likely will be confused as to the source of the goods in question." *Id.* (citation omitted).[2] Here, even if Plaintiff could demonstrate valid and senior rights in its mark, it cannot demonstrate a likelihood of confusion.[3]

### i.  Plaintiff's Marks are Weak, Meriting Narrow Protection

The strength of the trademark "refers to its ability to identify the source of the goods being sold under its aegis" and has two components: "its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004). "[A] mark's registered status . . . does not affect the plaintiff's ultimate burden of proof in an infringement action." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir. 1976) (observing that marks "with some descriptive qualities" cannot be used to exclude certain competing uses "even when the mark is properly on the register."). "Even an inherently distinctive mark can, in its commercial context, lack strength as a mark." *Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001).

---

[2] The same standards apply under both 15 U.S.C. §§ 1114 and 1125. *See Nike, Inc. v. B&H Customs Servs.*, 565 F. Supp. 3d 498, 508 (S.D.N.Y. 2021) ("[I]t is well-established that claims under Sections 1114 and 1125(a) are treated the same.").

[3] The eight factors for assessing likelihood of confusion, as set forth in *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961), are listed in Plaintiff's Motion, at 14.

1.  *Plaintiff premises this lawsuit on the shared use of a widely-used word.*

It is undisputed that the parties' marks share only one word in common: "wild." (Dkt. 7, ¶ 1.) Yet "wild" is already in a crowded field, forming the basis of countless other marks—many of which for the same or adjacent types of goods.

It is black letter law that extensive third-party use "can dilute the strength of a mark." *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 273 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007). As such, courts *routinely* reject trademark infringement claims premised on commonly used words. *See, e.g., Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 243 (S.D.N.Y. 2022) *aff'd* 2024 U.S. Dist. LEXIS 6383 (2d Cir. Mar. 18, 2024) (widespread use of "jackpot" in gaming markets "further underlines the weakness of the mark"); *Limited v. Macy's Merch. Grp. Inc.*, 2016 U.S. Dist. LEXIS 101151, at *18 (S.D.N.Y. Aug. 2, 2016), *aff'd* 695 F. App'x 633 (2d Cir. 2017) (JOULES "further weakened by the existence of a number of other trademark registrations and websites"); *Giggle, Inc. v. netFocal Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012) (third-party use of GIGGLE with children's goods and services demonstrated mark was weak); *Dana Braun, Inc. v. SML Sport Ltd.*, 2003 U.S. Dist. LEXIS 21349, at *29 (S.D.N.Y. Nov. 25, 2003) (SARAH ARIZONA not distinctive where numerous other marks in clothing industry incorporated SARAH or SARA); *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 698 (S.D.N.Y. 1999) *aff'd* 220 F.3d 43, 47 (2d Cir. 2000) (ICE BREAKERS for mints "further weakened by extensive third party use of the term 'Ice' within the confections field"); *Streetwise Maps v. VanDam, Inc.*, 159 F.3d 739, 744 (2d Cir. 1998) ("[T]hird party use of the words 'street' and 'wise' weakens the strength of Streetwise's mark"); *Mondo, Inc. v. Sirco Int'l Corp.*, 1998 U.S. Dist. LEXIS 18996, at *17-18 (S.D.N.Y. Dec. 3, 1998) ("Here, the strength of defendant's mark is seriously diminished by third-party use

. . . ."); *Lang v. Retirement Living Publ'g Co*., 949 F.2d 576 (2d Cir.1991) (extensive use of "Choice" and "Choices" demonstrated that NEW CHOICES was weak).

It is error to hold otherwise. In *RiseandShine Corp. v. PepsiCo, Inc.*, the Second Circuit vacated a preliminary injunction that would have prohibited Defendants' use of its "RISE"-formative mark for caffeinated beverages. 41 F.4th 112, 121 (2d Cir. 2022). As the panel explained, the district court erroneously failed to consider that "RISE" was already ubiquitous among coffee drinks and other similar products. *Id.* at 122-24. This was confirmed on a more fulsome summary judgment record when the Second Circuit noted that "'RISE' was, as a matter of law, an inherently weak mark for a coffee product because of the mark's logical association with the product." 2024 U.S. App. LEXIS 32182, at *7 (2d Cir. Dec. 19, 2024); *c.f. Am. Cyanamid Corp. v. Connaught Labs., Inc.*, 800 F.2d 306 (2d Cir. 1986) (vacating preliminary injunction and finding no infringement between HibVAX and HIB-IMUNE in connection with vaccines, because the common part of the mark—"HIB"—was generic in context).

Here, there are *thousands* of live trademark registrations and applications, hundreds of which are for goods and services that relate to children or newborns. Lichtman Decl. ¶¶ 4-8, DX1. This includes, among many others, WILD ACORN (for "[c]lothing for children and babies"); WILD BABY (for "Infant, baby, and toddler clothing" and "[i]nfant toys"); WILD OATS (for "baby clothing"); WILD DOUGH (for "children's playthings and toys"); WILD DOVES (for "[c]hildren's wear, namely, infant and toddler bodysuits")[4]; WILDVIBE (for

---

[4] Plaintiff testified that it had taken no action against WILD DOVES, notwithstanding the apparent similarity in meaning to WILDBIRD. DX6 (275:13-20).

