UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILDBIRD, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>WILDRIDE B.V., and WILDRIDE USA CORP.,<br><br>    Defendants. | Case No. 1:25-cv-05993 |

**DECLARATION OF BRITT SCHOORL IN OPPOSITION TO
<u>PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION</u>**

I, Britt Schoorl, declare and state as follows:

1.     I am the co-founder and Creative Director of Wildride B.V. and Wildride USA Corp. (collectively, "Wildride"), the Defendants in this action. This declaration is based upon my personal knowledge of the facts stated herein and my review of the documents and records referenced herein. If called upon to do so, I am able to testify competently to the matters as stated herein.

2.     As Creative Director of Wildride, I am responsible for managing and overseeing the brand's creative direction, including the conception, creation, design, development, marketing, advertising, promotion, and launch of Wildride products worldwide.

**A.  The Concept Behind WILDRIDE and the WILDRIDE Toddler Carrier**

3.     Wildride B.V. was founded in 2021 with the purpose of offering a smart, safe, and fashionable product for young parents to carry their toddlers who have physically outgrown or aged out of the traditional front or back baby carriers typically sold to young parents.

1

4.     In 2020, before Wildride's other co-founder, Joost Hultink, and I created the WILDRIDE toddler carrier, we were each using homemade, makeshift solutions to carry our toddlers around. Joost was using a surf strap hung diagonally over his shoulder to carry his child on his hip. I, on the other hand, often carried my daughter around in a shopper bag. We thought that surely there was a better way to carry our children around.

5.     In or around April 2021, inspired by adventures with our children and a desire for a carrier which would allow us to carry our toddlers with us with ease and comfort, Joost and I designed and created our flagship product—"the WILDRIDE toddler swing carrier."

6.     Our vision for Wildride has always been to create a reliable brand with a smart, safe, and fashionable product for parents looking to take their "wild" children along for the ride in a comfortable, quick, and easy way. Therefore, it was important that, in designing the WILDRIDE toddler carrier, we created a product that allowed on-the-go parents to swiftly and simply pick up their on-the-move toddlers.

7.     The WILDRIDE toddler carrier is SGS-certified (both ASTM and CEN/TR) and consists of a fabric shell in which a child can sit comfortably and supported. The bucket is attached to a wide strap, which is worn diagonally over the other shoulder with a soft shoulder pad. For added convenience, that strap has a secure plastic buckle at chest height, which can be easily opened and closed with one hand. The WILDRIDE toddler carrier has been exhaustively tested by physiotherapists, occupational therapists, and industrial designers to ensure that the design is suitable for children who can hold their head up and sit on their own, generally children from nine months to four years of age or children weighing 18 to 44 lbs. Accordingly, the WILDRIDE toddler carrier is not designed, marketed, or recommended for newborns, infants, or babies.

8. The WILDRIDE toddler carrier offers parents ergonomic and comfortable carrying comfort in numerous stylish designs and fabrics with new designs added to the collection every six months. The WILDRIDE toddler carrier is a unique carrier product because, unlike front or back carriers, parents can interact with their child eye-to-eye when carrying them at the hip, and see the same things together, making quality time with their little ones fun and pain-free.



9. The WILDRIDE toddler carrier has always been marketed as a "toddler carrier." For example, the product pages on Wildride's website describe the toddler carrier as "The Perfect Transition from Baby Carrier" and "[T]he ideal step up for parents who need a versatile, easy-to-use option for their toddler," and includes a weight recommendation of 18 to 44 lbs. I understand that Plaintiff contends that Wildride markets its product as a "baby carrier" on Nordstrom's website, but this was a mistake by Nordstrom, that has since been corrected.

10. The WILDRIDE name was originally born from the name of a children's clothing brand that I created independently in 2019 called "Wildrose." When Wildride's other co-founder approached me with the idea for a carrier suitable for toddlers, we were inspired by the "Wildrose" name. Our kids often told us that being carried on our hips felt like swinging, and we feel, as parents, that carrying a toddler anywhere is often a "wild ride." Children who are

3

walking, talking, and running around are more independent, lack inhibition, and full of "wild" energy, and a sense of adventure and exploration. Therefore, the combination of the words "wild" and "ride" felt like a perfect description of Wildride's product and the message we wanted to convey to Wildride's customers.

