**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WILDBIRD LLC,<br><br>       *Plaintiff*,<br><br>       v.<br><br>WILDRIDE B.V., and WILDRIDE USA CORP.,<br><br>       *Defendants.* | Civil Action No: 1:25-cv-05993-DLC-SN |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW IN
<u>SUPPORT OF PLAINTIFF'S PRELIMINARY-INJUNCTION MOTION</u>**

Pursuant to Paragraph Nine of this Court's Scheduling Order (Dkt. 18, as revised at Dkts. 32, 33), as well as Rules 4.H and 6.B.iv of this Court's Individual Practices in Civil Cases, Plaintiff Wildbird LLC respectfully submits these Proposed Findings of Fact and Conclusions of Law in support of its pending preliminary-injunction motion.

## [PROPOSED] FINDINGS OF FACT

### I.  Procedural Background

1.  Plaintiff Wildbird LLC ("Wildbird") commenced this lawsuit on July 22, 2025, against Defendants Wildride B.V. ("Wildride B.V.") and Wildride USA Corp. ("Wildride USA," together with Wildride B.V., "Defendants"). *See* Dkt. 1 (as amended at Dkt. 15 to include Exhibits 1-8; "Cplt.").

2.  In the Complaint, Wildbird alleges that Defendants' use of the trademark "WILDRIDE" for baby and toddler carriers infringes Plaintiff's "WILDBIRD" trademark for children's accessories and clothing, including carriers. *See* Cplt., ¶¶ 1-3.

3.  Wildbird asserts five claims for relief in the Complaint, namely: (i) federal trademark infringement in violation of 15 U.S.C. § 1114(1) ("Section 32"); (ii) federal false association, false designation of origin, and unfair competition in violation of 15 U.S.C. § 1125(a)(1)(A) ("Section 43(a)"); (iii) dilution and injury to business reputation in violation of New York General Business Law § 360-*l*; (iv) trademark infringement in violation of New York's common law; and (v) unfair competition in violation of New York's common law. *See* Cplt., ¶ 4; *see also id.* at pgs. 14-20.

4.  On July 22, 2025, Wildbird also filed a motion for a preliminary injunction. *See* Dkt. 8 ("PI Motion").

5.      In support of the PI Motion, Wildbird submitted: (i) a memorandum of law (Dkt. 9); the Declaration of Nate Gunn and Exhibits 1-10 thereto (J. Thomas Decl.[1], **Ex. 1**); and (iii) the Declaration of Jonathan W. Thomas, Esq. and Exhibits 1-7 thereto (J. Thomas Decl., **Ex. 2**).

6.      In the PI Motion, Wildbird seeks to preliminarily enjoin Defendants, their agents, servants, employees, officers, and all persons and entities in active concert and participation with them, from using the trademark WILDRIDE (or any other mark(s) confusingly similar to Plaintiff's WILDBIRD trademark) in United States commerce for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, children's accessories and clothing.  PI Motion at 2.

7.      On July 23, 2025, this Court Ordered Plaintiff to serve Defendants on or before July 25, 2025, and scheduled a hearing on the PI Motion for July 29, 2025.  *See* Dkt. 16.  On July 24, 2025, Plaintiff served Defendant Wildride USA Corp. with the Summons, Complaint, and PI Motion Papers.  *See* Dkt. 17.  On July 31, 2025, the Court approved the parties' request to extend Defendants' deadline to respond to the Complaint to September 15, 2025.  *See* Dkts. 22, 23. Defendants' filed their Answer to the Complaint on September 15, 2025.  *See* Dut. 35.

8.      On July 29, 2025, the Court held a conference on the PI Motion, during which Plaintiff and Defendants proposed, and the Court adopted, the following PI schedule: (i) the parties' core documents were exchanged by August 8, 2025; (ii) discovery requests were served by August 15, 2025; (iii) responses to discovery requests were served by August 29, 2025; (iv) depositions were to be conducted by September 12, 2025; (v) Defendants' opposition to the PI Motion was due September 22, 2025; (vi) Plaintiff's reply in further support of its PI Motion

---

[1] "J. Thomas. Decl." refers to the October 17, 2025, Declaration of Jonathan W. Thomas, Esq.

was due on October 3, 2025; (vii) a list of witnesses to cross-examine at the hearing on the PI Motion was due on October 8, 2025; (viii) the parties' Proposed Findings of Fact and Conclusions of Law, and deposition testimony, was due on October 10, 2025; and (ix) the hearing on Plaintiff's PI Motion would be on October 23, 2025.  *See* Dkt. 18 ("PI Scheduling Order").

9.      On September 11, 2025, the parties proposed, and the Court adopted, revising the PI Scheduling Order as follows: (i) depositions completed by September 19, 2025; (ii) Defendants' opposition to the PI Motion was due September 29, 2025; (iii) Plaintiff's reply in further support of its PI Motion was due on October 10, 2025; (iv) a list of witnesses to cross-examine at the hearing on the PI Motion was due on October 15, 2025; (v) the parties' Proposed Findings of Fact and Conclusions of Law, and deposition testimony, was due on October 17, 2025; and (vi) the hearing on Plaintiff's PI Motion would be on October 30, 2025.  *See* Dkts. 32, 33 ("Revised PI Scheduling Order").

10.      On September 19, 2025, Plaintiff filed a motion for a temporary restraining order against Defendants.  *See* Dkt. 19 ("TRO Motion"; *see also* J. Thomas Decl., Exs. **3**, **4**.).  In the TRO Motion, Plaintiff sought to temporarily restrain Defendants, together with Defendants' founders, agents, servants, employees, officers, and all persons and entities in active concert and participation with them, using the trademark WILDRIDE (or any other mark(s) confusingly similar to Plaintiff's WILDBIRD trademark) for, on, and/or in connection with the advertising, promotion, offering for sale, and/or sale of children's carriers (including, without limitation, any style, make, or model of carriers for babies and carriers for toddlers) in any Target location in the United States; on Target's website in the United States; and in any third-party store or on any third-party website in the United States (other than Nordstrom's website) until the October 30, 2025, hearing on Plaintiff's PI Motion.  *See* TRO Motion.

11.     On September 19, 2025, the Court scheduled a conference on Plaintiff's TRO Motion for September 22, 2025.  *See* Dkt. 41.

12.     On September 22, 2025, Defendants filed their opposition to Plaintiff's TRO Motion.  *See* Dkt. 42 ("Defendants' TRO Opposition").  In support of Defendants' TRO Opposition, they submitted: (i) a memorandum of law (Dkt. 42); (ii) the Declaration of Britt Schoorl and Exhibits 1-3 thereto (J. Thomas Decl., **Ex. 5**); and (iii) the Declaration of Leo M. Lichtman, Esq. and Exhibits 1-10 thereto (J. Thomas Decl., **Ex. 6**).

13.     Ms. Schoorl represented that Defendants did not intend to begin selling their WILDRIDE-branded products at Target's stores until March 2026.  *See* J. Thomas Decl., **Ex. 5**. During the September 22, 2025, hearing on Plaintiff's TRO Motion, Defendants' counsel represented to the Court that Defendants' WILDRIDE-branded products would not be available for sale in Target's stores before the date of the hearing on Plaintiff's PI Motion, *i.e.*, October 30, 2025.  Accordingly, the Court denied the TRO Motion "on the ground that plaintiff failed to establish that it will be irreparably harmed prior to October 30, 2025 […]."  Dkt. 45.

14.     On October 3, 2025, Defendants filed their opposition to Plaintiff's PI Motion.  *See* Dkt. 48 ("Defendants' PI Opposition").  In support of Defendants' PI Opposition, they submitted: (i) a memorandum of law (Dkt. 48); (ii) the Declaration of Britt Schoorl and Exhibits 1-4 thereto (*see* J. Thomas Decl., **Ex. 26**); and (iii) the Declaration of Leo M. Lichtman, Esq. and Exhibits 1-25 thereto (*see* J. Thomas Decl., **Ex. 27**).

15.     On October 10, 2025, Plaintiff filed its reply in further support of its PI Motion. *See* Dkt. 57 ("Plaintiff's PI Reply").  In support of Plaintiff's PI Reply, it submitted: (i) a memorandum of law (Dkt. 57); (ii) the Declaration of Molly R. Littman-Johnson, Esq. and Exhibits 1-4 thereto (J. Thomas Decl., **Ex. 7**); and (iii) the Declaration of Nate Gunn (J. Thomas

Decl., **Ex. 8**).

## II.    Factual Background

### A.  Plaintiff

16.    Founded in 2014 by first-time parents, Tayler and Nate Gunn, WILDBIRD is an award-winning brand of children and parental accessories and clothing.  *See* J. Thomas Decl., **Ex. 1** at ¶ 4.

