# Exhibit 6

## PART 2 OF 2

```
 1   there a conversation that prompted the question?

 2       A.   No.  So Brydie, Taylor, and I, we were

 3   there to meet suppliers.  So we approached -- you

 4   know, we approached several booths that showed

 5   interest to us, right, in the different product

 6   categories and things like that.

 7            So imagine there's a company that's

 8   selling -- you know, that's manufacturing strollers.

 9   You go to their booth.  They have a bunch of

10   strollers there.  You say, Hi.  I'm Nate with

11   WildBird.

12            They say, Hi.  I'm so-and-so.

13            And then they give you a catalog.  They

14   tell you about their company.  They tell you where

15   they're from.  They tell you what they do.  You

16   exchange some business cards, and then you move on.

17            And then you go to the next supplier and

18   you say, What do you guys make?

19            They say, Oh, we make high chairs, you

20   know.

21            You say, Cool.  I'm Nate with WildBird.

22            They're like, We're this.  We're here.

23            Again, they exchange business cards.

24            You just do that down the line.

25            And so we were there to do that that day.
```
                                                    158

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  Got it.

2    A.  These are where these interactions

3  happened.  So we were approaching them with, Hi.

4  I'm Nate.  I'm Brydie.  I'm Taylor.  We're with

5  WildBird.

6    Q.  Got it.  So their response -- their

7  question, "You are Wildride, yes?" it was after you

8  had said you're affiliated with WildBird?

9    A.  Yeah.  Both instances were, you know, met

10  with early confusion about who we were as a brand.

11    Q.  Got it.

12    And I know you weren't an exhibitor.  You

13  didn't have any kind of product display or any kind

14  of branding at this expo?

15    A.  The only branding we had was we had

16  nametags with our brand on the nametag, on our

17  chests.

18    Q.  Got it.

19    I mean, sitting here today, if you were an

20  exhibitor, do you think you would have been asked

21  those questions?

22    ATTORNEY THOMAS:  Objection to form.

23    THE WITNESS:  I mean, my true opinion --

24  and, again, this is total opinion.  It's assumption.

25  I don't know what would have happened there.

159

```
 1          But I can give you my assumption of what
 2   would have happened.
 3   BY ATTORNEY LICHTMAN:
 4       Q.  Sure.
 5       A.  I don't know if you'll like it.
 6       Q.  It's fine.  I'm just asking questions.
 7       A.  I know.  It's all good.
 8          I think there would have been more
 9   confusion, honestly.
10       Q.  Why?
11       A.  If we had both been exhibiting baby
12   carriers under the WildBird/Wildride name, I think
13   there would have been further confusion.
14          People trying to -- and, essentially,
15   that's what feeds us into the Nordstrom confusion on
16   our end.
17       Q.  How are you defining "confusion"?
18       A.  These instances, you know.  I don't know --
19       Q.  And can sense when somebody asks if you're
20   affiliated with Wildride?
21       A.  Yeah, that and just the extra effort that
22   it takes to identify who we are and what our brand
23   is.  And in a space -- even a business-to-business
24   space, to me that's concerning.  We want to make --
25   we want to be clear as day who we are and what we do
```
                                                    160

1  and what we sell.

2      Q.  Right.

3      A.  There's just too many brands.  There's too

4  much going on for these professionals to digest who

5  all the Wilds are and who all the yadda, yadda,

6  yadda brands are.

7          We want to just be known as, okay, yeah,

8  that's clearly WildBird.  I hear you.  I heard you.

9  I don't need to ask, you know, several times over.

10     Q.  All right.  So just really quick, going

11  back to this conversation.

12         Do you know -- like, was this a male or

13  female?

14     A.  The suppliers?

15     Q.  In this conversation where they said, "You

16  are Wildride, yes?"

17     A.  All I -- I can't tell you which one was

18  what, but I can tell you one was female and one was

19  male.

20     Q.  Okay.  And the approximate ages?  I mean,

21  were they over 50, under 50?

22     A.  Under 50, 30s, probably, yeah.

23     Q.  Do you know if any of them had hearing

24  aids?

25     A.  No.  Again, especially the second supplier,

                                                    161

1   I had quite a long conversation with them.  It's

2   like -- yeah, it was an easy conversation.  It was a

3   quiet day at the show.  It was actually very, very

4   quiet.  Everyone was talking about how quiet it was.

5   It was just a slow show in general, too.  So it felt

6   like we were able to meet and have a really good

7   conversation around product manufacturing.  Once

8   we -- once we met and sat down, it was a good

9   conversation.

10       Q.  Got it.

11           And just to confirm, so the question, "You

12   are Wildride, yes?" that was near the beginning of

13   the conversation?

14       A.  Both of these were at the front of

15   introductions, yeah.

16       Q.  And in both situations, you corrected them?

17       A.  Correct.

18       Q.  And in both situations, was there any other

19   question about Wildride?

20       A.  No.

21       Q.  And outside of those conversations, we've

22   just discussed at ABC Kids Expo, was there any other

23   instance at ABC Kids Expo where somebody asked you

24   whether you were affiliated with Wildride?

25       A.  No.

                                              162

CONFIDENTIAL - ATTORNEYS' EYES ONLY

** UNCERTIFIED ROUGH DRAFT **

1    Q.  Was there any other person who made any

2  kind of statement to you about your product as if

3  you were Wildride?

4    A.  I don't believe so, no.

5    Q.  Okay.  I'm going to move to -- and I'm just

6  kind of conscious of time and the court reporter

7  wanting a break as well.  I have -- I'm going to

8  move to one more line of questioning about this

9  Nordstrom brand showcase; and then maybe we'll take

10  a break, and we can finish up this topic after that.

11      So the next bullet point, June 2025,

12  "Nordstrom brand showcase — at least four category

13  leads for Nordstrom stores throughout the U.S. asked

14  Plaintiff's representative if the WildBird brand was

15  affiliated with Defendants' Wildbird brand or if it

16  was the same."

17      Okay.  So let's break that down.  What is

18  the Nordstrom brand showcase?

19    A.  It's -- it used to be called the Nordstrom

20  Road Show, I believe.  And now I think it's called

21  the Brand Showcase.  It's changed names over the

22  years.

23      But, essentially, this is an event that

24  departments put together at Nordstrom headquarters

25  where they bring in new -- they bring in brands that

163

1    they are considering for Nordstrom.  And then --

2        Q.  Got it.

3        A.  -- people that attend this showcase are --

4    you have the department lead or head of all things

5    kid/baby.  She's the one that kind of facilitates

6    the whole thing.  And then you have every -- you

7    have every department manager from every store in,

8    you know, across Nordstrom.

9            So I believe there's about 40, maybe 30 or

10   40 of these.  I'd say around 40.  So they come

11   together.  They meet.  They greet.  And then they

12   have this -- it's a multi-day thing, I believe.  But

13   they're coming in to the showcase where you have,

14   you know, maybe eight -- I think there's probably

15   six to eight brands at this showcase.  We all get

16   the table in a circle.  The department managers come

17   in, and then they just go table by table learning

18   and hearing about your brand.

19       Q.  Got it.

20       A.  But they do -- the whole point of it is

21   then they tell the department head what they're

22   excited about, who they liked, et cetera.

23       Q.  Right.  So the goal is to showcase your

24   brand to Nordstrom?