"Children's and infant's apparel"); WILDCOLORS (for "Children's arts and crafts paper kits"); and WILDWOVEN (for "Infant and toddler one piece clothing"). *Id*.[5]

This is unsurprising, given the natural connection between "WILD" and the parties' products. "WILD" connotes qualities commonly associated with young children, such as exploration, curiosity, and a lack of inhibition. Schoorl Decl. ¶ 10. This is a common theme: baby rompers and onesies are often printed with slogans like "Born to be Wild," "Born Wild," and "Be Wild." DX3. "Wildflower" and "Wild One" are common themes for baby showers and first birthdays. DX4. Bedrooms commonly evoke this theme with imagery of jungles and wild animals. DX5. The iconic children's book *Where the Wild Things Are* by Maurice Sendak plays off this same theme.[6] Plaintiff's product is even sold through retailers with names such as ***Wildflower & Company***, ***Wild Ones Baby Boutique***, and ***The Wild***. DX7; DX8; DX6 (134:19–136:1). And a company named "Stokke," mentioned in an article alongside Plaintiff, introduced a "***Wild Collection***" of YOYO Strollers. DX8 (WILDBIRD0001052); DX10 (RIDE000244–247). It is no wonder that Plaintiff *itself* testified that "WILD" is "obviously a generic word." DX6 (224:18-24).

### 2. *Plaintiff has not shown acquired distinctiveness in the marketplace.*

Courts in this Circuit analyze acquired distinctiveness by considering six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d

---

[5] It is "well-established that courts may take notice of USPTO records when analyzing trademark claims." *Kalamata Capital Grp., LLC v. Newco Capital Grp., LLC*, 2023 U.S. Dist. LEXIS 189156, at *2 (S.D.N.Y. Oct. 20, 2023).

[6] *See* https://www.bbc.com/culture/article/20230522-where-the-wild-things-are-the-best-childrens-book-ever (last visited 10/2/2025).

Cir. 2020). "There is no single yardstick or metric for acquired strength" and "a mark can attain secondary meaning, while still being commercially weak." *Jackpocket*, 645 F. Supp. 3d at 245.

   ***Advertising expenditures***. Plaintiff's evidence shows, at most, that it invests in advertising, but "[s]imply showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the mark with [Plaintiff]." *Easy Spirit, LLC v. Skechers U.S.A., Inc.*, 571 F. Supp. 3d 185, 203-05 (S.D.N.Y. Nov. 16, 2021); *see also Jackpocket*, 645 F. Supp. 3d at 246. (same). Plaintiff has not provided any evidence linking its advertisements to consumer recognition. In fact, Plaintiff's consumer study shows the opposite.

   ***Consumer studies.*** Plaintiff has not produced any consumer survey showing that consumers associate "wild" with Plaintiff. ████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████████

█ ████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ In other words, a majority of Plaintiff's target customers do not recognize Plaintiff's mark.

   ***Unsolicited Media Coverage.*** While Plaintiff produced some articles, none associate Plaintiff with the word "wild" standing alone. There is no evidence that consumers recognize Plaintiff as the "wild" baby brand. Further, of the articles produced, most are affiliate marketing, whereby a journalist features a product to earn commission. For example, most of the articles Plaintiff produced feature disclaimers with a variation of the following: "*Our editors love finding*

*you the best products and offers! If you purchase something by clicking on one of the affiliate links on our website, we may earn a commission at no extra cost to you.*" DX12 (WILDBIRD0000435). Plaintiff claims that most of its media coverage is "organic," but admitted that affiliate marketing is "part of the game of PR." DX6 (256:13–257:12).

Press coverage such as this holds little weight. *See, e.g., Bobcar Media, LLC v. Aardvark Event Logistics*, 554 F. Supp. 3d 606, 618 (S.D.N.Y. 2021) (rejecting press articles because plaintiff did not meet burden to show they were unsolicited); *Gameologist Grp., LLC v. Sci Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011) ("[I]t is unclear whether these articles were unsolicited or instead solicited by [plaintiff] as part of a promotional strategy."); *Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 481 (S.D.N.Y. 2002) (evidence of media coverage did not favor plaintiff where solicited).

***Sales Success.*** ███████████████████████████████ ███████████. DX6 (228:21–229:4); DX25. But about half of these sales were in the last two years, well after Defendants had already established a foothold in the U.S. *Id.* Moreover, this number is merely a drop in the bucket of the multi-billion dollar market in which Plaintiff's products sit.[7]

***Attempts to Plagiarize.*** "Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a 'strong source identifier in the eyes of the purchasing public.'" *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 427 (S.D.N.Y.  2012) (citations omitted). Plaintiff offers no evidence that anyone has ever intentionally copied its mark. Plaintiff only enforced its rights *once* before, when it sent a

---

[7]  An industry report published by product design firm Gizmospring, for instance, valued the U.S. baby products market at $34.2 billion in 2023. *See* https://www.gizmospring.com/wp-content/uploads/2024/06/BABY-INDUSTRY-REPORT.pdf (last accessed 10/2/2025).

demand letter ten years ago to someone operating the website mywildbirddesigns.com. DX13; *see also* DX6 (274:12-15). It admittedly never enforced any rights to "wild" prior to this lawsuit. DX15 (Response to RFA 5).