11. Children are often described as "wild" which is why Wildride's marketing and branding elements, i.e., packaging, tags, and social media content, primarily emphasize the "ride" element to differentiate our brand from other wild-formative brands. For example, Wildride's product packaging displays the tagline "ENJOY THE RIDE!," its social media accounts use hashtags like #itsawildride and #toddlercarrier, and Wildride's blog regularly features adventurous parents using our toddler carrier in a series titled *A Wildride With*. Examples of such branding initiatives are attached hereto as **Exhibit 1.** A true and correct copy of Wildride's brand guidebook is attached hereto as **Exhibit 2**.

12. Around the time Wildride chose the WILDRIDE trademark to represent our brand, I conducted a search of the Internet and social media to determine whether any other brands were already using WILDRIDE for a similar product.

13. When you type "wild" into Instagram, many accounts populate the search results. When I conducted my search on Instagram, I only found one Instagram account using @wildride which appeared to be owned or operated by the TV personality, Steve-O. I did not see anyone using WILDRIDE for a similar product on Instagram at the time.

14. Before adopting the WILDRIDE trademark, I was not aware of Plaintiff. I discovered Plaintiff much later in or around October 2024 on social media while working on social media marketing efforts. At no time did Wildride intend to trade off Plaintiff's products or purported goodwill, nor did Wildride make any trademark, design, or product choices based on

any of Plaintiff's trademark, design, or products. Simply put, Wildride has no intention of associating itself with Plaintiff's brand. I would have never imagined that Plaintiff would bring a lawsuit, because the overall commercial impression of our trademarks, products, and designs is clearly different from Plaintiff in my view.

15.     I have reviewed Plaintiff's offerings as shown in its preliminary injunction motion. Plaintiff does not appear to offer any carriers similar to the WILDRIDE toddler carrier. Plaintiff's offerings appear to include traditional front and back carriers and a wrap carrier, none of which are hip or sling carriers like the WILDRIDE toddler carrier. Further, unlike Plaintiff, Wildride does not market its products as baby products, does not recommend that its carrier be used with any child under 9 months old, and does not use any type of "bird"-focused branding.

16.     In addition to the WILDRIDE trademark, Wildride uses its logo, a stylized cheetah head. Wildride adopted this logo because cheetahs are commonly understood as wild animals, but are also kid-friendly, cool, and bold.



17.     Wildride's cheetah logo is used on most, if not all, of the brand's social media accounts, marketing and product packaging, often appearing alongside the tagline, "THE TODDLER SWING CARRIER," which we include to convey to consumers that we are a toddler company. The cheetah logo also appears on the product itself—either on the strap of the toddler carrier immediately next to the WILDRIDE trademark or as a standalone tag.

18.     Wildride offers products other than the toddler carrier under the WILDRIDE trademark which also align with our wild and adventure themes, such as our leopard-print scarf and sunglasses for "bold little explorers." True and correct copies of product pages are attached hereto as **Exhibit 3**.

19.     Wildride's target demographic includes young parents with active lifestyles—whether they are heading to the beach, hiking mountains, exploring museums, or navigating busy city streets—and toddlers aged 9 months to 4 years old.

20.     Wildride is a premium brand offering a product to customers who are highly discerning and focused on the safety, practicality, functionality, and aesthetics of products they are purchasing for themselves, but especially for their child. The retail price for our toddler carrier range from 132 to over 500 USD.

21.     Wildride regularly receives five-star reviews on the toddler carrier from purchasers. Wildride does receive customer complaints like any company, but they are few and far between, and typically concern things like the texture or "feel" of the fabric.

### B. Wildride's Extensive Intellectual Property Rights

22.     In an effort to protect the brand and goodwill that Wildride has been steadily building since 2021, Wildride has prioritized securing trademark rights in every country where it sells its toddler carrier.

23.     On August 19, 2021, Wildride filed Registration No. 018536206 for the stylized mark, [WILDRIDE logo], in International Classes 18, 25, and 35 in the European Union Intellectual Property Office (EUIPO) which matured to registration on January 12, 2022.

24.     The WILDRIDE toddler carrier product design is protected under a Registered Community Design (RCD) No. 015010565-0001, registered with the EUIPO on February 3,

2023. The registration provides design right protection for the WILDRIDE toddler carrier throughout all 27 EU Member States.