17.    Wildbird's founders felt the nurturing and protective nature of a mother bird.  *See* J. Thomas Decl., **Ex. 1** at ¶ 4.  As part of that nurturing, Tayler and Nate wanted to keep their newborn child close enough to their bodies to soothe their child with their breathing.  *Id*.   Unable to "wear" their newborn child, Tayler and Nate developed a ring-sling carrier, which allowed them to carry/wear their child.  *Id*.  A representative example of a WILDBIRD-brand ring sling is below:



*Id*.

i.    **Plaintiff's WILDBIRD-Brand Products**

18.    As of 2014, Tayler and Nate were not aware of any other baby brand in the United States that had "wild" or "bird" in its name.  *See* J. Thomas Decl., **Ex. 1** at ¶ 5; *see also id*. at **Ex. 9**, 28:15-30:3.  That fact, combined with the nurturing and protective nature of a mother bird that Tayler and Nate felt for their newborn, led them to adopt Wildbird as the name of their company in 2014.  *See* J. Thomas Decl., **Ex. 1** at ¶ 5.

19.    Tayler and Nate launched the WILDBIRD brand in November 2014 with the brand's ring sling, which was—and remains—suitable for carrying babies and toddlers.  *See* J. Thomas Decl., **Ex. 3** at ¶ 8; *see also id*. at **Ex. 9**, 69:1-25.

20.    Since Wildbird's founding in 2014, it has expanded its product offerings from ring slings to include a full range of accessories and clothing for children and their parents.  *See* J. Thomas Decl., **Ex. 1** at ¶ 6.

21.    Today, Wildbird offers: (i) ring slings; (ii) "wrap" baby carriers; (iii) pajamas; (iv) sleep sacks; (v) pregnancy pillows;  (vi) playmats; (vii) blankets; (viii) pillows; (ix) crib sheets; (x) swaddles; (xi) hats; and (xii) teethers.  *See* J. Thomas Decl., **Ex. 1** at ¶ 6; *see also id*. at Ex. 1.

22.    Wildbird currently plans to expand its product offerings to include: (i) additional carriers; (ii) stroller wagons; (iii) bouncers; (iv) bath products; (v) nursery products; (vi) additional clothing; and (vii) play items.  *See* J. Thomas Decl., **Ex. 1** at ¶ 7; *see also id*. at **Ex. 9**, 78:1-84:20.

ii.    **Plaintiff's WILDBIRD Trademarks**

23.    To identify and distinguish WILDBIRD-brand products in the marketplace, Plaintiff uses (i) the "WILDBIRD" word mark (the "WILDBIRD Word Mark") and (ii) the inset logo (the "WILDBIRD Logo," together with the WILDBIRD Word Mark, the "WILDBIRD Marks"):



*See* J. Thomas Decl., **Ex. 1** at ¶ 8.

24.      Wildbird owns U.S. Trademark Registration No. 7,798,495 (the "'459 Registration"), which covers the WILDBIRD Word Mark for, *inter alia*: (i) back packs for carrying babies; baby carriers worn on the body in Class 18 and (ii) on-line retail store services featuring baby related consumer products, namely baby carriers, baby pajamas, baby bedding, baby playmats, toddler pajamas, and baby sleep sacks in Class 35. *See* J. Thomas Decl., **Ex. 1** at Ex. 2.

25.      The United States Patent and Trademark Office registered the WILDBIRD Word Mark without proof of secondary meaning. *See* J. Thomas Decl., **Ex. 1** at Ex. 3.

26.      Wildbird owns U.S. Trademark Application Serial No. 99/068,040, which seeks registration of the WILDBIRD Logo for, *inter alia*, the Class 18 and Class 35 goods and services covered by Plaintiff's '549 Registration. *See* J. Thomas Decl., **Ex. 1** at Ex. 3.

**iii.     Consumer Recognition of Plaintiff's WILDBIRD Brand**

27.      In 2024, Plaintiff commissioned a WildBird Market Exploratory Report. *See* J. Thomas Decl., **Ex. 10**. The Report found that 72% of frequent users and 58% of occasional users of wearable baby carriers recognize the WILDBIRD brand. *See id.* at p. 57. Even 25% of non-owners - those who do not use a baby carrier – were familiar with the WILDBIRD brand. *See id.*

**iv.     Unsolicited Media Coverage of, and Awards Won For, Products Offered Under Plaintiff's WILDBIRD Marks**

28.      Plaintiff's products offered under its WILDBIRD Marks have received widespread media coverage throughout the United States in nearly one hundred instances, including in national publications such as: *Vogue*; *Glamour*; *Strategist*; and *The Bump*. *See* J. Thomas Decl., **Ex. 1** at

¶ 14; *see also* J. Thomas Decl., **Ex. 7** at Ex. 1. Products offered under the WILDBIRD Marks also have appeared on the widely watched *Today* Show.   *See* J. Thomas Decl., **Ex. 1** at  ¶ 15.

29.    Plaintiff's media coverage is primarily organic and not "affiliate marketing" as Defendants claim.  For example, of the 103 articles featuring Plaintiff's WILDBIRD-branded products between 2023 and 2025, only *nine* were "syndicated." *See* J. Thomas Decl., **Ex. 7** at Ex. 1. The remaining 94 were earned organically.   *See id*.

30.    Plaintiff's WILDBIRD carriers have also received numerous awards, such as "best new baby carrier," in publications like Parents Guide and The Bump.  *See* J. Thomas Decl., **Ex. 1** at ¶ 17; *see also id*. at Ex. 8; J. Thomas Decl., **Ex. 9** at 258:8-17.

31.    Plaintiff's WILDBIRD-brand products also commonly receive favorable reviews from customers.  *See*, *e.g.*, J. Thomas Decl., **Ex. 1** at Ex. 9.

**v.    Plaintiff's Advertising Spend and Sales Success**

32.    Since 2014, Plaintiff has spent more than ███████ promoting products offered under its WILDBIRD Marks.  *See* J. Thomas Decl., **Ex. 11**.

33.    Plaintiff's advertising efforts, include, for example: (i) advertising on Wildbird's website; (ii) advertising on Wildbird's social-media accounts, which, combined, have more than a half-a-million followers; and (iii) advertising via social-media influencers.  *See* J. Thomas Decl., **Ex. 1** at ¶ 13; *see also* J. Thomas Decl., **Ex. 2** at Exs. 5-7.

34.    Since 2014, Plaintiff has sold nearly ███████ worth of products offered under its WILDBIRD Marks.  *See* J. Thomas Decl., **Ex. 11**.

35.    In addition to Plaintiff's website, products offered under Plaintiff's WILDBIRD Marks are advertised, offered for sale, and sold by national retailers, such as: Target; Babylist; and Nordstrom; as well as on Amazon.com.  *See* J. Thomas Decl., **Ex. 1** at ¶ 16; *see also id*. at Ex. 9;

J. Thomas Decl., **Ex. 4** at Exs. 3, 4.  Over 125 boutique retailers throughout the United States also advertise, offer for sale, and sell products offered under Plaintiff's WILDBIRD Marks.  *See* J. Thomas Decl., **Ex. 12**.

> **vi.    Plaintiff's WILDBIRD Brand Was the Only "WILD"-Formative Brand of Baby and Toddler Carriers in the United States Until Defendants Launched Their Infringing WILDRIDE-Branded Baby and Toddler Carriers**

36.    Since November 2014, Plaintiff has used its WILDBIRD Marks continuously in the United States in connection with advertising and selling, *inter alia*, baby carriers and toddler carriers.  *See* J. Thomas Decl., **Ex. 1** at ¶ 28; *see also id.* at **Ex. 3**, ¶ 8.

37.    In 2015, Plaintiff sent a cease-and-desist letter to a company that formerly did business as "WildBird Designs."  *See* J. Thomas Decl., **Ex. 1** at ¶ 11; *see also id.* at **Ex. 9**, 271:6-272:4; J. Thomas Decl., **Ex. 13**.  Plaintiff also successfully stopped a third party in 2025 from unlawfully impersonating Plaintiff and its WILDBIRD-brand products.  *See* J. Thomas Decl., **Ex. 9** at 272:12-273:25.

38.    More than a decade after Plaintiff adopted and began using its WILDBIRD Marks in the United States, there are currently only two brands of carriers for babies and toddlers in the United States that have "wild" in their brand names: Plaintiff's WILDBIRD and Defendants' WILDRIDE.  *See* J. Thomas Decl., **Ex. 1** at ¶ 12; *see also id.* at **Ex. 3**, ¶ 8.

39.    For example, during discovery, Defendants produced printouts of third-party websites from August 7, 2025, that: (i) included "wild" in their name and (ii) sold clothing and accessories for children and/or arranged activities and parties for children.  *See, e.g.*, J. Thomas Decl., **Ex. 4** at Ex. 1; *see also id.* at **Ex. 15**.

40.    During Defendants' deposition, they could not identify a single third-party website that they visited—before or after August 7, 2025—to determine whether any third party was

advertising or selling a baby carrier or a toddler carrier in the United States under a brand name that included the word "wild." *See* J. Thomas Decl., **Ex. 14** at 91:16-100:16.

41.     After reviewing the third-party website printouts during the deposition, Defendants identified one website that advertised a carrier for sale—and the carrier was Plaintiff's WILDBIRD-brand carrier. *See* J. Thomas Decl., **Ex. 14** at 91:16-102-5; *see also id.* at **Ex. 16**; J. Thomas Decl., **Ex. 4** at Ex. 2.