25       A.  Yeah, this is an opportunity.  I mean, we

                                                    164

```
 1   were already in the work -- we were already going
 2   live with Nordstrom, so we were already committed.
 3   I think a lot of the brands in there were.  This was
 4   kind of a second act to think about in-store
 5   placement or marketing with the brand or for the
 6   department head to kind of really see who maybe has
 7   potential and who the department managers believe
 8   in.
 9        Q.  Got it.
10            And this was a -- so this was a B2B event
11   as well?
12        A.  This was a -- this was a B to Nordstrom
13   event, yeah.
14        Q.  B to Nordstrom, yes.
15        A.  B2B, yeah.
16        Q.  And where would it physically take place?
17        A.  This took place at Nordstrom headquarters
18   in Seattle.
19        Q.  And it says "at least four category leads."
20            What is a category lead?
21        A.  These would be the store managers.  So the
22   category, the leads of the baby/kids category at
23   each of these stores.
24        Q.  Got it.  And --
25        A.  So the --
```

                                                   165

```
 1              (Overlapping speakers.)
 2    BY ATTORNEY LICHTMAN:
 3         Q.  The wording says "at least."
 4              Outside of the 4 category leads, are there
 5    any other category leads that would have asked --
 6              (Overlapping speakers.)
 7         A.  Yeah.  It was a quick day.  I talked to
 8    lots of people.  I was kind of playing it safe.  I
 9    was like, you know -- I told Jonathan, like, Look,
10    again, was I --
11         Q.  And you don't need to get into any
12    conversation with your attorney.
13              ATTORNEY THOMAS:  Agreed.
14              Nate, remember, to the extent you can
15    answer without disclosing the contents of
16    conversations with myself or any other lawyer at GT.
17    BY ATTORNEY LICHTMAN:
18         Q.  I didn't want to cut you off, but I could
19    tell you were starting to go into the nature of your
20    communications.  And I don't -- didn't want to raise
21    it in anyways.
22         A.  Thanks, Leo.  Yeah, no worries.
23              Yeah, as I, like, thought through this, you
24    know, it was like a quick day, right?  I talked to a
25    lot of people.  And, you know, I just decided to,
```

                                                          166

```
 1  like, kind of come up with, okay, how many do I know
 2  I actually spoke to?  And I came up with the number
 3  at least four.  I mean --
 4          (Overlapping speakers.)
 5  BY ATTORNEY LICHTMAN:
 6      Q.  Got it.
 7          So the bottom line is you don't remember,
 8  but you could verify four?
 9      A.  Yeah, for sure, yeah.
10      Q.  Yeah.
11      A.  I would say, like, where's my safe number?
12  Yeah, I can back that up.
13      Q.  And who are those individuals?  What are
14  their names?
15      A.  Again, I'm meeting 40 people, at least, I
16  would say, within the matter of an hour.  And so,
17  you know, I'm hearing their name and forgetting it
18  two seconds later.
19          So these are just interactions as I'm going
20  through the motions.
21      Q.  Got it.
22          But sitting here today, you don't know
23  their names?
24      A.  No, I can't give you their names.
25      Q.  Do you know what they look like?
```

                                                              167

** UNCERTIFIED ROUGH DRAFT **

```
 1       A.  Most of these individuals are young 30s, I
 2  would say, like early 30s, both women, men.  One was
 3  like a short -- shorter Latina girl.  The other
 4  ones, I don't know if I could tell you in detail
 5  what I remember, but ...
 6       Q.  And who is the representative that was
 7  asked these questions?  Was that you?
 8       A.  Yeah, that was me.
 9       Q.  Okay.  And --
10       A.  I was there with Joe Licolli, our sales
11  rep, and then his -- one of his employees.
12       Q.  Did you have walked WildBird branding, like
13  a display or anything like that?
14       A.  Yeah, everybody had product and branding on
15  display.
16       Q.  Got it.
17       A.  Name, logo, the whole deal.  So we had a
18  tablecloth with the logo, our logo on top of the
19  table, branding materials on the table, product on
20  the table, product on mannequins with our label,
21  stuff like that.
22       Q.  So can you be a little bit more specific
23  about what was asked?  I know it says here that, you
24  know, kind of summarized and said but, like, did
25  they just come up to you and ask you that question;
```

168

 1  or was there a conversation in which it was asked

 2  and, you know --

 3      A.  Yeah, that part's pretty clear to me.  So,

 4  you know, you're standing at the table.  They're

 5  coming around, right?  They're doing the

 6  merry-go-round.  So everybody started -- everybody

 7  started right to left for the most part.  I had a

 8  few people come to the table straightaway.

 9          But I definitely noticed, like, they came

10  in the room and they went right, and then they kind

11  of came around.  And I was more towards the end of

12  the tables in the semicircle.

13          So, yeah, I think people just naturally

14  took that flow of traffic.  So they were presented

15  first with Nuna.

16          Second, I believe it was -- there was maybe

17  a brand, I can't remember what the brand was.

18          And then third was Wildride.

19          Fourth was Vuori.

20          Fifth was Itzy Ritzy, I think.

21          And then maybe two other brands.

22          And then I think between Wildride and me,

23  there was probably four brands.

24      Q.  Got it.

25          So they just circle around and kind of sit

                                                      169

```
 1   or stand at your booth and talk to you?
 2        A.   Yes.  Handshake, quick meet-and-greet.
 3   Tell me about your products.  Tell me about what the
 4   company's all about, you know.
 5        Q.   I got it.
 6        A.   That kind of thing.  And I would just over
 7   and over again make my small pitch, right?
 8        Q.   Yeah, yeah.
 9        A.   Yeah, Nordstrom is like a pretty -- I
10   normally wouldn't go to an event like this, but
11   Nordstrom is a pretty heavy one.  My team that
12   just -- that was -- should have gone was a team that
13   was like already going to other events across the
14   country.
15            So, yeah, I happened to be the one that
16   kind of needed to go.
17            And so, yeah, I made the pitch.  And then,
18   yeah, some people came straight to the table, looked
19   down at the logo, and they said -- you know, like
20   one guy was like looked down, looked back; he was
21   like, Wait.  Are you them?  Are you with them?
22   Wait.  What?  What?  What?
23            That kind of interaction.  Very similar to
24   what we experienced at ABC, like a quick, Wait.
25   What's the situation here?  Are you guys the same,
```

                                                    170

1  you know, so ...

2      Q.  But do you know if -- I mean, it would have

3  been close to the beginning of your conversation

4  with any of these category leads?

5      A.  All of them.

6      Q.  Okay.  And what was the response?

7      A.  Their response -- you know, I think, look,

8  it's a quick meet-and-greet.  I'm trying to get to

9  my pitch, right?  So I -- you know, I made it clear

10  that we're not affiliated.  I made it clear that we

11  are a different brand.  And I made it very clear

12  that we've existed in the U.S. for over ten years.

13      Q.  Right.

14      A.  And I made it -- I just made it clear that

15  they are new.

16      Q.  Got it.

17          And do they, you know, give you any

18  resistance to that?  Or was it kind of just move on

19  and continue your pitch?

20      A.  No.  It was really -- it was really kosher.

21  It was cool.  They're like, Oh, got it.  Okay.

22  Cool.

23          And then I would just kind of -- I just

24  moved it along kind of thing, so ...