**Length and exclusivity of mark's use.** As explained above, Plaintiff has *never* been an exclusive user of "WILD." *See Lopez*, 883 F. Supp. 2d at 429 ("With respect to exclusivity, however, numerous companies use the term 'Lower East Side' in their business name and on apparel."); *Jackpocket*, 645 F. Supp. 3d at 251 ("[T]he Second Circuit has advised . . . that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength.") (citation omitted).

ii.  <u>The Parties' Marks Give Markedly Different Commercial Impressions</u>

"The similarity of the marks is a key factor in determining likelihood of confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006). The threshold question is whether two marks "appear similar enough that a consumer concludes that they come from the same source." *Giggle*, 856 F. Supp. 2d at 635. Marks are considered similar "when they are the same in appearance, sound and meaning." *Easy Spirit*, 571 F. Supp. 3d at 205 (citation omitted). "[I]n determining whether two marks are confusingly similar," courts must "appraise the overall impression created by the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Nabisco,* 220 F.3d at 47; *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.* 426 F.3d 532, 538 (2d Cir. 2005) (citation omitted) (courts must analyze in "light of the way in which the marks are actually displayed in their purchasing context"). "The size, logos, typefaces, and package designs may be relevant to analyzing the similarity of the marks." *Easy Spirit*, 571 F. Supp. 3d at 205.

Notably, Plaintiff's Motion fails to explain how parties' marks overlap *other* than a shared word, considered by Plaintiff itself to be "obviously a generic word." DX6 (224:18-24). Instead, it simply argues that "wild" is the "dominant portion" of the parties' marks because it appears first. Motion, at 17.[8] Plaintiff is mistaken; commonly used components of marks are given less weight. *See, e.g. RiseandShine*, 41 F.4th at 124-25 (shared use of term "Rise" in large bold letters not probative because "the word 'Rise' in this context is not distinctive."); *Jackpocket*, 645 F. Supp. 3d at 256 ("If the common element in the conflicting marks is suggestive or descriptive of the goods or services, this lessons the likelihood of confusion.") (citation omitted); *USPTO v. Booking.com B.V.*, 591 U.S. 549, 562 (2020) ("When a mark incorporates generic or highly descriptive components, consumers are less likely to think that other uses of the common element emanate from the mark's owner.").[9] And both parties make the *other* part of their respective mark—the words "bird" and "ride"—the "dominant portion" through divergent brand strategies.

At the outset, the marks stray wildly apart in meaning. "BIRD" and "RIDE" mean different things, as Plaintiff admits. DX15 (Amended Response to RFA 3). The word "bird" refers to a living animal, and in the context of Plaintiff's brand, evokes the image of a mother bird caring for her newborn. (Dkt. 10, ¶ 5); DX6 (51:19–52:4).  By contrast, "ride" is an action word. It is both a noun and a verb, and evokes a sense of movement, independence, and adventure more commonly associated with toddlers. Schoorl Decl. ¶¶ 10-11. Even the meaning

---

[8] Plaintiff also argues that because both parties use their marks and logos on their websites, social media, and in advertisements, that this somehow creates the same overall impression on consumers. Motion, at 16. But the fact that both parties' use their marks on their own sites, social media, and advertisements says little—this could describe *any* company.

[9] Plaintiff cites no authority to the contrary. None of the cited cases, Motion at 17, involved shared use of a commonly-used word.

of "WILD" changes in the context of the parties' marks. Within Plaintiff's mark, "wild" might mean "living in a state of nature and not ordinarily tame or domesticated," or "of or relating to wild organisms" (i.e. an animal in nature); whereas within Defendants' mark, "wild" takes on different meanings, such as "not subject to restraint or regulation," or "going beyond normal or conventional bounds" (i.e. uncontrolled, fantastic). *See Wild*, MERRIAM-WEBSTER ONLINE DICTIONARY, https://www.merriam-webster.com/dictionary/wild.

The parties' branding furthermore ***emphasizes*** these differences. For instance:

- WILDBIRD is almost always featured with a stylized silhouette of a bird, placed over the word "bird," emphasizing the word conceptually as well as visually. DX6 (35:2–36:18); DX17 (WILDBIRD0003392). WILDRIDE, instead, is often paired with the logo of a cheetah, playing into the sense of wild movement that inspired the company. Schoorl Decl. ¶¶ 16-17.

- Plaintiff's website creates an immediate association with newborns, prominently featuring its core carriers under the header "Our Baby Carriers." DX2. By contrast, WILDRIDE is often paired with the brand tagline "THE TODDLER SWING CARRIER," further playing into that sense of movement, while simultaneously telling consumers that WILDRIDE is ***not*** for newborns. Schoorl Decl. ¶ 17.

- The parties use slogans that exclusively call attention to the unique meanings of their marks. Defendants include phrases like "ENJOY THE RIDE" on their packaging, and have a blog series titled *A Wildride With*, further solidifying "ride" as an action word. Schoorl Decl. ¶ 11, Ex. 1-2.  Plaintiff, by contrast, includes the bird logo prominently on its packaging, and includes phrases on its packaging like

"A HAPPY PLACE FOR YOUR LITTLE BIRD" and "WELCOME TO THE FLOCK," signifying that the consumer is joining a community of "wild birds." DX6 (140:25–142:9); DX17 (WILDBIRD0003393); DX18. It never uses the word "wild" in its slogans. DX6 (52:10-12).

- Even apart from the vastly different meanings and brand messaging, the parties' marks simply appear different. "WILDBIRD" uses a clean, sans-serif typeface, and when not stylized is intended to be written with a capitalized "W + B" (*i.e.* "WildBird"), ███████████████████. DX6 (65:1-20); DX17 (WILDBIRD0003416). "WILDRIDE" uses a serif typeface with thicker letters, and there is no capitalization rule when not stylized (*i.e.* "Wildride"). Schoorl Decl. ¶ 16.