25.     On May 12, 2023, Wildride filed International Registration No. 1743929 for the WILDRIDE trademark in International Classes 18, 24, 25, 35 in 54 countries.

26.     Wildride has since secured registrations for the WILDRIDE trademark in over 30 countries, including without limitation Australia, Bonaire, Sint Eustatius and Saba, Bosnia and Herzegovina, Chile, China, Colombia, Curaçao, Egypt, Indonesia, Iran, Japan, Liechtenstein, Malaysia, Mexico, Montenegro, Morocco, New Zealand, North Macedonia, Norway, Philippines, South Korea, Russia, San Marino, Serbia, Singapore, Sint Maarten, Slovenia, Switzerland, Türkiye, United Arab Emirates, United Kingdom, Vietnam.

27.     Wildride extended International Registration No. 1743929 to the U.S. with a priority filing date of May 12, 2023, which is filed with the United States Patent and Trademark Office (USPTO) as U.S. Application Serial No. 79375825.

28.     On April 15, 2024, Wildride filed Registration No. 019013984 for the stylized mark, , in International Class 18 in the EUIPO which matured to registration August 13, 2024.

29.     Wildride filed an additional trademark application directly with the USPTO over a year before this lawsuit was filed, on May 20, 2024, under U.S. Application Serial No. 98558373 for the WILDRIDE trademark in International Class 18 with a date of first use in U.S. commerce of June 18, 2021.

30.     Notably, the USPTO did not cite Plaintiff's U.S. Application Serial No. 98463953 for WILDBIRD against Wildride's U.S. Serial No. 98558373 for a likelihood of confusion. This

was the case even though Plaintiff had filed its trademark application for WILDBIRD only two months earlier, on March 22, 2024.

### C. Wildride's Use of the WILDRIDE Trademark in the United States

31. Since June 2021, consumers from around the world could purchase the WILDRIDE-branded toddler carrier online through its wildridecarrier.com website.

32. Wildride has offered its toddler carrier under the WILDRIDE trademark in the United States since June 18, 2021.

33. To date, Wildride's toddler carrier has been sold in over 5,000 stores across more than 90 countries, ranging from luxury department stores to online retailers and specialty boutiques.

34. Wildride first started offering the WILDRIDE toddler carrier as a direct-to-consumer product, but in recent years, particularly as a result of rapidly increasing demand for the toddler carrier in the U.S., Wildride has ramped up its business-to-business operations.

35. Since well before this lawsuit, in or around September 2024, Wildride began offering its WILDRIDE toddler carrier in boutique brick-and-mortar retail stores, through the Brixy network of independently owned and operated baby stores in the U.S. There are approximately seven Brixy retailers in the U.S. that currently sell Wildride toddler carriers.

36. In or around February 2025, Wildride began selling its WILDRIDE-branded toddler carrier in Nordstrom.

37. In or around May 2025, Wildride entered into discussions with Target to carry WILDRIDE-branded toddler carriers in stores. Those discussions culminated in an arrangement whereby Target is expected to begin carrying WILDRIDE-branded toddler carriers in hundreds of Target stores by March 2026.

38.     Wildride also regularly attends and exhibits at business-to-business exhibitions, trade shows and retailer/buyer showcases such as ABC Kids Expo, Kind + Jugend, and Nordstrom brand showcases, all of which are major business-to-business events focused on connecting juvenile product brands with retailers, distributors, and other trade professionals.

39.     Over the past five years, █████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████

### D. Wildride's Advertising and Marketing of the WILDRIDE Toddler Carrier

40.     Wildride's social media presence is vital to the success and growth of the brand worldwide. Wildride utilizes its social media accounts primarily for its global marketing of the WILDRIDE toddler carrier.

41.     Since 2021, Wildride has advertised and promoted its brand on social media. This includes @wildride_official, @wildrideuk, @wildride_czsk, @wildride_nordics, @wildride_pl, @wildride_southafrica, @wildride_sea, @wildrideofficial_tw, @wildride_latam, and @wildride_japan (on Instagram); @wildridecarrier and @wildrideuk (on Tik Tok); and Wildride and Wildride UK (on Facebook). Collectively, among all of its accounts, Wildride has hundreds of thousands of followers on social media.