42.     As another example, during Defendants' deposition, they were shown the results of a search for the word "wild" that their lawyers performed on the U.S. Patent and Trademark Office's website on August 8, 2025. *See* J. Thomas Decl., **Ex. 17**; *see also id.* at **Ex. 14**, 102:10-116:6-118:10. Defendants could not identify any mark in the report that is used in the United States for a baby carrier or a toddler carrier. *See id.*

43.     As a further example, during Defendants' deposition, they were shown a chart their lawyers prepared that purportedly included results from the U.S. Patent and Trademark Office's database for the world "wild." *See* J. Thomas Decl., **Ex. 18**; *see also id.* at **Ex. 14**, 116:6-. Defendants could not identify any mark in the chart that is used in the United States for a baby carrier or a toddler carrier. *See id.*

**B. Defendants and Their Infringing WILDRIDE Marks**

44.     According to documents filed with the United States Patent and Trademark Office ("PTO"), Defendant Wildride B.V. is a Netherlands besloten vennootschap with a principal place of business located at Donkere Spaarne 44, 2011 JH, Haarlem NETHERLANDS. *See* J. Thomas Decl., **Ex. 2** at Exs. 1, 2.

45.     According to the website us.wildridecarrier.com, Defendant Wildride USA Corp. is a Delaware corporation and maintains its principal place of business at 228 East 45th Street,

Suite 9E, New York, New York 10017.  *See* J. Thomas Decl., **Ex. 2** at Exs. 3, 4.

46.    According to the PTO's database, Defendant Wildride B.V. owns U.S. Trademark Application Serial No. 79/375,825 (the "'825 Application"), which seeks registration of the word mark WILDRIDE in, *inter alia*, the following Classes for the following goods and services:

a.    18: Baby and children carriers worn on the body; pouch baby and infant carriers; baby and infant carriers; sling bags for carrying babies and infants; slings for carrying babies and infants; baby and infant carrying bags, and

b.    35: Retailing services and wholesale services featuring baby and children carriers worn on the body, pouch baby and infant carriers, baby and infant carriers, carrier bags, slings for carrying babies and infants, sling bags for carrying babies and infants; shop services, business intermediary services, selling and buying and business advice relating to baby and children carriers worn on the body, pouch baby and infant carriers, baby and infant carriers, carrier bags, slings for carrying babies and infants, sling bags for carrying babies and infants.

*See* J. Thomas Decl., **Ex. 1**.

47.    According to the PTO's database, Defendant Wildride B.V. owns U.S. Trademark Application Serial No. 98/558,373 (the "'373 Application"), which seeks registration of the word mark WILDRIDE in Class 18 for Baby and children carriers worn on the body; pouch baby and infant carriers; baby and infant carriers worn on the body; sling bags for carrying babies and infants; slings for carrying babies and infants; baby and infant carrying bags.  *See* J. Thomas Decl., **Ex. 2**.  The WILDRIDE word mark, as set forth in the '825 Application and the '373 Application, is referred to hereinafter the "WILDRIDE Word Mark."

48.    In the '825 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark in, *inter alia*, the same Classes covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, 18 and 35.  *See* J. Thomas Decl., **Ex. 2**.  In the '825 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark for goods and services that are identical to goods and services covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, baby carriers and retail store services concerning, among other things, baby carriers.

*Compare id*. *with* J. Thomas Decl., **Ex. 1** at Ex. 2.

49.     In the '373 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark in same Class covered by Plaintiff's '459 Registration for the WILDBIRD Word Mark, namely, 18.  *See* J. Thomas Decl., **Ex. 2** at Ex. 2.  In the '373 Application, Wildride B.V. seeks registration of the WILDRIDE Word Mark for goods that are identical to goods covered by Plaintiff's '459 Registration, namely, baby carriers.  *Compare id*. *with* J. Thomas Delc., **Ex. 1** at Ex. 3.

50.     Wildride B.V. based the '825 Application on an International Registration Date of May 12, 2023 for International Registration No. 1743929.  *See* J. Thomas Decl., **Ex. 2** at Ex. 1.  In the '373 Application, Wildride B.V. claimed a first-use date of the WILDRIDE Word Mark of January 2021.   *Id*. at Ex. 2.  As set forth in the '459 Registration, Plaintiff began using its WILDBIRD Word Mark in United States commerce in November 2014 for baby carriers and retail store services.  *See* J. Thomas Decl., **Ex. 1** at Ex. 1.

51.     Defendant Wildride USA Corp. has ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮   *See* J. Thomas Decl., **Ex. 14** at 29:9-23.

52.     Defendants'    United-States-based    website    is    located    at https://us.wildridecarrier.com ("Defendants' U.S. Website").  *See* J. Thomas Decl., **Ex. 2** at Exs. 3, 4.

53.     Defendants' U.S. Website and social-media accounts display the Infringing WILDRIDE Word Mark and inset logos (together with the WILDRIDE Word mark, the "WILDRIDE Marks"):



*See* J. Thomas Decl., **Ex. 2** at Exs. 3, 4, 7.

> **i.    Defendants Offer the Same Categories of Products Under Their WILDRIDE Marks That Plaintiff Offers Under its WILDBIRD Marks: Carriers for Babies and Toddlers**

54.    As stated *supra*, in the '373 and '825 Applications to register the WILDRIDE Word Mark, Defendant Wildride B.V. identified its goods as: "*baby* and children carriers worn on the body; pouch *baby* and infant carriers; *baby* and infant carriers worn on the body; sling bags for carrying *babies* and infants; slings for carrying *babies* and infants; [and] *baby* and infant carrying bags." J. Thomas Decl., **Ex. 2** at Exs. 2, 3. (emphasis added).

55.    Defendants' U.S. website describes its carrier as the "best *baby* carrier." J. Thomas Decl., **Ex. 4** at Ex. 8, p. 6. (emphasis added).

56.    Defendants' U.S. website has an article that indicates children progress from babies to toddlers at the age of 1 year. J. Thomas Decl., **Ex. 4** at Ex. 10.

57.    Defendants' U.S. website describes its carrier as "fit[ting] children from *9 months to 4 years*." J. Thomas Decl., **Ex. 4** at Ex. 8, p. 6.

58.    Defendants advertise their carriers as being ASTM F2907-22 compliant, which is the safety standard for baby carriers. *See* J. Thomas Decl., **Ex. 7** at Ex. 3, p. 18; *see also id*. at **Exs. 19, 20**.

59.    Additional examples of the parties advertising and selling baby carriers and toddler

carriers under their respective WILDBIRD and WILDRIDE Marks in the United States include:

- Plaintiff advertises and sells carriers for babies and carriers for toddlers on its website (*See* J. Thomas Decl., **Ex. 1** at Ex. 1; J. Thomas Decl., **Ex. 4** at Ex. 7);

- Defendants advertise and sell carriers for toddlers on their U.S. Website (*See* J. Thomas Decl., **Ex. 4** at Exs, 8, 9);

- Both parties' carriers are offered in the "Baby Carriers" section of Nordstrom's website, including side-by-side in searches on Nordstrom's website (*See* J. Thomas Decl., **Ex. 1** at Ex. 10; J. Thomas Decl., **Ex. 2** at Ex. 5; J. Thomas Decl., **Ex. 4** at Ex. 4), and Defendants' carrier is in the baby section of Nordstrom's physical stores (*See* J. Thomas Decl., **Ex. 8** at ¶¶ 4-10);

- Consumer reviews of both parties' carriers refer to them as "newborn to toddler" (*See* J. Thomas Decl., **Ex. 4** at Ex. 5, p. 3) and "baby/toddler" (*See* J. Thomas Decl., **Ex. 4** at Ex. 6, p. 9).

- In May 2025, both parties attended the ABC Kids Expo - an exhibition "where leading brands showcase their newest collaboration and innovations in baby gear, toys, apparel, gifts, and more." (*See* J. Thomas Decl., **Ex. 4** at Ex. 11).

ii.   **Defendants Progressively Encroached on Plaintiff's WILDBIRD Trademarks in the United States**

60.   Defendants' WILDRIDE brand was founded in the Netherlands in 2021.  *See* J. Thomas Decl., **Ex. 26** at ¶ 3.

61.   From 2021 until December 2024, Defendants sold products off their Netherlands-based website and shipped them to the United States from the Netherlands.  *See* J. Thomas Decl., **Exs. 21-23**; *see also id*. at **Ex. 14**, 33:4-7; 60:15-61:2.

████████████████████████████████████████████████



68.     Defendants did not sell any WILDRIDE-branded products on their U.S. Website until December 2024.  *See* J. Thomas Decl., **Ex. 4** at Ex. 13; *see also id.* at **Ex. 24**; *id.* at **Ex. 14**, 33:4-7; 60:15-61:2; *id.* at Ex. **26**, ¶ 46.

69.

70.     The first sale of a WILDRIDE-branded product from a United-States-based retailer allegedly occurred at a small, unknown retail store somewhere in Texas in late-2024.  *See* J. Thomas Decl., **Ex. 14** at 56:10-57:5.