25      Q.  Okay.  And -- sorry.  I had a question that

171

1    came to me.

2          Oh, yeah, did anybody -- did any of the

3    leads, like, specifically talk to you as if you were

4    Wildride at any point?  Like, from what I understand

5    so far, every in-person reaction -- interaction,

6    somebody asked you if you were affiliated with

7    Wildride.

8          Is that fair to say?

9    A.   I'd say it's probably twofold.  It's, Are

10   you also Wildride?  Or are you affiliated with them?

11         It was probably those two.

12   Q.   But the point is that every situation was a

13   question.  There was never a situation where

14   somebody had a statement to you, such as, Hey, I

15   like your products; or, you know, Hey, you know, I

16   don't think we can carry this.  We already talked

17   with your partner over at that other table.  You

18   know, something like that?

19         Was there any -- ever an interaction that

20   involved like a statement that suggested to you that

21   these people assumed -- already assumed you were

22   Wildride?

23   A.   Between, like, all that, there may well

24   have been.  But I don't -- I don't recall one enough

25   to where I put it down here as one of the

                                                      172

1  statements.

2      Q.  Got it.

3          And so you reference there was only six to

4  eight other brands.  How big of a room was this?

5      A.  Pretty small room.  I would say -- I mean,

6  if you're thinking -- let's just say it's like a

7  6-foot pop-up table is what we were using, right?

8  Let's say it's -- one, two, three, four, five, six,

9  seven -- yeah, eight, eight brands, 6-foot tables in

10 a big circle with like a -- with a table in the

11 middle with, like, food.  You know, so ...

12     Q.  Did you interact with any representatives

13 from other brands?

14     A.  Very little.  One of my -- one of my close

15 friends was also there representing her brand

16 called -- it's the Ellavate wagon company.

17     Q.  Got it.

18         And did she ask you if you were affiliated?

19     A.  No.  She already -- she already knew me.

20 She already knew the brand.  You know, we had

21 already been working together.

22     Q.  And did any -- did you have a conversation

23 with any other brand representatives that asked, you

24 know, Are you guys the same or affiliated or

25 anything like that?

                                                 173

1    between.  So most of the show, I couldn't even see

2    them.

3        Q.  Got it.

4            All right.

5        A.  Honestly, I was fully ingrained in, like, a

6    ton of conversations, so I wouldn't even have a

7    moment to take a look.

8        Q.  Yeah, yeah, no, of course.  And I'm just

9    trying to get a full picture.

10           I just have like two or three more

11   questions, and then I'd say we take a break for

12   everyone's benefit.

13       A.  Okay.

14       Q.  So just to kind of close the loop on this,

15   outside of ABC expo, outside of Nordstrom brand

16   showcase, are there any other instances where

17   anybody spoke with you in person and asked, Are you

18   affiliated with Wildride?

19       A.  No, nothing -- nothing that I feel like is

20   substantial outside of like just casual

21   conversations with, you know, friends or family,

22   people that have been like -- you know, seen it and

23   asked like this seems really close to you guys kind

24   of vibe, you know.

25           I would say over the years, there's been

                                                    176

```
 1   like heads-up from friends, like asking to make sure
 2   I know about it, because to them the perception is
 3   it looks like a knock-off brand.  So -- but those
 4   are just one-off conversations that I can't really
 5   give too much context to.  They're too casual and at
 6   random.
 7       Q.  Understood.
 8           But they weren't conversations where
 9   anybody expressed, like, that they thought you were
10   Wildride.  It was basically, Hey, are you guys aware
11   of this company?
12       A.  Yes.
13       Q.  Okay.  And you said "over the years."
14   Approximately how long ago would that have started?
15       A.  I think there was maybe a few conversations
16   in the early days when they first started, and
17   that's when I kind of -- what I told you earlier,
18   first became aware of them.
19       Q.  When do you believe that would have been
20   when you say "early days"?
21       A.  I think I said earlier around -- I think I
22   said around 2022, maybe like somewhere in the year
23   '22.  But, again, I really can't recall.
24       Q.  Got it.
25           If I told you 2021, would that seem like a
```

177

1          ATTORNEY LICHTMAN:  And as I mentioned on

2     the record, if there's documentation that hasn't

3     been produced, we'd like to see that.

4     BY ATTORNEY LICHTMAN:

5          Q.  But let's talk about social media?

6          A.  Can you zoom in just a tad on this doc?

7          Q.  Yeah, yeah, of course.

8          A.  Appreciate it.  That's great.

9          Q.  So we're here on the document, which is

10    page 5, I guess.

11         A.  Yeah.

12         Q.  Okay.  So in terms of social media tagging,

13    you reference prospective consumers tagging

14    Plaintiff's Instagram account in July 2025 and

15    August 2025.

16              Have there been any other months in which

17    you're aware of anybody tagging your accounts?

18         A.  Yes; in September, of this month.

19         Q.  September, of this month.

20              ATTORNEY LICHTMAN:  And I guess I'll just

21    ask Jonathan.  Are those -- we received five.  Is

22    that inclusive?

23              ATTORNEY THOMAS:  I believe so, but we'll

24    double-check.

25              ATTORNEY LICHTMAN:  Okay.

                                                      182

1          I'm going to go to the first one.  Oh,
2  there it is.
3          (Exhibit No. 9 was marked for identification.)
4          ATTORNEY LICHTMAN:  All right.  This is
5  being introduced as Defendants' Exhibit 9.
6  BY ATTORNEY LICHTMAN:
7      Q.  Can you see this post?
8      A.  Yes.
9      Q.  When did you discover this?
10     A.  At the moment it was posted.
11     Q.  And what date was that?
12     A.  I couldn't tell you the exact date.
13     Q.  What month?
14     A.  That's something we could definitely dive
15  into and get the date, though, I would say -- I
16  would guess.
17          This was going to be probably August.
18     Q.  Not July?
19     A.  Honestly, I'm taking a guess.  I just
20  know -- I just know we've had these instances of
21  confusion between July and now that I think we've
22  documented.
23     Q.  Was there any instance of confusion on
24  social media that you're aware of prior to July?
25     A.  I would have to take a look.  The ones that
                                                    183

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1  we've sent you, I -- honestly, I'm not sure if they

2  were in May, June, July, August, or September.

3          But I can tell you we've been more aware

4  and watching for signs of confusion since probably

5  May.  I'd say June -- May/June.

6      Q.  Were you aware of any instance of somebody

7  tagging your social media in connection with

8  Wildride prior to 2025?

9      A.  Not that I'm aware of.  Could it have

10 happened and we just weren't really paying attention

11 at the time?  Possibly.

12         But it really wasn't until May where we

13 kind of -- where I was notified of it at least.

14 Someone on our social media team may have seen some

15 instance of a confusion before then, and we could

16 definitely check in with her on that.

17     Q.  Who would that be?

18     A.  That would be -- that would be a collection

19 of people.  So, you know, my wife, Taylor, is on her

20 social accounts.  Our social media coordinator is on

21 our social accounts.  Our influencer manager is on

22 our social accounts.  Our brand director is on our

23 social accounts.  And our content producer is also

24 on our social account.  So there's a group of about

25 five that would have the potential of seeing it, you

                                              184

** UNCERTIFIED ROUGH DRAFT **

 1  know.