At bottom, contrary to Plaintiff's characterization of Defendants' mark as "nearly identical," Motion, at 1, Defendants' mark has practically nothing in common with Plaintiff's mark at all. Courts routinely find no likelihood of confusion in comparable circumstances. *See, e.g., Easy Spirit*, 571 F. Supp. 3d at 206-07 (TRAVELTIME and Commute Time not similar, considering that the marks appeared in different typefaces and accompanying logos, and the words "travel" and "commute" create different connotations); *Giggle*, 856 F. Supp. 2d at 835 ("Defendant's mark only shares a single word—'giggle'—in common . . . and as discussed above, GIGGLE on its own is an extremely weak mark due to the extensive third-party use . . . ."); *MidCap Bus. Credit, LLC v. MidCap Fin. Trust*, 2023 U.S. Dist. LEXIS 17953, at *22 (S.D.N.Y. Feb. 2, 2023) (MIDCAP BUSINESS CREDIT and MICAP FINANCIAL not confusingly similar, notwithstanding "sharing one word in common"); *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 172 (2d Cir. 2000) (FEDERAL ESPRESSO and FEDERAL

EXPRESS "somewhat similar in content and sound" but "those similarities are far outweighed by the dissimilarities evident in the parties' use of the marks"); *Wizkids*/*NECA*, 2019 U.S. Dist. LEXIS 56555, at *20 ("Although 'at first blush, the use of the same word appears to weigh . . . in favor of similarity, the use of the same words is far from dispositive.'"); *Jackpocket*, 645 F. Supp. 3d at 256 ("Analyzing the two logos in context there is a low likelihood of confusion between the source of the two products."); *Medici Classics Prds., LLC v. Medici Grp. LLC*, 683 F. Supp. 2d 304, 311 (S.D.N.Y. 2010) ("Medici Classics" dissimilar to "Medici Masters" and "Medici Arts" when considering "overall impression created by the marks," based on differences in "typefaces and presentation").

### iii. The Parties' Goods and Services Do Not Overlap

"The fact that two products are in the same general field does not by itself mean that they are in competitive proximity." *Swanson v. Georgetown Collection*, 1995 WL 72717, at *12 (N.D.N.Y. Feb. 14, 1995); *Sunenblick v. Harrell*, 101 F.3d 684 (2d Cir. 1996) (proximity of products factor favored defendant, notwithstanding that the parties both used their mark on products sold in the same retail outlets, cities, and format); *see also Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) ("[T]he fact that both parties' products exist within the same industry is not enough."). Here, Plaintiff has, at most, demonstrated that the parties exist in the same industry. But that is not dispositive, particularly given the evident dissimilarities between the marks. *See Hershey Foods Corp. v. Voortman Cookies Ltd.*, 367 F. Supp. 2d 596, 599 (S.D.N.Y. 2005) ("[T]hat both products belong to the genus of sweet snack foods . . . is of little relevance given the highly visible packaging barriers to potential confusion"); *Giggle*, 856 F. Supp. 2d at 635 ("[W]hile both parties operate in the children's goods industry, they service different markets within the industry").

Plaintiff repeatedly mischaracterizes Defendants' product as a baby carrier, but Defendants market "THE TODDLER SWING CARRIER," a carrier recommended for toddlers weighing 18-44 lbs. Schoorl Decl. ¶¶ 7, 9, 17.[10] Plaintiff, by contrast, explicitly markets its products as "baby carriers" on its home page. DX2. The parties' other product lines further play off these differing market segments. In addition to its house mark, Plaintiff offers products under the marks "WILDBIRD BABY," as well as "CLOUDBLEND," the latter of which is used in connection with Plaintiff's proprietary Tencel fabric, which Plaintiff advertises as "the closest thing to actually sleeping on a cloud for your little bird!" DX19; DX17 (WILDBIRD0003394); DX6 (52:23-55:9). Defendants, by contrast, offer fun accessories like a leopard scarf and leopard-print sunglasses "made for bold little explorers," which are "*Perfect for sunny days, wild rides, and everything in between.*" Schoorl Decl. Ex. 3.

Even the parties' core carrier products are vastly different. Plaintiff's primary product is its ring sling carrier, which uses fabric to hold a newborn at chest level. DX6 (69:1-13). Defendants' primary product is a side sling, with strap and buckle, designed to hold a toddler to the side of the parent, just above hip level. Schoorl Decl. ¶¶ 8, 10, 15. The products look nothing alike:

---

[10] Plaintiff's sole evidence to the contrary is a listing on Nordstrom's website that describes Plaintiff's product as a "baby carrier." (Dkt. 11-5.) This was Nordstrom's error, and has since been resolved. Schoorl Decl. ¶ 9. The product description itself notably included the 18-44 lbs. recommendation.



Schoorl Decl. ¶ 8.



Dkt. 15, ¶ 16.

Plaintiff's evidence underscores the clear division in consumer base. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████    Evidently, consumers do not think of WILDRIDE as a ███████████

████████████████

    iv.  <u>Plaintiff Offers No Evidence of Bridging the Gap</u>

"'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 590 (S.D.N.Y. 2018) (citation omitted). To demonstrate an intention to bridge the gap, the plaintiff must provide nonspeculative evidence that (1) it intends to target the defendant's customer base and (2) its customers know that it intends to bridge the gap. *See id.*

Plaintiff does not even argue that this factor favors it, thereby waiving it. See *Blackrock Allocation Target Shares v. Wells Fargo Bank*, 247 F. Supp. 3d 377, 415 n.19 (S.D.N.Y. 2017) (arguments not raised in opening brief waived). Instead, Plaintiff simply speculates, without basis, as to the "overlapping customer base" of baby carriers and toddler carriers. Motion, at 18.