42.     Wildride's Instagram accounts share the WILDRIDE trademark as the dominant portion of the handle, have identical icons, and contain similar posts, all of the foregoing creating a cohesive look and feel and strong online presence.

43.     Wildride currently works with thousands of influencers worldwide, who have a combined millions of social media followers, to promote the WILDRIDE-branded toddler carriers. Wildride has engaged in influencer marketing in the U.S. since as early as November 9,

2021 when it gifted its first WILDRIDE-branded toddler carrier to a U.S. social media influencer.

44. In 2023, after engaging with U.S. social media influencers and promoting the WILDRIDE toddler carrier on social media for years, several of Wildride's Instagram videos went viral with tens of millions of views on each video. As a result, Wildride saw an immediate response and uptick in demand for WILDRIDE toddler carriers from U.S. consumers.

45. Due to the increasing demand for WILDRIDE-branded toddler carriers in the U.S. over the past five years, we formally incorporated a separate entity, Wildride USA Corp. ("Wildride USA"), in Delaware in January 2024 to establish a physical presence in the U.S., formally legitimizing the presence that we had already built in the U.S. since 2021.

46. In or around December 2024, Wildride activated the us.wildridecarrier.com subdomain of its wildridecarrier.com website, which would provide faster shipping and no import duties or fees for U.S. consumers. For all intents and purposes, us.wildridecarrier.com is the same website as wildridecarrier.com, which has been accessible to U.S. customers and used to make orders into the U.S. for years. The addition of the us. subdomain, however, helps Wildride on the back end for shipping, stocking, and warehousing purposes, given that Wildride also established a U.S.-based warehouse in 2024 as well.

E. **Wildride Has Not Experienced Any Instances of Confusion with Plaintiff**

47. In the past five years, Wildride has not experienced instances in which @wildride_official, or Wildride's other Instagram accounts, were tagged in a post or story showing the Plaintiff's product.

48. In the past five years, Wildride has not experienced any instances of actual consumer confusion with Plaintiff. To the contrary, Wildride has received numerous inquiries

from those interested in marketing for Wildride, who have in fact listed Wildbird as one of the brands (among other brands) that they worked with in the past. Similarly, major U.S. retailers, like Nordstrom and Target, have either already begun or will begin selling the WILDRIDE toddler carrier in its online and brick-and-mortar stores. To us, this suggests that retailers, marketers, and influencers are well aware that Wildbird is a different brand from Wildride, and, given their interest in working with both companies (among others), have no doubt that the two brands can each exist independent from one another. Attached as **Exhibit 4** are true and correct copies of customer service inquiries we have received from such marketers.

49. In the past five years, I am not aware of any instance in which someone has reached out to Wildride asking if it was Plaintiff, any instance in which someone has reached out to purchase a Wildride product believing it to be a Wildbird product, or any instance in which somebody has reached out to complain to Wildride about a Wildbird product that they purchased. Upon reasonable inquiry, no one else at Wildride is aware of any such instances.

50. In May 2025, Wildride attended the ABC Kids Expo in Las Vegas, Nevada which is an annual trade show for the juvenile products industry. The event is specifically for business-to-business relationship building where manufacturers, retailers, distributors, and industry professionals can connect to showcase and discover the latest juvenile products. This is not an event targeting end-customers.

51. I have reviewed Plaintiff's account of what it claims it experienced at the ABC Kids Expo. Wildride did not see or interact with Plaintiff at the ABC Kids Expo. Wildride did not have any interactions at the event related to Plaintiff—that is, no one asked if Wildride was related to or affiliated with Plaintiff. It was clear to me that the third parties we interacted with

were not confused about the fact that we were Wildride, not the Plaintiff. At no point did anyone at the showcase come up to our booth and call us "Wildbird."

52. In June 2025, Wildride also attended a showcase at Nordstrom in Seattle, Washington which was an intimate gathering of at most 10 brands and Nordstrom buyers. I have also reviewed Plaintiff's account of what it claims it experienced at the Nordstrom showcase. Again, Wildride did not interact with Plaintiff at the showcase. Wildride did not experience any confusion at the showcase, and at no point did any of Nordstrom's buyers come up to our booth and call us "Wildbird." The lack of confusion specifically amongst Nordstrom buyers (who are not our end-customers) is evident by the very fact that (i) Nordstrom willingly carries both Wildride's and Plaintiff's products, and (ii) Nordstrom invited both Wildride and Plaintiff to exhibit at the same showcase.