71.

72.     Defendants did not begin selling WILDRIDE-branded products at Nordstrom in the

United States until February or May of 2025. *Compare* J. Thomas Decl., Ex. 26 at ¶ 36 *with* J. Thomas Decl., **Ex. 14** at 53:20-22. Yet a customer on Nordstrom's website already gave one of Defendants' products only 3 out of 5 stars; complained about its design; and described the product as "[o]verall, it's ok —not a must have." *See* J. Thomas Decl., **Ex. 1** at Ex. 10.

73. Defendants attended their first trade show in the U.S. in May 2025, namely, the ABC Kids Expo in Las Vegas, Nevada. *See* J. Thomas Decl., **Ex. 14** at 90:6-91:15.



### vii. Plaintiff Noticed Actual Confusion For the First Time After Defendants Rapidly Expanded the Use of Their WILDRIDE Marks to Advertise and Sell Products in the United States

76. In May 2025, Plaintiff discovered, for the first time, that Defendants were using their WILDRIDE Marks while physically present in the United States. *See* J. Thomas Decl., **Ex. 1** at ¶¶ 19, 20; *see also id.* at **Ex. 3**, ¶ 9; **Ex. 4** at Ex. 12, pgs 4-5; **Ex. 9** at 184:22-185:20. Plaintiff made this discovery while attending the 2025 ABC Kids Expo in Las Vegas, Nevada, which Plaintiff and Defendants attended from May 21-23, 2025. *See* J. Thomas Decl., **Ex. 1** at ¶ 20; *see also* J. Thomas Decl., **Ex. 4** at Ex. 12, pgs 4-5.

77. On Day 2 of the ABC Kids Expo, a buyer for Nordstrom asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand. *See* J. Thomas Decl., **Ex. 1** at ¶ 21. On Day 3 of the ABC Kids Expo, multiple suppliers confused

Plaintiff's WILDBIRD brand with the Defendants' WILDRIDE brand.  *Id*. at ¶ 22.  For example, one supplier said to Plaintiff's representative: "oh, yes; I saw your booth"—but they were referring to Defendants' booth.  *Id*.  As another example, one supplier asked Plaintiff's representative: "You are Wildride, yes"?  *Id*.

78.    After the ABC Kids Expo, Wildbird attempted to determine the extent of Defendants' business operations in the United States.  *See* J. Thomas Decl., **Ex. 1** at ¶ 23.  For example, Plaintiff's co-founder, Nate Gunn, reached out to Plaintiff's contact at Target to see if they had any information about Defendants' plans for the United States market.  *Id*.  In July 2025, Plaintiff also attempted to resolve this dispute by speaking with Defendants' co-founders.  *Id*. at ¶ 27.

79.    While attempting to determine the extent of Defendants' business operations in the United States, Plaintiff encountered Defendants a second time; this time, at a brand showcase for Nordstrom.  *See* J. Thomas Decl., **Ex. 1** at ¶ 24.

80.    In June 2025, Plaintiff and Defendants attended a brand showcase for Nordstrom, which included only 6-to-8 other brands.  *See* J. Thomas Decl., **Ex. 1** at ¶¶ 23, 24.  At least four category leads for Nordstrom stores throughout the United States asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand or if Plaintiff's WILDBIRD brand was the same as Defendants' WILDRIDE brand.  *Id*.

81.    In July 2025, Plaintiff began to notice for the first time that consumers were confusing Plaintiff and Defendants on social media.  *See* J. Thomas Decl., **Ex. 1** at ¶ 26; **Ex. 3**, ¶ 9; **Ex.** 9, 189:3-21.

82.    Six additional instances of actual confusion that Plaintiff is aware of have occurred since the filing of this lawsuit: five on social media and one at a Nordstrom store in California on

October 9, 2025, where a Sales Associate confused the parties' brands and remarked that Defendants' WILDRIDE mark seemed "oddly similar" to Plaintiff's WILDBIRD mark. *See* J. Thomas Decl., **Ex. 4** at Exs. 14-19; *id.* at **Ex. 8**, ¶¶ 4-12.

### vii. Defendants Intend to Further Expand the Use of Their WILDRIDE Marks to Advertise and Sell Products in the United States

83.    When Plaintiff filed this lawsuit on July 22, 2025, it was aware of only one retailer in the United States that advertised and sold WILDBIRD-branded and WILDRIDE-branded carriers, namely, Nordstrom.   *See* J. Thomas Decl., **Ex. 3** at ¶ 4.

84.    During discovery, Defendants testified on September 15, 2025, that they have WILDIRDE-branded products on the way to the United States and intend to distribute them in approximately six weeks to six months to "all the stores that want to sell it" and "all the stores who have the right customer to sell it"; however, Defendants could not identify the name of any brick-and-mortar stores that would advertise and sell WILDRIDE-branded products in the United States. *See* J. Thomas Decl., **Ex. 14** at 76:20-83:21.; *see also id.* at **Ex. 25**.

85.    In the evening of September 17, 2025, Plaintiff learned for the first time that Defendants are planning to further expand the use of their WILDRIDE Marks in the United States by advertising and selling WILDRIDE-branded carriers in Target's retail locations, which Defendants state will occur in march 2026. *See* J. Thomas Decl., **Ex. 3** at ¶ 6.  Plaintiff has been selling its WILDBIRD-branded products at Target for approximately five years.  *Id.* at ¶¶ 5, 9.

### [PROPOSED] CONCLUSIONS OF LAW

1.    This Court has the authority to issue a preliminary injunction pursuant to Fed. R. Civ. P. 65(a) and 15 U.S.C. § 1116(a).   *See* Fed. R. Civ. P. 65(a)(1) (The court may issue a preliminary injunction only on notice to the adverse party"); and 15 U.S.C. § 1116(a) ("The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant

injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title").

2.      To obtain a preliminary injunction, Wildbird must "establish (1) irreparable harm; (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in [its] favor […]; and (3) that a preliminary injunction is in the public interest." *TushBaby, Inc. v. Jinjang Kangbersi Trade Co. Ltd.*, 2024 WL 4627452, at *2 (S.D.N.Y. Oct. 30, 2024) (granting preliminary injunction in trademark case); *accord Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015).

3.      Courts in this District regularly issue preliminary injunctions in trademark cases. *See*, *e.g.*, *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305 (S.D.N.Y. 2010); *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515 (S.D.N.Y. 2011); *NYP Holdings v. New York Post Pub. Inc.*, 63 F. Supp. 3d 328 (S.D.N.Y. 2014); *Museum of Modern Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361 (S.D.N.Y. 2018); *Goat Fashion Ltd. 1661, Inc.*, 2020 WL 5758917 (S.D.N.Y. Sept. 28, 2020); *Hope Organics LLC v. Preggo Leggings LLC*, 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021); *NES Baseball & Softball Facility, Inc. v. Northeast Angels Softball, LLC, et al.*, 2022 WL 17370117 (S.D.N.Y. Dec. 2, 2022); and *TushBaby, Inc.*, 2024 WL 4627452.

4.      Based on the record evidence, the Court finds that Wildbird has established all of the factors necessary to obtain a preliminary injunction.

5.      Wildbird has established that it is likely to prove trademark ownership, trademark

validity, and a likelihood of confusion.  Defendants use their nearly identical WILDRIDE Marks to advertise and sell the same types of products that Plaintiff advertises and sells—carriers for babies and carries for toddlers—in the same marketing and trade channels that Plaintiff uses to the same categories of customers—and Defendants intend to expand those commonalities, including by offering its products in Target, where Plaintiff has sold its products for half a decade. Accordingly, it is not surprising that the record already includes evidence of confusion between the parties' brands.

6.     Wildbird's likelihood of success on the merits, combined with the likelihood of Defendants' WILDRIDE Marks injuring the reputation and goodwill of Plaintiff's carefully curated WILDBIRD brand and Marks, constitutes irreparable harm.

7.     This irreparable harm, combined with the public's interest in not being confused about the source of goods and services, tips all four factors in Plaintiff's favor and warrants preliminarily enjoining the use of Defendants' WILDRIDE Marks in the United States.

**I.    Wildbird is Likely to Prevail on the Merits of its Claims**

8.     Wildbird must establish that it is likely to succeed on the merits of only one of its claims to obtain a preliminary injunction. *See 725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 459 (S.D.N.Y. 2019). Nonetheless, because the same standard governs Wildbird's claims for trademark infringement, unfair competition, false association, and false designation of origin under Sections 32 and 43(a)(1)(A) of the Lanham Act, and New York common law (collectively, the "Claims"), the Court analyzes these Claims together for purposes of the instant motion.

9.     For purposes of the PI Motion, Wildbird must establish that it is likely to prove the elements of its Claims, which are: (i) it owns its WILDBIRD Marks; (ii) its WILDBIRD Marks are valid; and (iii) Defendants are using their WILDRIDE Marks in a manner that creates a

likelihood of confusion with Plaintiff's WILDBIRD Marks. *See Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d 271, 277 (S.D.N.Y. 1998) (applying the same standard to Section 32 and 43(a)(1)(A) claims; granting preliminary injunction).