 2      Q.  Would they have knowledge about kind of

 3  data about tags in general?

 4      A.  I guess what do you -- clarify that one for

 5  me.  What does "knowledge of tags" mean?  Just --

 6      Q.  I guess would they have knowledge about

 7  just metrics with respect to, you know, social media

 8  engagements, such as like the number of times

 9  WildBird is tagged, WildBird is mentioned, hashtag,

10  whatever the case might be?

11      A.  Yeah, I'd say, yeah, all those team members

12  would have access to our tools that we use to kind

13  of track that stuff.

14      Q.  In preparation for today, did you look at

15  your engagement metrics?

16      A.  It's something I look at maybe once or

17  twice a month, that our team looks at each week, you

18  know.

19      Q.  So who captured this actual image, the one

20  that's on the screen right now?

21      A.  It would have been one of -- it would have

22  been one of our team members.

23      Q.  Do you know who?

24      A.  I don't know off the top of my head.  But

25  it was posted to our Slack, probably, or sent in a

                                                    185

** UNCERTIFIED ROUGH DRAFT **

```
 1  text message.  So we could get that information.
 2       Q.  Do you have communications regarding kind
 3  of things like this across Slack?
 4       A.  Yes.
 5       Q.  Okay.  And do you know how it was created?
 6       A.  Screenshot from an iPhone.
 7       Q.  Okay.  So let's kind of -- I'm just looking
 8  at this.  I can't see -- you know, it says, "Add to
 9  your story."
10          But it looks like there's a post, and it
11  says "@dreaming_outloud." And then "and."  And then
12  it says "wildride_official."
13          Is it your understanding that
14  "@dreaming_outloud" tagged WildBird?
15       A.  No.  So the way Instagram retagging works
16  is it's been mentioned by this lorenadonovan1923,
17  and she's reposting a collaboration post done by
18  @dreaming_outloud and wildride_official.
19          I would assume this was like a giveaway of
20  some sort where -- I mean, I'm just making
21  assumptions.  But I would assume, you know, lorena
22  had some reason to tag this -- repost this.  Sorry.
23       Q.  Do you -- does anybody at WildBird know who
24  this user, lorenadonovan1923, is?
25       A.  No.
```

                                                    186

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   So how do we know -- how does anybody know

2    that they're a prospective consumer?

3        A.   Anybody is a prospective consumer in our

4    mind.  If you're a human being, you're a potential

5    consumer of our brand.  So that's the way we would

6    view it.

7        Q.   Do you know if lorenadonovan1923 is a

8    purchaser of WildBird products?

9        A.   I don't know if she is.

10       Q.   Do you know if this person has purchased

11   Wildride products?

12       A.   I also don't know.

13       Q.   Outside of the username, do you have any

14   information about the identity of this individual?

15       A.   Of lorenadonovan?

16       Q.   Yes.

17       A.   I don't know who she is, no.  I don't know

18   anything about her.

19       Q.   Do you know if they're a follower of

20   WildBird?

21       A.   I do not know.

22       Q.   And upon discovering this, did anybody at

23   WildBird message lorenadonovan1923?

24       A.   I do not know.

25       Q.   Do you know if lorenadonovan1923 directly

                                                    187

** UNCERTIFIED ROUGH DRAFT **

1  messaged WildBird?

2       A.  Again, I don't know.

3       Q.  Do you know how many views this post

4  received?

5       A.  I don't know.

6       Q.  Do you know how many followers

7  lorenadonovan1923 has on her social media?

8       A.  I don't know.

9       Q.  In response to this tag, did WildBird take

10  any action to untag itself from the post?

11       A.  I don't know.  We'd have to talk to the

12  team about that.  I mean, all answers to all these

13  questions could be discovered, if we need to.

14       Q.  Do you know if you can do that?

15       A.  Untag a post, a photo?

16       Q.  Yes.

17       A.  I don't believe -- I don't believe we can

18  on Stories.

19       Q.  But you can on other types of posts?

20       A.  I think if someone were to request like a

21  collaboration post -- again, I'm not the guy to talk

22  to you about how Instagram works, but our team would

23  be happy to answer some questions.

24       Q.  Right.  But I'm asking because this is part

25  of the topic is related to social media confusion.

                                                    188

** UNCERTIFIED ROUGH DRAFT **

```
 1  So I'm just trying to understand if there's other
 2  information.  I just want to know --
 3      A.  Sorry.  Go ahead.
 4      Q.  No.  Go ahead.
 5      A.  No, not necessarily your former questions;
 6  more just this last question of how Instagram
 7  functions, like how the app actually functions,
 8  that's what I'm alluding to, in terms of like the
 9  team can help us understand how that functions.
10  Again, that's just not my responsibility.
11      Q.  Got it.
12          Do you know if anybody on the team would
13  have knowledge that you don't have concerning
14  lorenadonovan1923's identity?
15      A.  Yeah.  I mean, a lot of the things you're
16  asking about we could find.  For example, all we'd
17  have to do is just open up her handle and open up
18  the messaging tab on Instagram, and we can see if we
19  have former conversations with her.  Like, we can do
20  all that.
21      Q.  Was that done at any time prior to today?
22      A.  Not that I know of.
23      Q.  What about prior to filing suit?
24      A.  Again, not that I know of.
25      Q.  Okay.  I'm going to put up another document
```
                                                     189

1  that was produced.

2          (Exhibit No. 10 was marked for identification.)

3  BY ATTORNEY LICHTMAN:

4      Q.  Okay.  This is being presented as

5  Defendants' Exhibit 10.

6          Do you see it on your screen?

7      A.  Uh-huh.

8      Q.  And what is it?

9      A.  Like, what am I looking at?

10     Q.  Yes.

11     A.  I'm looking at an image of a woman and a

12  child in a carrier and us tagged in it, my -- our

13  brand, WildBird.

14     Q.  Was this image posted somewhere?

15     A.  Looks like an Instagram post.  That's the

16  font for Instagram, and it looks like it's, yeah,

17  done in Instagram Stories.

18     Q.  How can you tell that's Instagram Stories?

19     A.  The formatting of the white and the text

20  and the font, and it's our @wildbird handle, which

21  is our Instagram handle.

22     Q.  Got it.

23          Remind me your handle for other social

24  media is mywildbird; right?

25     A.  Correct.

                                              190

1      Q.  Who discovered this post?

2      A.  I believe someone on our marketing team.

3      Q.  Do you know when it would have been

4  discovered?

5      A.  I personally don't know.

6      Q.  Do you know who captured the image?

7      A.  I'd say the same person that also shared

8  it, meaning the person on our team.

9      Q.  When you say "shared it," you mean what?

10      A.  Brought it to light, shared it in Slack or

11  in a text message or basically produce -- produced

12  what this -- what we're looking at.

13      Q.  Do you know how it was captured?

14      A.  I would -- I would guess a screenshot of

15  some sort, either on a laptop or something.

16      Q.  Do you know if this is the full picture?

17      A.  It may not -- yeah, it may be cropped.

18  Like, I could see someone just screenshotting and

19  cropping out, you know, the date, time, and, you

20  know, Wi-Fi connection, whatever, that is shown.

21      Q.  So does anybody at WildBird know who posted

22  this?

23      A.  It's something that I'm sure we could track

24  down.