This is insufficient. *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 295 (S.D.N.Y. 2012) ("A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant should provide evidence of a concrete expansion plan.");  *Lang v. Retirement Living Publ'g Co.,* 949 F.2d 576, 579, 582 (2d Cir.1991) (plaintiff's claim that it had "considered" publishing self-help guides had not crystalized, was speculative, and did not demonstrate a likelihood of entering the defendant's market). Plaintiff evidently does not believe its own contention; ████████████████████████████████████████████ ██████████████████████████████████████ .

> v.   <u>Plaintiff Lacks Any Evidence of Actual Confusion.</u>

While Plaintiff asserts that actual confusion has occurred, the record demonstrates the exact opposite. "Proof of actual confusion is generally shown through consumer surveys or anecdotal evidence of confusion." *Medici*, 590 F. Supp. 2d at 556. Here, Plaintiff admittedly has no survey, DX15 (Response to RFA 4), and "the absence of surveys is evidence that actual confusion cannot be shown." *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021). Plaintiff instead relies on anecdotal evidence starting in May 2025 or after, notwithstanding that Defendants have been in the U.S. market for *years*.

Plaintiff offers three categories of "evidence": (1) in-person conversations at certain business-to-business ("B2B") events; (2) five (5) unauthenticated social media posts, purportedly captured on Instagram by a representative for Plaintiff, but who Plaintiff could not identify; and (3) Plaintiff's contention that a search for "Wildbird" on Nordstrom's website returns Defendants' WILDRIDE-branded baby carrier in the results. DX16 (Response to ROG 1). None even remotely suggest that consumers' purchasing decisions have been affected by Defendants'

use of WILDRIDE. *See Giggle*, 856 F. Supp. 2d at 636 ("[T]he record reflects no evidence that consumers' purchasing decisions have been affected by Defendant's use of its mark.").

> 1. *Plaintiff's In-Person Conversations With Industry Professionals Do Not Evidence Actual Confusion*

With respect to the in-person conversations, Plaintiff identified the following: (i) in May 2025 at the ABC Kids Expo, a buyer asked whether Plaintiff was affiliated with Defendant, a supplier asked "You are Wildride, yes?," and another supplier stated "oh yes; I saw your booth" while referring to Defendants; (ii) in June 2025 at a Nordstrom brand showcase, four category leads (store managers) asked if Plaintiff's brand was affiliated with Defendants' brand. DX16 (Response to ROG 1); DX6 (181:19-182:4).

These conversations are hearsay, for which no exception applies. Fed. R. Evid. 801. What is more, with one exception, Plaintiff *cannot identify any of the declarants.* DX6 (154:3-17; 160:9-16; 161:7-13; 172:18-173:4); *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) (noting that actual confusion evidence that consisted of a "handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants" was not persuasive).

Even so, these conversations do not evidence marketplace confusion. At most, they represent simple misunderstandings among industry professionals. *See, e.g., Riseandshine*, 2024 U.S. Dist. LEXIS 32182, at *3 ("We note that [plaintiff's] anecdotal evidence of actual confusion, which is largely centered on the perceptions of industry professionals, does little to show likelihood of *consumer* confusion") (emphasis in original); *Giggle*, 856 F. Supp. 2d at 636 ("While vendors and manufacturers may be customers of Plaintiff's business, they are not representative of the typical consumer of retail goods.").

Take the ABC Kids Expo for instance. Plaintiff admits the conversations with suppliers took place in a large convention space filled with people networking. DX6 (157:1–158:6). In each conversation, Plaintiff introduced itself, the supplier stated something that led Plaintiff to believe they mixed Plaintiff with Defendants, Plaintiff corrected them, and everyone moved on. *Id.* (158:21–159:16; 167:15-25). Plaintiff has no idea how many others they spoke with that day, or whether any had hearing issues, *id.* (157:1-158:6; 158:15-20; 167:3-14) which is particularly important here, given that they did not necessarily even see Plaintiff's mark—they simply heard it in conversation, on a large conference floor filled with other attendees.[11] It is equally plausible that the suppliers—who likely had countless conversations with other brands during the 3-day conference—simply misheard. *See Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) ("[T]here is a difference between isolated expressions of momentary confusion and confusion that leads to actual purchasing decisions.").

The Nordstrom brand showcase is no different. The four category leads were not actually confused. They merely questioned whether the parties were associated, and it was immediately cleared up. DX6 (175:5-177:4). Inquiries such as this do not amount to actual confusion; they prove precisely the opposite. *See Reply All*, 843 F. App'x at 398 ("Inquiries about the relationship between an owner of a mark and an alleged infringer . . . . are arguably premised upon a *lack* of confusion . . . such as to inspire the inquiry itself.'") (citing *Nora Bevs., Inc. v. Perrier Grp. Of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001)) (emphasis in original).