**F. Wildride Would Suffer Extreme Hardship if Plaintiff's Injunction is Granted**

53. Wildride, through its well-established and long-standing trademark rights and use around the world, has cemented itself as a global brand with substantial goodwill.

54. An injunction that prevents Wildride from using its WILDRIDE trademark in connection with its toddler carrier would wreak serious, irreparable harm. Wildride has invested millions of euros into building its brand. Contrary to Plaintiff's contention, Wildride is a globally established brand—not a knock-off company or newcomer to the U.S. market. Over the past five years, Wildride has built a strong global following through extensive marketing and advertising of the toddler carrier under the WILDRIDE trademark which has resulted in substantial goodwill and consumer recognition.

55. With every intention to lawfully establish itself as a global brand, Wildride has taken substantial steps and invested in securing valid trademark and design rights for the

WILDRIDE trademark and the toddler carrier design around the world, including the U.S. Further, Wildride has invested significant time and resources into building meaningful relationships with U.S. retailers through traveling to attend U.S. exhibitions and trade shows to meet with retailers and buyers—relationships which are likely to become soured or attenuated by a sudden halt in production or distribution and a forced rebrand. It even incorporated Wildride USA in the U.S., almost two years ago, to further cement the enormous investments Wildride had already made in the U.S. market.

56. Wildride's success in the U.S. is a direct result of the foregoing efforts to establish itself as a recognizable and independent brand with a unique product and commercial impression. At this stage, it would be prohibitively expensive, time-consuming, and burdensome if Wildride were forced to undo all of the growth and success it has had under the WILDRIDE name for the past five years.

57. Beyond the harm of lost investment, Wildride would also suffer from lost sales, possible loss of customers, reputational damage, harm to Wildride's brand, significant costs associated with rebranding, and costs associated with lost media and social media purchases. An injunction which prevents Wildride from using its trademark in connection with its toddler carrier in the U.S. while Wildride continues to use its trademark everywhere else in the world would create an impossible situation for Wildride, and a confusing situation for Wildride's consumers.

58. Consumers in the U.S. and around the world already recognize the brand "Wildride" as the single source of Wildride's toddler carrier. So an injunction which requires Wildride to sell the same product under two different brand names would create confusion among consumers on a mass scale given Wildride's global presence, fundamentally affecting

Wildride's rights and goodwill abroad. Wildride's marketing and advertising efforts are dependent on its social media influencer relationships and its social media accounts, which all share the WILDRIDE trademark in their names. Because social media is global, Wildride's reach on these platforms is not siloed to just Wildride's U.S. consumers.

59. If enjoined, Wildride would have to create an entirely new brand segmented at just the U.S. market, and secure new social media handles—of which there is no guarantee—which will undoubtedly cause confusion in their consumers all over the world, not just the U.S. Because consumers already identify the brand "Wildride" as the source of its toddler carrier, changing the name now would create unnecessary confusion and therefore harm innocent consumers.

60. Further, if Wildride is enjoined from using its trademark in the U.S. now but ultimately wins this lawsuit, then Wildride would have to change its name now, just to change it back later—which not only multiplies the inevitable consumer confusion but would further cause significant damage to Wildride's brand and reputation.

61. Moreover, Plaintiff's preliminary injunction motion calls for payment of profits to Plaintiff, destruction of product, and attorneys' fees, all of which would leave Wildride without sufficient funds to rebrand itself, adding insult to injury should Wildride be enjoined from using its trademark in the U.S.

62. On the evening of Friday, July 18, 2025, Wildride received an email from Plaintiff's CEO, Nate Gunn apprising Wildride for the first time that Plaintiff was asserting its trademark rights against us. This was a surprise, because, as noted, we have already been in the U.S. market for years without any issue, and have never experienced any instance of actual confusion. Nor do I believe the parties' marks, products, or branding are confusingly similar.

63. On Tuesday, July 22, 2025, when I spoke to Mr. Gunn about his email, I understood that Plaintiff had already filed a lawsuit in the U.S. We did not have a chance to have a meaningful conversation with Mr. Gunn before Plaintiff filed suit.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on October 3, 2025 in Haarlem, Netherlands.

_____
Britt Schoorl