## A. Wildbird Has Established That it is Likely to Prove Trademark Ownership and Validity

10.    Wildbird's '549 Registration constitutes *prima facie* evidence of its ownership of the WILDBIRD Word Mark and its validity.  *See* 15 U.S.C. § 1115(a); *see also City of New York v. Lopez*, 2021 WL 6063839, at *2 (S.D.N.Y. Dec. 21, 2021) (*accord*).

11.    Wildbird also is likely to prove ownership and validity of its unregistered WILDBIRD Logo.  *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *5 ("The Lanham Act (the 'Act') protects both registered and unregistered trademarks, as well as trade dress") (citing, *inter alia*, 15 U.S.C. § 1125(a)(1)(A)).

12.    To prove ownership and validity of the unregistered WILDBIRD Logo, Plaintiff must prove: (i) it was "the first to use a particular mark to identify [its] goods or services in a given market," *i.e.*, trademark priority and (ii) its Logo is distinctive—either inherently or acquired—of Plaintiff's goods and services. *Id.*; *see also* MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 16:1.50 ("[I]n the United States, the rule of priority is that ownership and priority of a trademark go to the party who was first-to-use"); § 11:2 ("Without achieving distinctiveness, either inherently or through the acquisition of secondary meaning, then a designation does not have the legal status of a 'trademark' or 'service mark.' No distinctiveness— no mark").

13.    To establish priority, Wildbird must demonstrate that it used its WILDBIRD Logo in United States commerce before Defendants began using the WILDRIDE Marks and that Wildbird's use of the Logo "has been deliberate and continuous, not sporadic, casual or transitory."

21

*NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *5.   Wildbird is likely to establish both.

14.   As discussed *supra*, Wildbird began using its WILDBIRD Logo for carriers (ring slings) in November 2014; whereas, Defendants' claimed priority and/or first-use dates of the WILDRIDE Marks were 2021 and 2023.   Wildbird also has been using its WILDBIRD Logo continuously for more than a decade to advertise, promote, offer for sale, and sell its products throughout the United States.

15.   Accordingly, Wildbird is likely to establish priority.  *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (priority and continuous use based on only "at least two years" of use).

16.   To establish distinctiveness, Wildbird must demonstrate where its WILDBIRD Logo falls on the spectrum of trademark distinctiveness, *i.e.*, whether the Logo is "generic, descriptive, suggestive, arbitrary, or fanciful."  *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (referencing *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)).   For context:

> "Generic marks, which are those consisting of words identifying the relevant category of goods or services have no inherent distinctiveness and are not protectable.  Descriptive marks are those consisting of words identifying qualities of the product. […] Suggestive marks are those that are not directly descriptive but do suggest a quality or qualities of the product, through the use of 'imagination, thought and perception' and are inherently distinctive.  Arbitrary or fanciful marks, which are ones that do not communicate any information about the product either directly or by suggestion, are inherently very distinctive."

*NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (internal quotations and citations omitted.

17.   The WILDBIRD Logo is inherently distinctive.  There is no evidence of any other company in the United States using a logo that consists of "wild" or "bird" (other than Defendants

as it relates to the word "wild") or those words together with the image of a bird in connection with carriers for babies and carriers for toddlers. Thus, the WILDBIRD Logo is not generic. The WILDBIRD Logo also does not describe or identify any qualities of Plaintiff's products, which have nothing to do with birds (wild or otherwise). Accordingly, the WILDBIRD Logo is inherently distinctive and, therefore, valid. *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6 (unregistered logo was inherently distinctive).

18.    Based on the foregoing, Plaintiff is likely to prove ownership and validity of its WILDBIRD Marks. Plaintiff also is likely to prove that Defendants' use of the WILDRIDE Marks creates a likelihood of confusion with Plaintiff's WILDBIRD Marks.

**B. Wildbird Has Established that it is Likely to Prove that the WILDRIDE Marks Create a Likelihood of Confusion With Plaintiff's WILDBIRD Marks**

19.    To assess likelihood of confusion, "courts in this Circuit apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2d Cir. 1961) […]." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *8. Those factors "are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market." *Id*.

20.    While "no single *Polaroid* factor is determinative, [] the first three factors are 'perhaps the most significant.'" *New York City Triathlon, LLC*, 704 F. Supp. 2d at 341 (quoting *Mobil Oil Corp. v. Pegasus Petroleum Corp.*, 818 F.2d 254, 258 (2d Cir. 1987)); *see also Museum of Modern Art*, 339 F. Supp. 3d at 380.

21.    Here, the evidence demonstrates that, not only do the critically important first,

23

second, and third *Polaroid* factors favor Plaintiff but also the fifth, sixth, seventh, and eighth factors do, too.

### i.    Plaintiff's WILDBIRD Marks are Strong

22.    For purposes of the first *Polaroid* factor, a trademark's "strength" refers to "its distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public."  *Hope Organics LLC*, 2021 WL 5919367, at *3.   When assessing strength, "courts will consider: (1) the mark's 'inherent distinctiveness' and (2) the mark's distinctiveness in the marketplace."  *Id*.

### a.    The WILDBIRD Marks are Conceptually Strong

23.    Both of Plaintiff's WILDBIRD Marks are inherently distinctive and conceptually strong.

24.    The PTO's registration of the WILDBIRD Word Mark without proof of secondary meaning creates a rebuttal presumption of inherent distinctiveness. *See Hope Organics LLC*, 2021 WL 5919367, at *4; *Goat Fashion Ltd.*, 2020 WL 5758917, at *10.

25.    But even if the WILDBIRD Word Mark was not registered, the Court finds that it is inherently distinctive for the same reasons discussed above concerning the WILDBIRD Logo's inherent distinctiveness, namely, the word "wildbird": (i) is not a commonly used term in the children's accessories-and-apparel industry in general; (ii) is not a commonly used term for baby carriers or toddler carriers specifically; and (iii) does not describe any qualities of the children's accessories and apparel that Plaintiff advertises and sells under its WILDBIRD Marks.

26.    Accordingly, the WILDBIRD Marks are conceptually strong marks.  *Accord Hope Organics LLC*, 2021 WL 5919367, at *4; *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *6.

### b.    The WILDBIRD Marks are Commercially Strong

27.    The WILDBIRD Marks also are commercially strong marks.

24

28.    When assessing a mark's distinctiveness in the marketplace, "the court considers six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Hope Organics LLC*, 2021 WL 5919367, at *5.

29.    The evidence demonstrates that, for more than a decade, Plaintiff has invested substantial sums in creating a unique association in consumer' minds between the WILDBIRD Marks, on the one hand, and Plaintiff, on the other hand.

30.    Plaintiff has spent ███████████ on advertising that prominently features its WILDBIRD Marks.   Products advertised and sold under the WILDBIRD Marks have enjoyed over ████████ in sales and receive unsolicited media coverage in *hundreds of* national publications, such as *Vogue* and *Glamour*; and receive awards.   Consumers also receive widespread exposure to products advertised and sold under the WILDBIRD Marks at national retailers, such as: Target,  Nordstrom, and Amazon.com, as well as on Plaintiff's social-media accounts.  Plaintiff also has enforced the WILDBIRD Marks by sending protest letters, including to "Wildbird Designs," and, other than Defendants, there is no evidence of any other company or brand in the United States besides Plaintiff that advertises or sells carriers under a brand name or mark that includes the word "wild."

31.    Defendants' argument that Plaintiff's WILDBIRD Marks are weak because of a purported "crowded field" fails for several reasons.

32.    First, "[t]he significance of third-party trademarks depends wholly on their usage," including whether the third-party marks are used on the same goods as those offered by the trademark owner. *See Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir. 1976).

33.     Defendants have not identified a single third party in the United States that uses a trademark or brand name containing the word "wild" *with baby or toddler carriers*.  The only companies using "wild" for baby and toddler carriers are Plaintiff and Defendants.

34.     Second, Defendants rely primarily on third-party registrations and applications, which, likewise, do not establish a crowded field. *See Scarves by Vera*, 544 F.2d at 1173 (finding third-party applications and registrations irrelevant and inadmissible because they provided "no evidence that the[] trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers"); *see also* MCCARTHY ON TRADEMARKS § 11:89 ("[N]early all courts agree" that "[t]he citation of third party registration is not proof of third party uses for the purpose of showing a crowded field and relative weakness of a mark."); *Bear U.S.A., Inc. v. Kim*, 71 F. Supp. 2d 237, 255 (S.D.N.Y. 1999) (finding no crowded field where evidence consisted of 250 applications and registrations for marks containing the word "bear" with clothing, but only seven were used on "parkas or jackets" – the goods at issue).

35.     Defendants submit no evidence to show whether these alleged third party marks are in use or have achieved consumer recognition, much less any evidence that the marks are in use in the United States for baby carriers or toddler carriers. Even if they did, a review of those results—and Defendants' printouts of third-party websites—reveals only two companies in the U.S. that advertise and sell baby and toddler carriers under a mark that includes "wild": Plaintiff and Defendants. There is no "crowded field." That consumers have confused Defendants with Plaintiff speaks to the strength of Plaintiff's WILDBIRD Marks in the United States marketplace for baby carriers and toddler carriers—and to the similarities in the parties' marks and products.