25      Q.  Like the username?

                                              191

** UNCERTIFIED ROUGH DRAFT **

1    A.  Yes.

2    Q.  But sitting here today, you don't know who

3  posted this?

4    A.  Me personally, no.

5    Q.  Or the username of who posted this?

6    A.  Correct.

7    Q.  It could have been the person in the photo.

8  It could have been somebody else who is giving the

9  carrier to her.  We don't know?

10        ATTORNEY THOMAS:  Objection; asked and

11  answered.

12        THE WITNESS:  Sorry.  Say that question one

13  more time, Leo.

14  BY ATTORNEY LICHTMAN:

15    Q.  I'm just saying, we don't know if the

16  person in the photo posted it?

17    A.  I don't know.  Personally, I don't know.

18    Q.  Would anybody at WildBird be able to find

19  out if the person in the photo is the one that

20  posted it?

21    A.  Possibly.

22    Q.  Sorry.  Can you repeat that?  I didn't hear

23  you.

24    A.  Possibly, yeah, we can definitely put

25  towards -- we could put towards time and effort into

CONFIDENTIAL - ATTORNEYS' EYES ONLY

 1  figuring that out.

 2      Q.  Do you know if anybody at WildBird reached

 3  out to the person that posted this?

 4      A.  I don't know.

 5      Q.  Do you know if anyone at WildBird tried to

 6  remove the tag?

 7      A.  I also don't know.

 8      Q.  Do you know why they tagged WildBird?

 9      A.  Do I know why this person -- the person who

10  may have done it tagged WildBird?

11      Q.  Yes.

12      A.  I have an assumption, but I don't know for

13  a fact.

14      Q.  Got it.

15          But nobody's like contacted them and asked

16  why you posted WildBird?

17      A.  Correct.  I mean, to what I know, yes.

18      Q.  Does anybody -- sitting here today, do you

19  know how many views this post would have received?

20      A.  I don't know.

21      Q.  Would you know how many followers the user

22  that posted this has?

23      A.  I don't know.

24      Q.  Would you know whether they follow

25  WildBird's accounts?

                                                193

** UNCERTIFIED ROUGH DRAFT **

```
1        A.   I don't know.

2        Q.   What about Wildride's accounts?

3        A.   Also don't know.

4        Q.   Okay.  I'll move to the third one.

5             ATTORNEY LICHTMAN:  All right.  This is

6   Defendants' Exhibit 11.

7             (Exhibit No. 11 was marked for identification.)

8   BY ATTORNEY LICHTMAN:

9        Q.   All right.  I just put it on the screen.

10            Can you see it?

11       A.   I see it.

12       Q.   I'll try to -- that's zoomed in way too

13  much.  Let me see -- yeah, that seems better, right?

14  You can -- is that good distance?

15       A.   Yes, I see it.

16       Q.   Okay.  Do you recognize this image?

17       A.   Yeah, I've seen it.

18       Q.   What is it?

19       A.   It's another post from a mom wearing a

20  Wildride carrier, tagging WildBird.

21       Q.   Where is the tag on WildBird?

22       A.   So on some posts on Instagram, you don't

23  have to actually physically show the tag.  Some

24  people find ways of hiding it or whatever.  But the

25  fact that it says "Add to your story" shows that it
```
                                                      194

** UNCERTIFIED ROUGH DRAFT **

```
 1   just came from -- it's obviously inviting us to
 2   share it.  So it came through to our account.
 3        Q.  And who at WildBird discovered this post?
 4        A.  It's something I'd have to ask the team on.
 5        Q.  And was this also an Instagram post?
 6        A.  Yes.
 7        Q.  And who at WildBird captured the image?
 8        A.  I would have to ask the team.
 9        Q.  Do you know if it was captured the same way
10   as the other ones?
11        A.  It looks like an iPhone screenshot; yes.
12        Q.  Is it your understanding that the person
13   that would have done the tagging was kvalverde_?
14        A.  Yeah, she was the one that tagged it.
15        Q.  Do you know if kvalverde_ is the person in
16   the photograph?
17        A.  It's something we could verify by just
18   going to her account and looking at her past images,
19   I'm sure.
20        Q.  Does anybody know this person's name?
21        A.  Again, we could go to her Instagram profile
22   and find her name there.
23        Q.  But nobody, as far as you're aware, has
24   done so prior to today?
25        A.  No.  We'd have to do that.
```
                                                    195

CONFIDENTIAL - ATTORNEYS' EYES ONLY

```
 1        Q.  Do you know if anybody at WildBird reached
 2   out to this user?
 3        A.  I would have to ask the team if they did.
 4        Q.  Do you know if this user reached out to
 5   WildBird?
 6        A.  Again, I'd have to ask our team.
 7        Q.  Do you know if anybody asked to remove the
 8   tag?
 9        A.  I'd have to ask our team.
10        Q.  Okay.  And do you know how many views it
11   received?
12        A.  I'd have to ask our team.  I don't know.
13        Q.  And do you know how many followers the user
14   that posted it has?
15        A.  Yeah, we could click into her profile and
16   get that number.
17        Q.  Got it.
18            And, also, do you know if they follow your
19   account?
20        A.  Same thing.  We'd just have to just click
21   into her profile and see who she's following.
22        Q.  Would the same answer be with respect to
23   following Wildride's account?
24        A.  Yeah.
25        Q.  Got it.
```

                                                           196

** UNCERTIFIED ROUGH DRAFT **

```
 1          But that hasn't been done yet as of today?
 2     A.   I'd have to ask our team.  I don't know.
 3     Q.   Okay.
 4          (Discussion off the stenographic record.)
 5          ATTORNEY LICHTMAN:  I think this might be
 6  the last of them.  It's -- is this the fourth or the
 7  fifth one?  We'll see in a second.
 8          I'm putting up Exhibit -- Defendants'
 9  Exhibit 12.
10          (Exhibit No. 12 was marked for identification.)
11  BY ATTORNEY LICHTMAN:
12     Q.   Can you see this exhibit?
13     A.   Yes, I can.
14     Q.   And what is it?
15     A.   It's an Instagram post.  Looks like a
16  screenshot from an iPhone.  And it is a picture of a
17  mom or somebody.  I shouldn't assume.  It's somebody
18  holding a Wildride carrier.
19     Q.   Do you know when this image was captured?
20     A.   I'd have to ask the team.
21     Q.   Do you know when the post was created?
22     A.   Same, I'd have to ask our team.
23     Q.   Is it fair to say that the post would have
24  been created in May 2025 or later?
25     A.   Is it safe to assume?
```
                                                    197

** UNCERTIFIED ROUGH DRAFT **

1    Q.  Yeah.  Is that a fair assumption?

2    A.  Yes.

3    Q.  Do you have any reason to believe this was

4  posted prior to May 2025?

5    A.  Could have been, but I have no reason.

6    Q.  Okay.  So I'll just kind of quickly go

7  through questions, which I imagine I'll know the

8  answer to, so I'll try to go quickly through them.

9       But this user, motherknowswest_, sitting

10  here today, do you know who this person is?

11    A.  When you say that, like me personally?  Do

12  I know her?

13    Q.  Yeah.  Can you identify -- do you have the

14  identity of who posted this apart from a username?

15    A.  We would just look at her handle and grab

16  the name.