Plaintiff may believe that innocent inquiries at industry events amount to confusion, but that is not the law. When asked to define what Plaintiff meant by "confusion" in the context of

---

[11] Unlike Plaintiff, Defendants were featured exhibitors at the ABC Expo. DX6 (145:2-13, 149:7-9; 156:14-16, 164:17-22). Accordingly, Defendants' visual branding was far more prominent, which would understandably put it in the minds of conference attendees.

these conversations, Plaintiff admitted that it simply did not want to have to put in "extra effort that it takes to identify who we are and what our brand is" because "[t]here's too much going on for these professionals to digest who all the Wilds are and who all the yadda, yadda, yadda brands are." DX6 (165:22–166:14). This is not what the Lanham Act is intended to protect.

        2.   *Plaintiff's "Evidence" of Five Mistaken "Tags" Is Not Evidence of Actual Confusion*

With respect to the social media posts, Plaintiff identified a total of five (5) on Instagram where an unknown user apparently "tagged" or "mentioned" Plaintiff's Instagram handle @wildbird while appearing to hold Defendants' product. DX16 (Response to ROG 1); DX20; DX6 (211:13-22). Though Plaintiff purportedly gets more than "20-plus" tags *per day*, DX6 (214:12-215:5), it could produce only five, and none prior to May 2025, which is notable given that Defendants had started to build a massive presence on Instagram years earlier. Schoorl Decl. ¶¶ 40-46. Plaintiff does not know who captured the evidence, and could only speculate as to how it was created. DX6 (196:6-25; 200:8-13; 202:19-203:2; 206:16-208:11; 209:14-25). Two of the posts transparently, and for unexplained reasons, cropped out the username of the poster. DX20. When pressed at its deposition, Plaintiff testified that it had no idea who these users were, whether they were Wildbird customers, or whether they are even based in the United States, DX6 (197:1–22; 200:17-202:7; 202:17-206:1; 209:17-211:12; 237:18-25), which is critical, given that this lawsuit is ostensibly premised on U.S. consumer confusion. *Id.* (237:14-16); *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426 (2023) ("[E]ach country is empowered to grant trademark rights and police infringement only within its borders."). By contrast, Defendants are not aware of any situations in which a user with Plaintiff's product accidentally tagged Defendants. Schoorl Decl. ¶¶ 47-49.

The fact that a *de minimis* number of users mistakenly tagged @wildbird does not indicate marketplace confusion. Plaintiff is required to show "instances of actual consumer confusion that 'could inflict commercial injury . . . in the form of either a diversion of sales, damage to goodwill, or loss of control over reputation." *Reply All*, 843 F. App'x at 397. At most, Plaintiff demonstrates that a few users—who may or may not even be in the U.S.—might have been careless when posting. *See LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 674 (S.D.N.Y. 2016) (finding actual confusion evidence to be *de minimis*, notwithstanding evidence that a few social media posts appeared to confuse the parties, because none of the posts "indicates that the speaker made a purchasing decision based on his confusion"). As Plaintiff itself admitted, when a user starts typing in the word "wild," Instagram will start auto-filling the search box with suggestions, and there are countless suggestions to offer given that "wild" is "obviously a generic word." DX6 (224:10-225:4). It is telling that Plaintiff has not one instance of "confusion" in connection with its TikTok handle, @<u>my</u>wildbird. DX6 (213:3-6).

### 3. Nordstrom's Search Results are Not Evidence of Actual Confusion

Whether a search for "Wildbird" on Nordstrom's website pulls Defendants' product as a search result is disputed. In fact, Plaintiff's own evidence demonstrates that as of August 27, Defendants' product does *not* appear as a search result.[12]

However, even if Nordstrom did generate Defendants' product in the search results for Plaintiff's product, this is not evidence of actual confusion. *See Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) (a search engine's failure to distinguish between

---

[12] Another brand is listed in the search results however, because they appear to have a line of "Wildbird" products. DX21. Plaintiff has not asserted its rights against this company. DX6 (278:13-24).

marks does not amount to consumer confusion); *c.f. Savin Corp. v. Saving Grp.*, 391 F.3d 439, 462 n.13 (2d Cir. 2004) (when a consumer who searches for plaintiff's website is directed to defendant's website instead, there is no confusion absent "a showing of intentional deception").

### 4.  *There is Ample Evidence that Consumers See the Parties as Two Separate Brands*

Plaintiff presents a contrived picture, but the reality is that the two brands have already co-existed for years, and as such, the marketplace already tells them apart. *See Giggle*, 856 F. Supp. 2d at 636 ("[I]f there is proof that consumers are actually *not* confused by Defendant's use of a mark, then that is even stronger proof that there is no likelihood of confusion.") (emphasis in original). For instance, Defendants have received numerous inquiries from marketers expressing an interest in creating content for Defendants that would suggest they understand Defendants are not affiliated with Plaintiff. One marketer noted her "[p]ast collaborations include brands such as: Primally Pure, Quince, Merit Beauty, Lovevery, Lalo, Pact, and WildBird." Schoorl Decl. Ex. 4. Another marketer noted she has been "baby-wearing since my little one was born, using carriers like the Solly Wrap, Artipoppe, and Wildbird Ring Sling. . . . [m]y son is turning one next week, and I wanted to purchase . . . your carrier to add to my rotation." *Id.* Yet another one noted: "I have been using Wildbird carriers since my son was six months old, while I have loved the brand, now that he is a year and a half it is so difficult to try to get him into those carriers, and I found your brand and thought that I would reach out . . . ." *Id.*

This is true of social media as well. In a post on a Reddit forum dating back *two years*, one discerning consumer wrote:

> "My first attempted carrier was a wild bird ring sling and I absolutely hated it! . . . . I almost purchased a side sling from Wild Ride and then I saw a comment on here saying those types are uncomfy and to just try a ring sling again. I pulled out my ring sling and I figured it out by the second try and my baby LOVES it."