36.     Based on the foregoing, the WILDBIRD Marks are commercially strong identifiers of and for Plaintiff and products offered under the WILDBIRD Marks.  *See Hope Organics LLC*,

2021 WL 5919367, at *5 (finding commercial strength where, as here, plaintiff sold millions of dollars' worth of products each year under its marks; invested millions of dollars into advertising; received media coverage in, *inter alia*, *Glamour*; and promoted its marks on social media); *Goat Fashion Ltd.*, 2020 WL 5758917, at *10 (finding commercial strength where, as here, plaintiff used mark continuously for over a decade; received media coverage in, *inter alia*, *Glamour*; and enforced its marks); *TushBaby, Inc.*, 2024 WL 4627452, at *4 (finding commercial strength where, as here, plaintiff invested millions into advertising; had sales in the millions of dollars; and enforced its marks); *Metrokane, Inc. v. The Wine Enthusiast*, 160 F. Supp. 2d 633, 640 (S.D.N.Y. 2009) ($3 million in sales an "indisputable sales success").

37.    This commercial strength, combined with the WILDBIRD Marks' conceptual strength, tips the first *Polaroid* factor in Plaintiff's favor.

ii.    **The Parties' Marks Create the Same Overall Impression on Consumers**

38.    When assessing the similarities between parties' marks under the second *Polaroid* factor, "the court evaluates the overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Hope Organics LLC*, 2021 WL 5919367, at *6 (internal quotations and citations omitted); *see also NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *8 ("[A] court does not look just at the typewritten and aural similarity of the marks, but how they are presented in the marketplace").

39.    Here, the parties use their marks and logos on their websites; social-media accounts; and products.  The parties' retailers also use their marks in advertisements for the parties' products.

40.    These uses of the parties' marks create the same overall impression on consumers in the marketplace.

27

41.     The parties' marks and logos begin with "W-I-L-D," which is the dominant portion of the marks and logos and is what consumers are likely to recall when seeing the marks and logos in the marketplace.  *See Palm Bay Imports, Inc. v. Vueve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 1372 (Fed. Cir. 2005) (first word is a "prominent feature" because it is "the first word in the mark and the first word to appear on the label"); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 333-34 (in a logo or mark that "contains both a design and a word, the word is generally considered to be dominant and is therefore accorded greater weight"); *Goat Fashion Ltd.*, 2020 WL 5758917, at *11 (finding mark similarity; "[t]he average consumer, seizing on the memorable word 'GOAT,' would likely perceive these caprine marks as similar and have difficulty distinguishing the brands").

42.     The parties' marks also sound similar when spoken aloud.  *See Hope Organics LLC*, 2021 WL 5919367, at *6 ("'[M]arks are considered similar when they are similar in appearance, sound and meaning'"; "when spoken, MTHR and MUTHA are almost indistinguishable in sound") (quoting *Museum of Modern Art*, 339 F. Supp. 3d at 375).

43.     Defendants' attempts to downplay the similarities between the parties' marks fails.

44.     Defendants argue that the shared term "wild" in the parties' marks is not probative of confusion.  However, Defendants' cited cases indicate that a shared term is not probative of confusion if the shared term is descriptive or generic, which is not the case here. *See e.g. USPTO v. Booking.com B.V.*, 591 U.S. 549, 562 (2020) ("When a mark incorporates *generic or highly descriptive* components, consumers are less likely to think that other uses of the common element emanate from the mark's owner.") (emphasis added); *Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 238 (S.D.N.Y. 2022) (finding mark "jackpot" descriptive).

45.     Here, the word "wild" in the parties' marks is not a generic term.  Nor is it

28

descriptive, as it does not say something about the parties' carrier products, their intended purpose, function, use, or merit. To be sure, the PTO did not make Plaintiff disclaim the "wild" portion (or "bird") of its WILDBIRD mark. *Compare with RiseandShine Corp. v. PepsiCo, Inc.*, 41 F.4th 112, 122-24 (2d Cir. 2022) (Defendants' case; finding shared term "rise" was descriptive where trademark owner admitted as such in USPTO filings).

46.    Defendants also argue that the relevant analysis should be "bird" vs. "ride." Leaving aside that Defendants' argument runs afoul of the well-settled principle discussed above that the first word of a mark is what leaves an impression on consumers, this argument ignores a critical point: there is no evidence of consumers confusing Plaintiff's WILDBIRD brand with any mark or brand that has "bird" or "ride" in it—or any other company that has "wild" in its name, for that matter. Instead, the evidence shows Plaintiff's WILDBIRD brand being confused with only Defendants' WILDRIDE brand, which not only sounds like Plaintiff's brand but also includes products in the identical categories as Plaintiff's brand: carriers for babies and carriers for toddlers.

47.    Based on the foregoing, the second *Polaroid* factor favors Plaintiff.

### iii.    The Parties Offer Carriers for Babies and Toddlers

48.    Under the third *Polaroid* factor, the court considers "to what extent the two products compete with each other [] accounting for the market proximity and geographic proximity." *NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *9.  The former "asks whether the two products are in related areas of commerce and geographic proximity looks to the geographic separation of the products."  *Id*.  Combined, "[b]oth elements seek to determine whether the two products have an overlapping client base that creates a potential for confusion." *Id*.

49.    Here, Defendants' attempt to paint the parties' products as baby carriers (Plaintiff) versus toddler carriers (Defendant) fails.

50. The evidence demonstrates that, since the founding of Plaintiff's WILDBIRD brand 11 years ago, it has used its WILDBIRD Marks to advertise and sell, *inter alia,* carriers for babies and carriers for toddlers.

51. As discussed at length above, the evidence also demonstrates that the parties, retailers, and consumers advertise and identify the parties' products as carriers for both babies and toddlers.

52. In short, the evidence demonstrates that the parties' products fall into the identical category: carriers—for babies and toddlers. Accordingly, the third *Polaroid* factor favors Plaintiff and the fourth is inapplicable because there is no gap in the parties' offerings for Plaintiff to bridge. *See NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *9 (third and fourth *Polaroid* factors favored plaintiff where, as here, the parties' goods "are of the same type and function, and that the marks at issue serve to promote these goods. Thus, there is 'no gap to bridge'"); *Hope Organics LLC*, 2021 5919367, at *7 (although not identical, parties' products were competitive where products fell into same category and "aimed at new and expecting mothers"; fourth *Polaroid* factor neutral where, as here, "the parties' products are already in direct competition […]").

### iv. There is Already Evidence of Actual Confusion Occurring—and at an Increasing Rate—at this Early Stage of the Case

53. Under the fifth *Polaroid* factor, "actual confusion means consumer confusion that enables a seller to pass off his goods as the goods of another." *Museum of Modern Art*, 339 F. Supp. 3d at 378.

54. "It is black letter law that actual confusion need not be shown to prevail under the Lanham Act, since actual confusion is very difficult to prove and the Act requires only a likelihood of confusion as to source." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 318. "This is particularly true when [as here] an infringing product or service has been on the market for only a

short time." *Id*.

55.    Nonetheless, if there is evidence of actual confusion, then that "is particularly relevant," as its "indicates a likelihood of confusion" occurring. *TushBaby, Inc.*, 2024 WL 4627452, at *7 (internal quotations and citations omitted); *see also Goat Fashion Ltd.*, 2020 WL 5758917, at *13 ("Although actual confusion need not be shown to prevail under the Lanham Act, *Lois Sportswear*, [t]here can be no more positive or substantial proof of the likelihood of confusion") (internal quotations and citations omitted).

56.    Here, Plaintiff has proffered evidence of actual confusion despite this case being only three months old and Defendants only recently increasing their advertising and sales efforts in the United States. *See discussion infra*.

57.    At the buyer level, actual confusion occurred immediately at the ABC Kids Expo in May 2025, followed by additional confusion at a buyer showcase at Nordstrom in June 2025, and a still further instance of confusion at a Nordstrom store in California on October 9, 2025, where a Sales Associate confused the parties' brands and remarked that Defendants' WILDRIDE mark seemed "oddly similar" to Plaintiff's WILDBIRD mark.

58.    At the consumer level, actual confusion began occurring in July 2025 and has increased each month since. This actual confusion has occurred despite only one retailer—*i.e.*, Nordstrom—advertising and selling the parties' products. It follows, then, that even more confusion will occur as Defendants continue the rapid expansion of the use of their infringing WILDRIDE Marks in the United States, including, for example, at Target, which is one of the nation's largest retailers and where Plaintiff has been advertising and selling its WILDBIRD products for half a decade.

59.    Defendants argue that Plaintiff's evidence of actual confusion is *de minimis* and

31

unreliable.  Defendants' argument misses several points.

60.    *First*, it is well-settled that Plaintiff does not need to prove actual confusion to prove an overall likelihood of confusion, much less prove actual confusion on its PI Motion, which requires Plaintiff to establish that it is *likely* to prove an overall likelihood of confusion.