17    Q.  Got it.

18       But the point is, sitting here today, you

19  don't have a first and last name or contact

20  information for them?

21    A.  I don't.  I'd have to ask the team if they

22  do.  I'm not the one on social ever really.  So it's

23  all kind of on our team if they know these people.

24    Q.  Got it.

25       You don't know if they've checked yet?

198

** UNCERTIFIED ROUGH DRAFT **

1       A.   I don't know if they've checked or if they
2   already know.
3       Q.   Do you know who on the team discovered
4   this?
5       A.   I'd have to ask the team.
6       Q.   Do you know who captured the image?
7       A.   Same.  I'd have to ask them.
8       Q.   Is it fair to assume it was captured the
9   same way as the others?
10      A.   Yeah.
11      Q.   So is it fair to say that this is
12  accurately displaying what was on the person's phone
13  at the time they saw it?
14      A.   Yeah.
15      Q.   Do you know if anybody at WildBird
16  contacted motherknowswest_?
17      A.   I'd have to ask the team.
18      Q.   Do you know if motherknowswest_ contacted
19  anybody at WildBird?
20      A.   No.  I'd have to ask the team.
21      Q.   Do you know if anybody tried to remove the
22  tag?
23      A.   Again, I'd have to ask the team, yeah.
24      Q.   What about the amount of use this post got?
25      A.   I don't know.  I'd have to ask the team.

                                              199

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1    Q.  What about the amount of followers this

2  person has?

3    A.  Same answer to that.

4    Q.  And do you know if this person follows your

5  accounts?

6    A.  We'd have to go in and do a search and then

7  see if they follow us.

8    Q.  Similarly, do you know if they follow

9  Wildride's accounts?

10    A.  Same thing.  We just look at their handle

11  and see if they follow.

12    Q.  Do you know if this person has ever

13  purchased a WildBird product?

14    A.  I don't know.

15    Q.  I guess same question, just to make sure I

16  cover it for all of them.

17    Do you know if any of the social media

18  posters that we've seen so far have purchased a

19  WildBird product?

20    A.  Yeah, I'd have to check with the team.  I

21  don't know on my own.

22    Q.  Do you know if any of them fall within kind

23  of the core group that was covered in ▮▮▮▮▮▮

24  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

200

CONFIDENTIAL - ATTORNEYS' EYES ONLY

** UNCERTIFIED ROUGH DRAFT **

```
 1        A.  Yeah, I don't know.
 2        Q.  Okay.  I'm going to stop presenting.  And
 3   let me just make sure I covered all of them.
 4            Shoot, I accidentally went back.
 5            All right.  Just bear with me like one
 6   second.
 7            Oh, no.  Sorry.  I do have one more.  I
 8   just want to make sure we go over all these.
 9            (Exhibit No. 13 was marked for identification.)
10   BY ATTORNEY LICHTMAN:
11        Q.  Okay.  This is Defendants' Exhibit 13.
12            All right.  I think you kind of know what
13   I'm going to ask at this point, so I'll just go
14   through them.
15            Do you recognize this picture?
16        A.  I have not seen that one.
17        Q.  Do you know who discovered it?
18        A.  Someone on our team.
19        Q.  Do you know if it was discovered prior to
20   May -- do you have any reason to believe it was
21   discovered prior to May 2025?
22        A.  No.
23        Q.  Do you have any reason to believe it was
24   posted prior to May 2025?
25        A.  Yes.
```

                                                    201

1      Q.   What gives you reason to believe it was

2  posted prior to 20 -- May 2025?

3      A.   I remember hearing about this one from a

4  team member not that long ago.  I didn't see it, but

5  I was told.

6      Q.   But how long ago did you -- sorry.  It kind

7  of broke up for a second.  So I apologize.

8           You said you were told about this by a team

9  member?

10     A.   Yeah.  I just remember she -- I mean, I'm

11 making an assumption.  She said one that kind of

12 resonates our desert lark color, the mom's selfie.

13 We were just talking about it in passing.  So I

14 just -- I'm assuming this is the one that she was

15 talking about.

16     Q.   Do you know which employee this was?

17     A.   Daniela.

18     Q.   And what's her last name?

19     A.   Bertolino.

20     Q.   What's her role in the company?

21     A.   She -- she's the one that reviews a lot of

22 content at our company.

23     Q.   Got it.

24          And what gives you reason to believe it was

25 prior to May?

                                                    202

** UNCERTIFIED ROUGH DRAFT **

```
 1        A.  Oh, sorry, prior or after May?
 2        Q.  Prior.
 3        A.  Oh, my bad.  I'm assuming it's after May.
 4   Sorry.  I misunderstood you there.
 5        Q.  Got it.  The question was prior.
 6        A.  My bad.
 7        Q.  Yeah, no worries.  And I see our
 8   videographer just came on just real quick.  I mean,
 9   we can go off record if we need to, but I take it
10   there might be stuttering?
11             THE VIDEOGRAPHER:  Yes, sir, I think it was
12   like a little bit of a lag on your end.  I think
13   we're fine now, so we should be good to proceed.
14   But I'll definitely keep an eye out for, you know,
15   if it shows up again.
16             ATTORNEY LICHTMAN:  Okay.  We'll just pray
17   to the internet gods that we can just finish this
18   and be done.
19   BY ATTORNEY LICHTMAN:
20        Q.  Okay.  So -- yeah, so the question -- I
21   apologize if I was unclear.
22             So the question is, is there any reason for
23   you to believe this was posted prior to -- or before
24   May 2025?
25        A.  No, there's not.
```
                                                    203

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1        Q.   Approximately when was the conversation

2   with I believe you said Daniela?

3        A.   I mean, I've had conversations with her as

4   these have come in, and the team, from -- between

5   June and now.  You know, they're just telling me

6   either verbally on a phone call or sending me a

7   screenshot of when we're getting tagged in Wildride

8   posts.

9        Q.   Do you know who captured the image?

10       A.   I don't.  But, yeah, we could definitely

11  find out.

12       Q.   And do you know who posted the image?

13  Because it appears cropped.

14       A.   Again, that looks like an Instagram post,

15  one, because it's tagged.  It's tagged on our

16  Instagram.  And it looks like it's just a horizontal

17  photo, so it's not fitting the full frame of the

18  vertical.  And that's an Instagram font.  That's a

19  generic Instagram font.  So that kind of gives me

20  the inclination that it was on Instagram.

21       Q.   Do you know the person that posted it?

22       A.   I do not know her.

23       Q.   Do you know if anybody reached out to this

24  user from WildBird?

25       A.   I'd have to ask the team.  I don't know

                                              204

** UNCERTIFIED ROUGH DRAFT **

1  personally.

2       Q.  Do you know if anybody asked, you know, if

3  anybody found out why she posted it?

4       A.  Same.  I'd have to ask the team.  I don't

5  know myself.

6       Q.  Sitting here today, you don't know the

7  username of whoever posted this?

8       A.  I don't.  I'd be curious if there was an

9  original screenshot that maybe got cropped or

10 something; but as of this, I don't.

11      Q.  Do you know if the person who posted

12 this -- or who published this is the person in the

13 photograph?

14      A.  I don't know.

15      Q.  Do you know if anybody tried to remove the

16 tag?