DX22.

      vi.   <u>Defendants Adopted the WILDRIDE Mark in Good Faith</u>

There is absolutely no evidence that Defendants intended to trade off of Plaintiff's goodwill. Defendants adopted WILDRIDE without any reference to Plaintiff's Mark. Schoorl Decl. ¶ 14. Defendants were not even aware of Plaintiff's Mark until late 2024, well *after* they had built their own brand. *Id.*

Plaintiff's sole argument to the contrary is that Defendants had "constructive notice" of its "prior rights" in the marks. (Dkt. 10, at 20.) Plaintiff is wrong. When Defendants first applied to extend their international marks to the U.S. in 2023, Plaintiff **had no live registration**. To the contrary, the USPTO **cancelled** Plaintiff's prior WILDBIRD mark in 2022, due to Plaintiff's failure to file a declaration of use. DX23. For all intents and purposes, Plaintiff's registration was essentially abandoned when Defendants applied in 2023. Furthermore, when Defendants separately applied for their U.S. mark in 2024, DX24, the USPTO **did not cite Plaintiff's mark as a source of likely confusion**, even though the parties' applications were filed merely two months apart. Schoorl Decl. ¶ 30.

In any event, "constructive notice" alone is insufficient: there must be "additional evidence indicating an intent to promote confusion or exploit good will or reputation." *See Star Indus..*, 412 F.3d at 388-89. Plaintiff's sole authority confirms this. *See Hope Organics LLC v. Preggo Leggings LLC*, 2021 U.S. Dist. LEXIS 239779, at *23-24 (S.D.N.Y. Dec. 15, 2021) (bad faith found where defendant's business practice was to capitalize on established brands).

      vii.   <u>The Respective Quality of the Parties' Goods and Services Does Not Favor a Finding of Infringement</u>

To support this factor, Plaintiff provides a single review from an unidentified reviewer describing Plaintiff's product as "ok – not a must have." (Dkt. 10-10.) This proves nothing,

particularly when Plaintiff's own products have been subject to negative reviews from far more credible sources. The New York Times, for example, gave Plaintiff's "Linen Sling Rings" a far-from-stellar review, noting that "multiple testers needed to adjust the rings often to keep their baby secure, even after rethreading." DX14 (WILDBIRD000747). In the words of Plaintiff's own CEO: "[F]ind me a baby-wearing company that doesn't have complaints like that, and I will reward them handsomely." DX6 (269:14-16). This factor does not support Plaintiff.

viii.   Consumers in the Relevant Markets can Tell the Difference

The last *Polaroid* factor considers "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Reply All*, 843 F. App'x at 399. "Courts generally assume that more sophisticated purchasers are less likely to be confused." *General Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 664 (S.D.N.Y. 1997). Here, the relevant consumer base is "careful and discerning," as Plaintiff admits. Motion, at 22. Indeed, Plaintiff testified that it considers itself to be in the "premium space," meaning that its products primarily appeal to "a higher income, discretionary income . . . customer base." DX6 (128:14–129:10). ███████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Plaintiff's sole argument is that that this factor cannot be relied upon where the marks are highly similar. Motion, at 22. But as described above, they are not. *Supra*, Section I.a.ii.

**b. Plaintiff's State Law Claims Are Unlikely to Succeed**

i.   General Business Law § 360-l

A claim under GBL § 360-l requires showing (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *Easy Spirit*, 515 F. Supp. 3d at 76. As a threshold matter, while a mark

need not be famous to qualify for protection under GBL § 360-l, courts have explained that a plaintiff still must be able to show that its mark is "extremely strong." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 328 (S.D.N.Y. 2015) (under section 360-l, the plaintiff's mark "must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning."). Furthermore, "New York law does not permit a dilution claim unless the marks are "similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Easy Spirit*, 515 F. Supp. 3d at 77.

As explained above, Plaintiff's mark is far from "extremely strong," and the only similarity to Defendants' mark is the common use of "wild." Plaintiff thus does not qualify for protection under GBL § 360-l, and even so, it would not be able to demonstrate a likelihood of dilution under New York law, given the abundant third-party use of "wild"-formative marks.

## ii. Trademark Infringement and Unfair Competition

"New York common law claims for trademark infringement are analyzed under the same framework as . . . Lanham Act claims." *Reply All*, 843 F. App'x at 400. Because Plaintiff is unlikely to succeed on its Lanham Act claims, its state-law claims fail too.

## II. OTHER FACTORS WARRANT DENIAL OF INJUNCTIVE RELIEF

### a. Plaintiff Has Not Demonstrated Irreparable Harm

"To demonstrate irreparable harm, the movant must show 'an injury that is neither remote nor speculative, but actual and imminent." *Engine Capital Mgmt., LP v. Engine No. 1 GP LLC*, 2021 WL 1372658, at *4 (S.D.N.Y. Apr. 12, 2021) (citation omitted). Courts routinely find that preliminary injunctions are unwarranted due to the moving party's delay in seeking them. "There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline

to grant preliminary injunctions in the face of unexplained delays of more than two months*."
Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (internal
quotations and citations omitted) (collecting cases); *accord Weight Watchers Int'l, Inc. v.
Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("delays of as little as ten weeks" can "defeat
the presumption of irreparable harm"); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir.
1985) (ten-week delay rebutted claim of irreparable injury).