61.    *Second*, courts in this District accept evidence from social media as evidence of anecdotal actual confusion.  *See Hope Organics LLC*, 2021 WL 5919367, at *8 (citing *Museum of Modern Art*, 339 F. Supp. 3d at 378-79); *see also Fujifilm N. Am. Corp. v. PLR IP Holdings, LLC*, 2025 WL 2444652, at 19 n. 26 (S.D.N.Y. Aug. 25, 2025); *TushBaby, Inc.*, 2024 WL 4627452, at *7.

62.    *Third*, even if the Court were to agree with Defendants that Plaintiff's evidence of actual confusion is *de minimis*, the fact that Plaintiff has *any* evidence of its brand being confused with Defendants' brand at this early stage of the case and the early stages of Defendants' rapid expansion within the U.S. forecasts that confusion is likely to continue to occur—and at an increasing rate, as demonstrated since the filing of this lawsuit when only a single retailer carried both parties' products—and "could lead to a diversion of sales, damage to goodwill, or loss of control over reputation."  *Fujifilm N. Am. Corp.*, 2025 WL 2444652, at n. 26; *see also New York City Triathlon, LLC*, 704 F. Supp. 2d at 319 (actual confusion occurred only months after defendant's entrance to the marketplace).

63.    Based on the foregoing, the Court finds that the fifth *Polaroid* factor favors Plaintiff.

### v.    Defendants Entered the U.S. Marketplace in Bad Faith

64.    Under the sixth *Polaroid* factor, "[b]ad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products."  *Hope Organics LLC*,

2021 WL 5919367, at *9.    When evaluating the defendant's intent, actual or constructive knowledge of the senior user combined with "similarities so strong that it seems plain that deliberate copying has occurred, [courts] have upheld findings of bad faith."  *Id*.  (internal quotations and citations omitted).  That is precisely the case here.

65.    Prior to Defendants' entrance to the U.S. marketplace, Plaintiff had been using its WILDBIRD Marks to advertise and sell, *inter alia*, carriers for babies and carriers for toddlers throughout the United States for nearly a decade.

66.    Even if Defendants were not actually aware of Plaintiff's WILDBIRD Marks despite Plaintiff using them throughout the United States for over a decade, the '459 Registration for Plaintiff's WILDBIRD Word Mark gave Defendants constructive notice of Plaintiff's trademark rights for a WILD-formative mark for carriers.  *See* 15 U.S.C. § 1072 (Registration of a mark on the principal register provided by this chapter or under the Act of March 3, 1881, or the Act of February 20, 1905, shall be constructive notice of the registrant's claim of ownership thereof").

67.    This constructive knowledge, combined with Defendants' decision to enter the U.S. marketplace with nearly identical marks for identical products, allows this Court to infer bad faith by Defendants.  *See Hope Organics LLC*, 2021 WL 5919367, at *9.

68.    At a minimum, Defendants were on actual notice of Plaintiff's WILDBIRD Marks in July 2025, when Plaintiff's Co-Founder, Nate Gunn, reached out to Defendants' owners about the actual confusion that had occurred and relayed Plaintiff's concerns about Defendants' infringement of Plaintiff's trademark rights.  *See* J. Thomas Decl., Ex. 1 at ¶ 27.  Despite this, Defendants have continued to use the infringing WILDRIDE Marks on identical goods, sold to the same categories of consumers and in the same channels of trade. As a result, actual confusion has

escalated—and is likely to continue escalating if Defendants follow through on their stated plans to further expand the use of their WILDRIDE Marks to advertise and sell products in the United States.

69.    Based on the foregoing, the sixth *Polaroid* factor favor Plaintiff.

      **vi.    Products Offered Under Defendants' WILDRIDE Marks Are Inferior to Products Offered Under Plaintiff's WILDBIRD Marks**

70.    Under the seventh *Polaroid* factor, the court has "weigh cross-cutting considerations." *Goat Fashion Ltd.*, 2020 WL 5758917, at *14. "On the one hand, the court must determine whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Id.* On the other hand, if the products are roughly equal in quality, the court must also consider whether that very similarity of quality may tend to create confusion as to source by bringing the products into even closer proximity." *Id.* (internal quotations citations omitted).

71.    The evidence demonstrates that products offered under Plaintiff's WILDBIRD Marks have received numerous awards and favorable customer reviews.

72.    Conversely, the evidence demonstrates that products offered under Defendants' WILDRIDE Marks have already received negative customer reviews in the United States.

73.    Accordingly, the seventh *Polaroid* factor favors Plaintiff. *See Goat Fashion Ltd.*, 2020 WL 5758917, at *14 (customer complaints about defendant's products tipped seventh *Polaroid* factor in plaintiff's favor).

      **vii.    The Eighth *Polaroid* Factor Favors Plaintiff**

74.    Under the eighth *Polaroid* factor, "courts are to consider "[t]he general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *TushBaby, Inc.*, 2024

WL 4627452, at *8.

75.     Plaintiff acknowledges that, generally speaking, parents purchasing accessories and clothing for their children are careful and discerning.  Nonetheless, Defendants' WILDRIDE Marks have confused parents and experienced retail buyers of the parties' products.

76.     Accordingly, the eighth *Polaroid* factor—like the first, second, third, fifth, sixth, and seventh factors, respectively—favors preliminarily enjoining the use of Defendants' WILDRIDE Marks in the United States.  *See Hope Organics LLC*, 2021 WL 5919367, at *11 (eighth factor favored preliminary injunction; "when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion"); *TushBaby, Inc.*, 2024 WL 4627452, at *8 (granting preliminary injunction where six of the eight *Polaroid* factors favored Plaintiff); *Museum of Modern Art*, 339 F. Supp. 3d at 380 (*same*); *New York City Triathlon, LLC*, 704 F. Supp. 2d at 342 (*same*); *Goat Fashion Ltd.*, 2020 WL 5758917, at *15 (granting preliminary injunction where five of the eight *Polaroid* factors favored Plaintiff); *NYP Holdings*, 63 F. Supp. 3d at 338 (*same*); and *NSE Baseball & Softball Facility, Inc.*, 2022 WL 1737011, at *11 (of the four relevant factors, three favored plaintiff).

77.     Based on the foregoing, Plaintiff has established that it is likely to prove a likelihood of confusion.  This finding, together with the Court's finding that Plaintiff has established that it is likely to prove trademark ownership and trademark validity, leads the Court to find that Plaintiff has established a likelihood of success on the merits of its Claims.

## II.     Plaintiff Has Established Irreparable Harm

78.     Plaintiff establishing a likelihood of success on the merits of its Claims creates a rebuttable presumption of irreparable harm.  *See* 15 U.S.C. § 1116.   Plaintiff also has proven irreparable harm.

79.    "Irreparable harm is 'harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Really Good Stuff, LLC v. BAP Investors, L.C.*, 813 Fed. Appx. 39, 44 (2d Cir. 2020) (internal quotations and citations omitted).

80.    In the trademark context, "[i]t is well-settled that a trademark owner's loss of goodwill and ability to control its reputation constitutes irreparable harm sufficient to satisfy the preliminary injunction standard." *New York City Triathlon, LLC*, 704 F. Supp. 2d at 325; *see also Really Good Stuff, LLC*, 813 Fed. Appx. at 44 ("The loss of reputation and goodwill constitutes irreparable harm").  "And for good reason […] 'loss of control over one's reputation is neither calculable nor precisely compensable.'"  *TushBaby, Inc.*, 2024 WL 4627452, at *8 (quoting *NYP Holdings*, 63 F. Supp. 3d at 342).

81.    Here, Plaintiff has spent more than a decade investing substantial resources into its carefully curated WILDBIRD brand, which the WILDBIRD Marks identify in the marketplace. Defendants are using their WILDRIDE Marks for the same and competitive products in the same marketing and trade channels to appeal to the same categories of customers.  Unsurprisingly, Defendants' WILDRIDE Marks have already caused actual confusion, which is likely to continue if Defendants follow through with their stated intent to further expand the use of their WILDRIDE Marks in the United States.

82.    Moreover, Plaintiff cannot control the use of Defendants' WILDRIDE Marks or monitor the quality of products offered thereunder, which already have received negative customer reviews.  *See* J. Thomas Decl., Ex. 1 at ¶¶ 28-9; J. Thomas Decl., Ex. 3 at ¶ 10; J. Thomas Decl., Ex. 8 at ¶ 15.

83.    This lack of control, combined with consumers mistakenly associating Plaintiff

with Defendants, leaves the reputation and goodwill of Plaintiff's carefully curated WILDBIRD Marks and brand in Defendants' hands. *See id.* This is textbook irreparable harm. *See also New York City Triathlon, LLC.*, 704 F. Supp. 2d at 325; *see also TushBaby, Inc.*, 2024 WL 4627452, at *8 ("Courts have consistently found irreparable harm to exist in situations where there is a likelihood of confusion between the marks, and where the reputation and goodwill cultivated by the party seeking the injunction would be out of the party's control because of the infringement"); *Hope Organics LLC*, 2021 WL 5919367, at *12 ("Plaintiff has demonstrated the likelihood of confusion between the MUTHA and MTHR marks, and, therefore, absent a preliminary injunction, 'the reputation and goodwill cultivated by [Hope Organics] would be out of its hands'") (quoting *U.S. Polo Ass'n, Inc.*, 800 F. Supp. 2d at 541)); *accord NES Baseball & Softball Facility, Inc.*, 2022 WL 17370117, at *11.