17      A.  I'd have to ask the team.  I don't know.

18      Q.  Do you know how many followers this user

19 has?

20      A.  We'd have to find out.  I don't know.

21      Q.  Do you know if they ever purchased a

22 WildBird product?

23      A.  Don't know.

24      Q.  Okay.  And you don't know if they -- well,

25 they seem to have a Wildride product, so I can skip

                                                    205

** UNCERTIFIED ROUGH DRAFT **

1  that for now.

2       But you don't know if they follow your

3  accounts?

4     A.  I don't know.

5     Q.  You don't know if they follow Wildride's

6  accounts?

7     A.  Correct.  I don't know.

8     Q.  Okay.  I might come back to these, but I

9  guess I'll just kind of more generally now ask a few

10 questions about social media.

11      Outside of the posts that we just went

12 through, are there any other instances in which --

13 that you're aware of, sitting here today, in which

14 somebody with a Wildride product tagged WildBird?

15    A.  Other than the -- other than the latest

16 ones that maybe you don't have yet, that is all I

17 know.

18      ATTORNEY LICHTMAN:  And, again, I'll just,

19 you know, Jonathan, if there's any others, I'd ask

20 they be produced quickly.

21 BY ATTORNEY LICHTMAN:

22    Q.  You know, we don't know today if there's

23 others that might be produced, but is it fair to

24 assume that the answers to the questions would be

25 similar with respect to knowledge of the user,

                                               206

** UNCERTIFIED ROUGH DRAFT **

```
 1   whether they have -- you know, how many followers
 2   they have, whether they follow WildBird, et cetera?
 3        A.  No.  I think at this point we would gather
 4   more information.
 5        Q.  Okay.  Has there been any instance in which
 6   WildBird has ever reached out to anybody who
 7   mistakenly tagged them?
 8        A.  Again, I'd have to ask the team.  I don't
 9   know personally because I don't interact with the
10   customers on social myself, so we'd have to talk to
11   them.
12        Q.  So I know WildBird referenced other
13   platforms like TikTok, YouTube.
14            What about Pinterest?  Is WildBird on
15   Pinterest?
16        A.  We are, but we're not -- we're not very
17   active.
18        Q.  Outside of Instagram, what is WildBird's
19   most active account?
20        A.  It's pretty heavy Instagram and then some
21   TikTok.
22        Q.  Got it.
23            Do you know if anybody has mistakenly
24   tagged WildBird on TikTok in connection with a
25   Wildride product?
```

                                              207

CONFIDENTIAL - ATTORNEYS' EYES ONLY

1      A.  Not that I know of yet.

2      Q.  Do you know about -- what about YouTube,

3  like commenting or sharing something that was

4  clearly Wildride, but they were referencing

5  WildBird?

6      A.  Again, I don't know.

7      Q.  So you said kind of your biggest presence

8  is Instagram; is that correct?

9      A.  Not just ours, but I would say like the

10  collective industry, yeah.  For moms, that's like

11  where they're mostly sharing.

12  ████████████████████████████████████████

13  ████████

14      Q.  Do you know how many followers WildBird has

15  right now?

16      A.  Off the top of my head, I don't.  Maybe

17  400k, something like that.

18      Q.  Is it fair to say it would be at least

19  400k?

20      A.  Yeah, I think so, yeah.

21      Q.  ████  ████████████████████████████

22  ████████████  ████████████████████

23  ████████████████████

24  ██ ██ ████████████████████████

25  ████████████████████████

208

1    Q.    ▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

3    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5    ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

6    ▮▮  ▮▮▮

7    Q.    Do you know how many tags WildBird receives

8    in a day?

9    A.    So I think Instagram Reels and posts, I

10   believe we get at least around 20-plus a day.

11         On Instagram Stories, I don't know.  We do

12   have a social-listening tool that tracks all those

13   numbers for us.  We'd be happy to provide any

14   information on those numbers.  That's something we

15   could easily produce.

16   Q.    That would -- I appreciate that.  Thank

17   you.

18         And then, I guess, a day, you said around

19   20.

20         What about a month?  Is it fair to say the

21   number would be 20 times 30?

22   A.    Yeah.  Yeah.

23   Q.    And that doesn't include Stories?

24   A.    Correct.  I think Stories -- yeah, Stories

25   would be different than Reels.

209

1 ▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮    ▮▮▮▮▮▮▮▮▮▮▮▮

3 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5     Q.  Do you know how many other user names on

6 Instagram start with "wild" in their handle?

7     A.  No, but I would assume a lot.

8     Q.  Have you checked, ever?

9     A.  No.  Just through passing, I've seen, as I

10 type in "wild" myself, it obviously shows a bunch of

11 others.  But none in the carrier space other than

12 Wildride?

13     Q.  What do you mean when you type in "wild,"

14 others show up?

15     A.  You know, it just like auto-fills for you,

16 or it will show like -- it will show, you know,

17 names that are like.  And I'm just like -- I'm just

18 assuming wild is obviously a generic word, so I'm

19 sure there's lots.

20     Q.  Got it.

21         So essentially when you start typing "wild"

22 in, WildBird will show up; other user names that

23 start with "wild" will also show up?

24     A.  Yeah, I believe so.

25     Q.  Do you know if it's in alphabetical order?

219



```
 1  BY ATTORNEY LICHTMAN:
 2      █   ████████████████████████████
 3  ████████████████  ██████████████  ██
 4  █████████████████████████████████
 5  ██████████████████████████████
 6  ███████████████████████████████
 7  █████████████████
 8      ████████████████  ████████████
 9      ████████████  █  █████████████
10  █████████████████████████████████████
11  ██████████
12  BY ATTORNEY LICHTMAN:
13      Q.  The Instagram accounts that -- going back
14  to those social media posts for a second, do you
15  know where those users are located?
16      A.  No.  We'd have to look at that, right up.
17  My assumption is U.S., but have to see.
18      Q.  But sitting here today, you don't know if
19  they're in the United States or in another country?
20      A.  No.
21      Q.  ██████████████████████████████
22  ██████████  ████████████████████████
23  ██████
24      ████████████████████████████████████
25  ██████████
```

232

# Exhibit J

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

WILDBIRD LLC,

    *Plaintiff*,

    v.

WILDRIDE B.V., and WILDRIDE USA CORP.,

    *Defendants*.