Here, while Plaintiff alleges that Defendants entered the U.S. market early this year, in
reality, Defendants have already been using the WILDRIDE mark in the U.S. for years. Schoorl
Decl. ¶¶ 31-46. Plaintiff also admits it has been aware of Defendants for years. DX6 (181:19–
183:9). While Plaintiff denies that it was aware of Defendants' *physical* presence in the U.S.
until more recently, this is immaterial; both parties operate and market their products online.
Plaintiff was furthermore aware of Defendants' social media presence years ago, DX6 (87:15–
88:15), which is critical given that Plaintiff premises the alleged "confusion" on social media
posts. *Supra*, Section I.a.v. Ultimately, whatever "irreparable harm" Plaintiff allegedly faces, it
also faced years ago. It was not harmed then, and is not harmed now. Plaintiff offers nothing but
speculation to the contrary. *Stringer v. Simon & Schuster, Inc.*, 2025 U.S. Dist. LEXIS 172398,
at *8-9 (S.D.N.Y. Sept. 4, 2025) (a plaintiff must do more than simply "assert that [consumer]
confusion [resulting from infringement] will irreparably injure them" and must provide more
than "conclusory statements of loss of reputation and goodwill").

Even if Plaintiff could prove irreparable harm, the requested relief goes well beyond what
is necessary. *See Nordic Windpower USA, Inc. v. Jacksonville Energy Park, LLC*, 2012 U.S.
Dist. LEXIS 55552, at *53 (D. Vt. Apr. 18, 2012) (injunctive relief must "be no broader than
necessary to avert the alleged irreparable harm"). Plaintiff seeks a sweeping injunction that

27

would effectively force Defendants to change their name in the U.S. entirely, even though any perceived harm can be mitigated through divergent brand strategies, such as logo and tagline placement. *Supra*, Section I.a.ii.

Finally, the injunction would significantly complicate Defendants' ability to use its mark abroad, given that Defendants' website and social media has ***always been accessible to U.S. customers***. *See Abitron*, 600 U.S. at 426. Adding insult to injury, this appears to be Plaintiff's intent. At deposition, Plaintiff had no qualms admitting ███████████████████████ ████████████████████████████████████████████████ ███████████████ In other words, ███████████████████████████ ████████████████████████████████████████████████ █████████████████████████████.[13]

### b. The Balance of Hardships Weighs Heavily in Defendants' Favor

The proposed injunction would have a devastating impact on Defendants' business. Defendants have invested heavily in WILDRIDE to build a global brand that has already built enormous goodwill in the U.S. Schoorl Decl. ¶¶ 53-55. Even though Defendants already take numerous steps to distinguish their brand, Plaintiff seeks an injunction that would force Defendants to relinquish their brand entirely, stripping Defendants of its hard-earned goodwill and creating even more potential confusion in the market due to a forced rebrand, simply because Plaintiff does not want to make the "extra effort that it takes to identify who we are and what our brand is." DX6 (165:22-166:14); Schoorl Decl. ¶¶ 56-61. Equity and good conscience counsel against granting the injunction sought. *See Long Island-Airports Limousine Serv. Corp. v. New*

---

[13] Plaintiff could not identify whether it has any internal guidelines for using others' intellectual property. DX6 (65:8-21).

*York Airport Servs. Corp.*, 641 F. Supp. 1005, 1012 (E.D.N.Y. 1986) (balance of hardships weighed against requiring trademark defendant to "devise a new name" because if defendant prevailed, Defendant would have to "restore its former name and reeducate the public," which could cause more confusion). This is particularly true where an adverse decision here would affect Defendant's brand globally. *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995) ("Plaintiff seeks to enjoin an entire product line, which would cause [the defendant] considerable hardship far outweighing any speculative possibility that [plaintiff's] goods would be harmed by consumer confusion.").

### c.  The Requested Relief Disserves the Public

Plaintiff has failed to demonstrate that Defendants' conduct is "anything but legitimate competition," and "any reduction in competition must be considered against the public interest." *Steelite Int'l U.S.A., Inc. v. McManus*, 2021 U.S. Dist. LEXIS 80528, at *30 (S.D.N.Y. Apr. 27, 2021).

## III.    IN THE ALTERNATIVE, A SIZABLE BOND IS WARRANTED

The court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Should the Court be inclined to order an injunction, any bond should be significant given the enormous risk to Defendants' business and goodwill. *See Interlink Int'l Fin. Servs., Inc. v. Block*, 145 F. Supp. 2d 312, 318 (S.D.N.Y. 2001).

## <u>CONCLUSION</u>

In light of the foregoing, Plaintiff's Motion should be denied.

Dated: October 3, 2025.

Respectfully submitted,

/s/ Leo M. Lichtman
Leo M. Lichtman
James M. Slater (admitted *pro hac vice*)
ESCA Legal LLC
1177 6th Avenue, 5th Floor
New York, NY 10036
Tel: 347-745-2535
leo@esca.legal
james@esca.legal

*Attorneys for Defendants Wildride B.V. and Wildride USA Corp.*

## <u>LOCAL RULE 7.1(c) CERTIFICATION</u>

The undersigned certifies that the foregoing was prepared using Microsoft Word, and that, according to the word-count feature, the foregoing document contains 8,734 words, including materials in footnotes and endnotes, but not including the caption, table of contents, table of authorities, or signature blocks.

*/s/ Leo M. Lichtman*
Leo M. Lichtman

*Attorney for Defendants Wildride B.V. and Wildride USA Corp.*

31