84.    The Court finds that Defendants fail to rebut (i) the presumption of irreparable harm that Plaintiff is entitled to under 15 U.S.C. § 1116 and (ii) the evidence of irreparable harm that Plaintiff has proffered.

85.    Defendants claim that Plaintiff would not suffer irreparable harm in the absence of a preliminary injunction because Plaintiff allegedly waited four years to file its PI Motion. Defendants are not correct. The evidence confirms that Defendants progressively encroached on Plaintiff's trademark rights in the U.S.—and Plaintiff acted diligently after discovering that encroachment in the United States in May 2025.

86.    The doctrine of progressive encroachment "allows a plaintiff some latitude in the timing of its bringing suit, permitting it to wait until the likelihood of confusion looms large." *ProFitness Physical Therapy Ctr. v. Pro-Fit Orthopedic and Sports Physical Therapy P.C.*, 314 F.3d 62, 70 (2d Cir. 2002). Put another way, progressive encroachment asks whether the

defendant, after beginning its use of the mark, redirected its business so that it more squarely competed with plaintiff and thereby increased the likelihood of public confusion of the marks. *Id.* The evidence confirms that is what Defendants did in the United States.

87.    The evidence confirms that, from 2021 to 2023, Defendants' WILDRIDE brand had a *de minimis* presence in the United States.

88.    The evidence confirms that, beginning in late-2024, however, Defendants began to increase their advertising and sales efforts in the United States by launching their U.S. Website and working with a U.S.-based distributor for the first time.

89.    The evidence further demonstrates that Defendants' increased focus on the United States reached a fever pitch in 2025, when Defendants increased their U.S. advertising spend for the first time; began selling their products on a third-party website for the first time between February-May 2025; began discussions with a national retailer in May 2025; and attended their first trade show in May 2025, which Plaintiff also attended and encountered—for the time in Plaintiff's 11-year history—confusion with another brand, namely: *Defendants'* WILDRIDE brand.

90.    As Plaintiff diligently investigated this newly discovered expansion of Defendants' WILDRIDE brand in the United States, Plaintiff encountered additional instances of actual confusion at the buyer level and on social media; attempted to resolve this dispute with Defendants; and filed this motion approximately eight weeks after the ABC Kids Expo. *See* J. Thomas Decl., **Ex. 1** at ¶¶ 19-27.

91.    In short, Plaintiff timely filed its PI Motion. *Accord Girl Scouts of Am. v. Boy Scouts of Am.*, 597 F. Supp. 3d 581, 607-07 (S.D.N.Y. 2022) (denying motion for summary judgment on laches under progressive encroachment theory where plaintiff was not aware of any

confusion or dilution until defendant "redirected its business" to allow girls into program); *Road Dawgs Motorcycle Club of the U.S., Inc. v. "Cuse" Rd. Dawgs, Inc.*, 679 F. Supp. 2d 259, 282-83 (N.D.N.Y. 2009) (finding progressive encroachment where actual confusion exponentially increased before plaintiff filed suit); *Kuklachev v. Gelfman*, 629 F. Supp. 2d 236, 250 (E.D.N.Y. 2008) ("The presumption [of irreparable harm] remains in cases where the plaintiff was  . . . actively pursuing its rights"); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (eight month delay in seeking injunction was excusable where the plaintiff contacted the defendant to resolve the dispute); *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (seven month delay not unreasonable when time involved constructive effort to resolve the dispute without litigation).

92.    Based on the foregoing, Plaintiff has established irreparable harm.

## III.    The Balance of Equities Favors Plaintiff

93.    As discussed *supra*, Plaintiff will suffer irreparable harm in the absence of a preliminary injunction.  *Accord Tushbaby, Inc.*, 2024 WL 4627452, at *9; *Hope Organics LLC*, 2021 WL 5919367, at *13.

94.    In stark contrast, preliminarily enjoining the use of Defendants' WILDRIDE Marks would not adversely affect Defendants.  Defendants could still sell their products in the United States—just not under the WILDRIDE Marks.  Not infringing is not a "hardship.[2]" *See Tushbaby, Inc.*, 2024 WL 4627452, at *9 ("And although a preliminary injunction is likely to carry economic

---

[2] For this reason, the Court finds that a bond is not warranted.  *See Goat Fashion Ltd.*, 2020 WL 5758917, at *16, n.6; *see also Shenzhen Miracle Laptop Bags Co. v. Castill*, 2023 U.S. Dist. LEXIS 14405, at *15-16 (E.D.N.Y. Jan. 27, 2023) (waiving bond where defendant failed to identify damages or costs they will suffer if wrongfully enjoined); *725 Eatery Corp. v. City of New York*, 408 F. Supp. 3d 424, 470 (S.D.N.Y. 2019) (same).

costs for Appearing Defendants, such harms are largely self-inflicted given that [Appearing] Defendants took a calculated risk in launching a product with a trade dress virtually identical to the trade dress associated with TushBaby"); *accord Hope Organics LLC*, 2021 WL 5919367, at *13.

96.    Moreover, the Court rejects Defendants' argument that a preliminary injunction would "significantly complicate Defendants' ability to use its mark abroad."

96.    Trademark rights are territorial and, as such, the use of Defendants' WILDRIDE Marks outside of the United States is irrelevant to the issue at hand on Plaintiff's PI Motion, namely, whether Plaintiff has established the four factors that are necessary to preliminarily enjoin the use of Defendants' WILDRIDE Marks *in the United States* (Plaintiff has). *See* MCCARTHY at § 29:1 ("Under the territoriality doctrine, a trademark is recognized as having a separate existence in each sovereign territory in which it is registered or legally recognized as a mark. . . .) (quoting *ITC Ltd. v. Punchgini, Inc*., 482 F.2d 135, 155 (2d Cir. 2007)).

97.    Based on the foregoing, the balance of hardships favors Plaintiff.

## IV.    Preliminarily Enjoining Defendants' Use of Their WILDRIDE Marks Would Protect the Public From Additional Confusion

98.    Preliminarily enjoining the use of Defendants' Infringing WILDRIDE Marks would benefit the public by preventing additional confusion.  *See Celine S.A.*, 2024 WL 4627666, at *4 ("'[T]he public has an interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods or unknown origin or quality'") (quoting *N.Y.C. Triathlon, LLC*, 704 F. Supp. 2d at 344)); *see also Tushbaby, Inc.*, 2024 WL 4627452, at *9 ("The consuming public has a protectable interest in being free from confusion, deception and mistake"); *Goat Fashion Ltd.*, 2020 WL 5758917, at *16 ("Customer confusion has resulted from 1661's use of its GOAT mark in connection with apparel, and preventing this confusion would benefit the

public").

## V.    CONCLUSION

99.    Based on the foregoing, the Court finds that Plaintiff has established the four factors necessary to obtain a preliminary injunction.

100.    Accordingly, the Court hereby **GRANTS** Plaintiff's PI Motion and:

a.    Preliminarily enjoins Defendants, their agents, servants, employees, officers, and all persons and entities in active concert and participation with them, from using the trademark WILDRIDE (or any other mark(s) confusingly similar to Plaintiff's WILDBIRD trademark) in United States commerce for, on, and/or in connection with the manufacture, distribution, advertising, promoting, offering for sale, and/or sale of any goods or services, including, without limitation, children's accessories (including carriers for babies and carriers for toddlers) and clothing, and

b.    Orders Defendants to file with the Court and serve upon Plaintiff's counsel, within 30 days after service of this Order, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction.

**IT IS SO ORDERED** this ___ day of _____, 2025.

_____
The Honorable Denise L. Cote
United States District Judge, S.D.N.Y.

Dated: October 17, 2025

Respectfully submitted,

GREENBERG TRAURIG, LLP

*/s/ Jonathan W. Thomas*
Jonathan W. Thomas (JT1016)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9219
Email: jonathan.thomas@gtlaw.com

Molly R. Littman-Johnson (*pro hac vice*)
90 South 7th St., Suite 3500
Minneapolis, Minnesota 55402
Tel:  (612) 259-9669
Fax: (612) 259-9700
Email: Molly.Littman@gtlaw.com

*Attorneys for Plaintiff Wildbird LLC*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on October 17, 2025, I served a true and correct copy of the foregoing document on the following counsel of record for Defendants via ECF and electronic mail:

Leo M. Lichtman
James M. Slater
ESCA LEGAL
Leo@esca.legal
James@esca.legal
1177 6th Avenue, 5th Floor
New York, New York 10036


*/s/ Jonathan W. Thomas*
Jonathan W. Thomas

*Attorney for Plaintiff*

43