Civil Action No: 1:25-cv-05993

## PLAINTIFF'S OBJECTIONS AND RESPONSES TO DEFENDANTS' PRELIMINARY-INJUNCTION RELATED INTERROGATORIES

Plaintiff Wildbird LLC ("Plaintiff"), by and through its undersigned counsel, hereby responds to Defendants Wildride B.V. and Wildride USA Corp.'s (together, "Defendants") First Set of Interrogatories ("Interrogatories") as follows:

## PRELIMINARY STATEMENT

The following responses and objections are based only upon information presently available to and specifically known by Plaintiff. Facts and evidence now known may be imperfectly understood. Additionally, discovery is continuing in this matter. Accordingly, Plaintiff reserves the right to modify or amend these responses on the basis of subsequently acquired knowledge, information, or understanding. These responses reflect the information that is presently available to Plaintiff as derived from such investigation as was possible prior to the date of these responses. Plaintiff expressly reserves the right to amend, add to, delete from, or otherwise modify or supplement each response, to produce documents, and/or to make such claims and contentions as may be appropriate when Plaintiff has concluded discovery and has ascertained more relevant facts. Except for facts expressly admitted, if any, no incidental or implied admissions are intended or should be construed from any response. The fact that Plaintiff provides a response

to part or all of any Interrogatory is not intended and shall not be construed to be a waiver by Plaintiff of all or any part of any objection to any such Interrogatory. Plaintiff's responses are made without waiver of the following rights, and, on the contrary, are intended to preserve and do preserve the following:

(i)     the right to raise all questions of authenticity, foundation, relevancy, materiality, privilege, and admissibility as evidence for any purpose of the information identified in response to the Interrogatories that may arise in any subsequent proceedings in, or trial of, this or any other action;

(ii)    the right to object on any ground to the use of said information identified in response to the Interrogatories in any subsequent proceeding in, or hearing of, this or any other action;

(iii)   the right to object on any ground to the introduction into evidence of information identified in response to the Interrogatories;

(iv)    the right to object on any ground at any time to other discovery involving the information provided; and,

(v)     the right to amend or supplement this response in the event that any information is unintentionally omitted. Inadvertent identification or production of privileged documents or information by Plaintiff is not a waiver of any applicable privilege.

This Preliminary Statement is incorporated into each response set forth below.

## <u>GENERAL OBJECTIONS</u>

Plaintiff asserts the following general objections ("General Objections") to each and every one of the Interrogatories where applicable. The General Objections may or may not be reasserted after each specific Interrogatory. The assertion of the same, similar or additional objections to each

specific Interrogatory, or the failure to assert any additional objection to each specific Interrogatory, does not waive or alter the General Objections immediately set forth below:

1. Plaintiff objects to all definitions, instructions, and Interrogatories that purport to impose any obligations on Plaintiff beyond those set forth in the Federal Rules of Civil Procedure or any applicable local rule or order of the Court.

2. Plaintiff objects to each and every Interrogatory to the extent it improperly calls for information protected from disclosure by the attorney-client privilege, the attorney work product doctrine, or by any other recognized legal privilege, including because it purports to extend to Plaintiff's attorneys.

3. Plaintiff objects to the definition of "WILDRIDE Mark" in Paragraph Five of the Definitions section of Defendants' First Set of Interrogatories on the ground that it assumes the "WILDRIDE Mark" is a valid and protectable trademark.

4. Plaintiff objects to each and every Interrogatory to the extent that it seeks Plaintiff's confidential, private, or proprietary information. Plaintiff will designate any such information in accordance with the Protective Order in this action.

5. Plaintiff objects to each and every Interrogatory to the extent that it seeks confidential, private, or personal information about Plaintiff's customers who are not parties to this case, and without notice to said parties. Plaintiff will designate any such information in accordance with the Protective Order in this action.

6. Plaintiff objects to each and every Interrogatory to the extent it seeks information not in Plaintiff's possession, custody, or control.

7. Plaintiff objects to each and every Interrogatory to the extent it seeks information already in the possession, custody, or control of, or equally available to, Plaintiff.

8.   Plaintiff objects to each and every Interrogatory to the extent it is vague, ambiguous, cumulative, overbroad, unduly burdensome, or disproportional to the needs of the case.

9.   Plaintiff objects to each and every Interrogatory to the extent that the applicable timeframe is vague, ambiguous, or overbroad.

### INTERROGATORIES

**INTERROGATORY NO. 1:**      Identify each instance or communication of alleged confusion between you and Wildride in the past five (5) years, including the date, manner in which the information was shared with you, the names of each person who participated in or has knowledge about the alleged confusion, and a description of the communication.

**ANSWER:** Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney/client privilege or work product doctrine.

Subject to and without waiving its objections, Plaintiff identifies the following:

- May 22, 2025 – ABC Kids Expo – a buyer from Nordstrom asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand.

- May 23, 2025 -  ABC Kids Expo – one supplier said to Plaintiff's representative "oh, yes; I saw your booth" – but they were referring to Defendants' booth.

- May 23, 2025 – ABC Kids Expo - a supplier asked Plaintiff's representative "You are Wildride, yes"?

- June 2025 – Nordstrom brand showcase – at least 4 category leads for Nordstrom stores throughout the U.S. asked Plaintiff's representative if Plaintiff's WILDBIRD brand was affiliated with Defendants' WILDRIDE brand or if Plaintiff's

WILDBIRD brand was the same as Defendants' WILDRIDE brand.

- July 2025 – confusion on social media – prospective consumers "tagged" Plaintiff's Instagram account when posting about Defendants' products.

- August 2025 – in a search for "Wildbird" on Nordstrom's website, Defendants' WILDRIDE-branded baby carrier is the first item to appear.

- August 2025 – additional confusion on social media – prospective consumers "tagged" Plaintiff's Instagram account when posting about Defendants' products.

Plaintiff's search for information and documents is ongoing.

**INTERROGATORY NO. 2:**      Identify the date and manner in which you first became aware of Wildride's existence in the United States and each person who participated in or has knowledge about the discovery.

**ANSWER**: Plaintiff objects to this Interrogatory to the extent it seeks information protected by the attorney/client privilege or work product doctrine.

Subject to and without waiving its objections, Plaintiff states the following: Plaintiff first became aware of Wildride's physical existence in the United States on or about May 21, 2025, at the ABC Kids Expo in Las Vegas, Nevada. Nate Gunn has knowledge about this discovery.

**INTERROGATORY NO. 3:**      Identify each channel through which you distribute and sell, or intend to distribute and sell, Wildbird's Goods and Services in the United States, including domain names, online storefronts, third-party e-commerce platforms, retailers, wholesale accounts, and social media handles.

**ANSWER:** Plaintiff identifies the following trade channels: (1) Wildbird's website www.wildbird.co; (2) Wildbird's social media pages, including Instagram @wildbird, Facebook @mywildbird, TikTok at @mywildbird; and YouTube at @mywildbird; (3) third-party brick-and-

Dated: August 29, 2025

GREENBERG TRAURIG, LLP

/s/ Jonathan W. Thomas
Jonathan W. Thomas (JT1016)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 801-9219
Email: jonathan.thomas@gtlaw.com

Molly R. Littman-Johnson (*pro hac vice*)
90 South 7th St., Suite 3500
Minneapolis, Minnesota 55402
Tel:  (612) 259-9669
Fax: (612) 259-9700
Email: Molly.Littman@gtlaw.com

*Attorneys for Plaintiff Wildbird LLC*

## VERIFICATIOÄ

I, Nate Gunn, am the Co-Founder of Wildbird LLC.  I have the authority to sign this Verification on Wildbird's behalf.  I have read and reviewed these responses to Defendants' First Set of Interrogatories in this lawsuit.  To the best of my knowledge, these interrogatory responses are true and correct as of the day they are made.

Pursuant to 28 U.S.C. § 1746, I verify under penalty of perjury that the foregoing is true and correct.  Executed on August 29, 2025.

Nate Gunn

## CERTIFICATE OF SERVICE

I hereby certify that, on August 28, 2025, I served a true and correct copy of the foregoing document, titled *Plaintiff's Responses and Objections to Defendants' Preliminary-Injunction Related Interrogatories* via electronic mail, on the following counsel of record for Defendants:

Leo M. Lichtman
James M. Slater
ESCA LEGAL