UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILDBIRD, LLC, | |
| Plaintiff, | Case No. 1:25-cv-5993 (DLC) |
| v. | |
| WILDRIDE B.V., *et al.*, | |
| Defendants. | |

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Defendants Wildride B.V. ("Wildride") and Wildride USA Corp. ("Wildride USA") (collectively, "Defendants") hereby submit their Proposed Findings of Fact and Conclusions of Law in connection with Plaintiff Wildbird LLC's ("Plaintiff") motion for a preliminary injunction. Defendants reserve the right to request additional or amended findings.

**FINDINGS OF FACT**

**I.    PLAINTIFF'S HISTORY, PRODUCTS, AND TRADEMARKS**

1.    Founded in 2014 by Tayler and Nate Gunn, Plaintiff offers children and parental accessories and clothing. (DX1 ¶ 4.)[1]

2.    Plaintiff's core products are a line of baby carriers, including its "Aerial Wrap," carrier, its "Aerial Carrier," and its "Ring Sling" carrier. (DX1 ¶ 6; DX4; DX8 at 69:1-13.)

3.    A general review of Plaintiff's website, wildbird.co, demonstrates that other products currently offered by Plaintiff include baby pajamas and sleepsacks, fitted crib sheets, newborn hats and baby sunhats, teethers, pregnancy pillows, and bathrobes.

---

[1] References to "DX__" are to the Defendants' marked exhibits in their October 17, 2025 exhibit list filed with the Court.

4.      Plaintiff offers its products under the brand name WILDBIRD ("WILDBIRD" or "Plaintiff's Mark"). It additionally uses the brand name CloudBlend™ to refer to its proprietary fabric blend offered in some products. (DX8 at 54:8-23.)

5.      When spelled out, Plaintiff's Mark appears as "WildBird," with the "W" and B" capitalized; however, Plaintiff almost always displays it in the form of a stylized mark, which combines the word "WILDBIRD" in all capitalized letters in a sans-serif font, with its inset logo of a bird, which appears as follows:



(DX19; DX8 at 35:2-36:18.)

6.      As its co-founder Nate Gunn explained, Plaintiff conceived of the name WILDBIRD because the brand is intended to evoke "the nurturing and protective nature of a mother bird." (DX1 ¶ 4.)

7.      Plaintiff's marketing and brand identity place particular emphasis on this theme. Among other things:

WILDBIRD is almost always displayed in the stylized form above, in which a silhouette of a bird appears immediately above the "D" in the word "BIRD," drawing the viewer's eyes to this part of the Plaintiff's Mark. (DX19; DX8 35:2-36:18.)

a.   Plaintiff prominently features a large cut-out of the inset bird logo on product packaging, along with the phrase "WELCOME TO THE FLOCK," which is intended to signify that the consumer is joining a community of "wild birds." (DX20.)

b. Plaintiff uses a number of additional slogans and advertising language that puts emphasis on the word "bird" by treating it as a metaphor. For instance, Plaintiff regularly uses the phrase "A HAPPY PLACE FOR YOUR LITTLE BIRD" on branding materials, and notes that its CLOUDBLEND™ fabric is "the closest thing to actually sleeping on a cloud for your little bird!" (DX21.)

8. In contrast to the word "bird," Plaintiff does not use any brand slogans or taglines that incorporate the word "wild." (DX8 at 54:10-12.)

9. In connection with Plaintiff's Mark, Plaintiff owns U.S. trademark registration No. 7,798,495 (the "'495 Registration"), covering the WILDBIRD wordmark in International Classes 018, 024, 025, 028, and 035. (DX26.)[2]

10. The '495 Registration reflects a registration date of May 20, 2025. The listed first-use date for goods in International Classes 018 and 035 of July 1, 2014, with use in commerce starting November 14, 2024, and the listed first-use date for the remaining classes is February 28, 2022, with use in commerce also starting February 28, 2022.

11. Plaintiff also owns U.S. Trademark Application Serial No. 99/068,040 (the "'040 Application), which seeks registration of the stylized wordmark, accompanied with the inset bird logo as depicted above.

12. Plaintiff has never offered any goods or services under the word "wild" by itself, nor has Plaintiff ever offered any goods or services under the word "wild" combined with "ride." Nor has Plaintiff ever used the words "wild" or "ride," as part of any marketing slogan or tagline. (DX8 at 52:6-12.)

---

[2] The Court additionally takes judicial notice of the relevant Patent and Trademark Office records. *See Telebrands Corp. v. Del Labs., Inc*., 719 F.Supp.2d 283, 287 n. 3 (S.D.N.Y.2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office.").

13.     Prior to this lawsuit, Plaintiff sought to enforce its rights to WILDBIRD only once. Specifically, in February 2015, Plaintiff sent a cease and desist letter in connection with an online store for baby related clothing and wearables called "MyWildbirdDesigns." (DX15.) Apart from this lawsuit, Plaintiff has never sought to enforce rights in the word "wild" standing alone, or in combination with any word other than "bird." (DX8 at 275:13-20.)

## II.     DEFENDANTS' HISTORY, PRODUCTS, AND TRADEMARKS

14.     Defendants are an interrelated group of corporate entities that operate under the name "Wildride."

15.     Defendant Wildride was founded in the Netherlands by Joost Hultink and Britt Schoorl in 2021 with the purpose of offering a product to carry toddlers that have outgrown traditional baby carriers. (DX28 ¶ 3.) Its core product is a carrier marketed as "THE TODDLER SWING CARRIER." (*Id.*)

16.     Other products currently offered by Defendants include carrier accessories, adult backpacks, shoulder bags, and children's sunglasses. (*Id.* ¶ 18; DX31.)

17.     Defendants offer their products under the brand name WILDRIDE ("WILDRIDE," or "Defendants' Mark").

18.     When spelled out, Defendants' Mark appears as "Wildride,"; however, Defendants' Mark is primarily displayed in branding as a stylized mark, which includes the word "WILDRIDE" in all capitalized letter in a bold, serif font, as follows:

19.     Additionally, Defendants adopted the image of a cheetah as a logo, which is

displayed on its own as a symbol for Defendants' company, as well as in conjunction with the stylized WILDRIDE wordmark:



(DX28 ¶ 16.)

20.    The WILDRIDE name was inspired by a brand of children's previously founded by Defendants' co-founder Britt Schoorl in 2019 called "Wildrose." (*Id.* ¶ 10.) Serving as inspiration for the name, WILDRIDE was born from the idea that carrying small children at the hips provided them with the sensation of swinging, and that carrying a toddler in particular— who may be more independent and energetic than a newborn—could be described by the parents as a "wild ride."  (*Id.*)

21.    Defendants' marketing and branding initiatives play directly into this brand identity. Among other things:

a.    Defendants advertise their core product as "THE TODDLER SWING CARRIER." (*Id.* ¶ 17; DX29.)

b.    Defendants' product packaging displays the tagline "ENJOY THE RIDE!" (DX28 ¶ 11; DX29.)

c.    Defendants use the hashtags "#itsawildride" and #toddlercarrier" in social media branding. (*Id.*)

d.    Defendants feature a blog titled *A Wildride With* on their website,

wildridecarrier.com, which provides short features on adventurous parents. (*Id.*)

    e.   Defendants use advertising language that plays off the idea of "wild" children, such as marketing leopard-print sunglasses as being "made for bold little explorers," and "[p]erfect for sunny days, wild rides, and everything in between." (DX28 ¶ 18; DX31.)

22.    Defendants have secured trademark registrations in dozens of countries. On May 12, 2023, Wildride filed International Registration No. 1743929 for WILDRIDE in International Classes 18, 24, 25, and 35, which covers 54 countries, and extended this registration to the United States with the same priority filing date, Serial No. 79/375/825. (DX28 ¶¶ 25-27; *see also* DX38.)

23.    Since then, Defendants filed for a U.S. trademark registration on May 20, 2024, Serial No. 98/558/373, for the WILDRIDE word mark in International Class 18. The first use in commerce is listed as June 18, 2021. (*Id.* ¶ 29.)

24.    Defendants have marketed their brand in the United States since June 2021 through a network of U.S.-based influencers on social media. (*Id.* ¶ 43.)

25.    Since 2021, Defendants' website, wildridecarrier.com, has been accessible to U.S. consumers. (*Id.* ¶ 31.)

26.    Since 2021, Defendants have advertised and promoted the WILDRIDE brand on social media, including through the following accounts:

    a.   On Instagram: @wildride_official, @wildrideuk, @wildride_czsk, @wildride_nordics, @wildride_pl, @wildride_southafrica, @wildride_sea, @wildrideofficial_tw, @wildride_latam, and @wildride_japan.

    b.   On Tik Tok: @wildridecarrier and @wildrideuk.

      c.   On Facebook: Wildride and Wildride UK.

      (*Id.* ¶ 41.)

27.     Since that time, demand in the United States has expanded significantly. (*Id.* ¶¶ 34, 44.)

28.     In January 2024, Wildride formally incorporated Wildride USA as a separate entity in Delaware to establish a physical U.S.-based entity. Wildride licenses the WILDRIDE trademark to Wildride USA. (*Id.* ¶ 45.)

29.     That same year, Defendants established a U.S.-based warehouse, and activated a U.S.-specific subdomain for their website, wildridecarrier.com, in order to expedite the shipping and ordering process for U.S. consumers. (*Id.* ¶ 46.)

30.     Defendants were not aware of Plaintiff's Mark when they adopted WILDRIDE. Defendants first learned of Plaintiff's Mark in or around October 2024. (*Id.* ¶ 14.)

31.     Plaintiff testified that it has been aware of WILDRIDE since at least 2023, but likely earlier. (DX8 at 87:5-19; 181:19-183:9.) In particular, Plaintiff noted that there had been "a few conversations" in the early days of the WILDRIDE, when WILDRIDE first came to be used in commerce. (*Id.*)

## III.   THE WORD "WILD" IS UBIQUITOUS AMONGST PRODUCTS AND SERVICES FOR BABIES AND SMALL CHILDREN

32.     The word "wild" is commonly used in connection with products and services geared towards babies and young children.

33.     This is unsurprising, given that the word "wild" brings with it certain connotations commonly associated with that segment of the market, including a sense of exploration, curiosity, adventure, a lack of inhibition, and boundless energy.

34.     There are currently hundreds of third-party registrations and applications for

"wild"-formative marks in connection with goods and services that relate to babies and/or young children. (DX2 ¶ 7; DX3.)

35.     Plaintiff itself presented evidence demonstrating the ubiquity of "wild" in the marketplace. For instance:

a.  Plaintiff presented evidence that its product has been sold through boutique retailers with names that include "Wildflower & Company," "Wild Ones Baby Boutique," and "The Wild." (DX9.)

b.  Plaintiff presented an article in which it was featured alongside Stokke, another company which makes baby products. (DX11.) Among the products Stokke is known for is a line of baby strollers referred to as the "Wild Collection." (DX12.).

c.  Plaintiff opined during its deposition that there are likely "lots" of other Instagram users whose usernames start with the word "wild," because "wild" is "obviously a generic word." (DX8 at 224:10-24.)

36.     In addition to the hundreds of live third-party trademark registrations and applications, Defendants presented ample evidence which leads the Court to conclude that the term "wild" is commonly understood as a descriptor for, or otherwise suggestive of, goods and services for young children. For example:

a.  The internet is rife with examples of baby apparel designed with slogans such as "Born to be Wild," "Born Wild," and "Be Wild." (DX5.)

b.  "Wild One" and "Wildflower" are commonly used themes for parties centered around babies and toddlers, such as baby showers and first birthday parties. (DX6.)

c.  "Wild" imagery, such as jungles and safari animals, is a common feature of baby

products and bedrooms. (DX7.)

    d.   Children's books sometimes include "wild" in the title, such as the classic

children's book *Where the Wild Things Are*, by Maurice Sendak.

## IV.   PURCHASERS OF THE PARTIES' PRODUCTS EXERCISE A HIGH DEGREE OF CONSUMER CARE

37.    There is no dispute that consumers of the parties' products are careful and

discerning. (DX28 ¶ 20.)

38.    Both parties market their products towards parents of young children, who are

naturally expected to be more discerning than the average consumer.

39.    As the Voccii Report, Plaintiff's exploratory market study, further suggests,

Plaintiff's customers "tend to be educated and aware of various brands in the marketplace."

(DX13, at 58.)

40.    Additionally, both parties' carriers start at over one hundred dollars, with some

models costing several hundred dollars.

41.    Such pricing is consistent with Plaintiff's own testimony that it operates "in the

premium space," and is intended to appeal to "a higher income, discretionary income . . .

customer base." (DX8 at 128:14-129:10.)

42.    Accordingly, consumers of Plaintiff and Defendants' products are likely to be

more sophisticated and discerning than the average consumer.

## V.   THERE IS NO EVIDENCE OF ACTUAL CONFUSION

43.    The Court addresses the merits of Plaintiff's purported "actual confusion"

evidence in Part II.A.4 of the Conclusions of Law, *infra*. However, the Court finds the following

facts to be relevant and supported by the evidentiary record.

### A.  Plaintiff Has Not Presented Any Evidence Demonstrating that Consumers Are

**Actually Confused**

44.    In this case, Plaintiff has identified a small number of instances in which certain industry representatives purportedly "confused" Plaintiff with Defendants in conversation, as well as a small number of instances in which a user on Instagram purportedly "tagged" Plaintiff while appearing to hold Defendants' product. None of the materials Plaintiff cites, however, demonstrate that any of Plaintiff's customers or potential customers were actually misled into a purchasing decision, or that sales were otherwise diverted away from Plaintiff.

45.    Rather, the evidence Plaintiff points to demonstrates, at most, simple misunderstandings in conversations with other industry professionals, such as suppliers, store managers, or sales associates, and not consumers, which Plaintiff itself immediately corrected, and a statistically negligible number of instances of carelessness or mistake in the form of typographical errors on Instagram.

46.    With respect to Instagram, Plaintiff has maintained and operated the username @wildbird since 2017 or 2018 and Defendants have maintained and operated the username @wildride_official (among others) since 2021 to promote their respective brands.

47.    Both parties have significant social media engagement, and their accounts are followed by hundreds of thousands of Instagram users. Evidence furthermore shows that Defendants have used their Instagram accounts to market their products to the United States for years, with a significant increase in social media engagement in 2023 following several promotional videos posted to Defendants' Instagram account that were viewed tens of millions of times.

48.    Though Plaintiff's @wildbird account is tagged over twenty (20) times per day, Plaintiff has only presented evidence that a user has mistakenly "tagged" @wildbird while

holding Defendants' product a total of five (5) times since Defendants first began using the @wildride_official username. (DX8 at 214:12-15.) Defendants, meanwhile, are not aware of any instance in which a customer has mistakenly "tagged" @wildride_official while holding Plaintiff's product. (*Id.* at 213:3-6.) Plaintiff has not identified any of the users that mistakenly "tagged" @wildbird other than by user name (and in some instances does not even provide that information), nor has Plaintiff presented evidence that any of these users are a customer or prospective customer of Plaintiff, or otherwise even located within the United States. (*Id.* at 196:6-197:22; 200:8-202:7; 202:17-206:1; 206:16-208:11; 209:14-211:22.)

49.    Plaintiff furthermore did not reach out to any of these users to notify them of the error, and has presented no evidence that any of these users mistakenly "tagged" @wildbird due to actual confusion or deception. (*Id.* 210:3-10.)

50.    To the contrary, Plaintiff testified that when a user on Instagram begins to type "wild" into a search box, Instagram will begin to auto-fill the search box, and observed that "wild is obviously a generic word," so there are likely "lots" of other user names that start with the word "wild." (*Id.* at 224:10-24.)

51.    As such, Plaintiff has not demonstrated that any of these individuals were actually confused, or whether they simply mistyped Plaintiff's username due to the fact that Instagram may have auto-filled "wildbird" when a user started to type "wild" into Instagram's search box. Notably, Plaintiff has not faced any such confusion on its other social media accounts, which generally start with the word "my," such as the Tik Tok account @mywildbird.

**B. The Record Demonstrates That Consumers, And Those Marketing to Consumers, Can Tell the Difference Between the Parties' Brands**

52.    Contrary to a finding of actual confusion, the Court finds that consumers are likely *not* confused.

53.     As noted above, there is no evidence that leads the Court to conclude that any consumer has been confused. By contrast, Defendants have presented evidence that they have received inquiries from marketers and consumers expressing an interest in WILDRIDE which referred to WILDBIRD in passing, in the context of describing *other* brands. (DX32.)

54.     One consumer noted that she has been "baby-earing since my little one was born, using carriers like the Solly Wrap, Artipoppe, and Wildbird Ring Sling. . . . [m]y son is turning one next week, and I wanted to purchase . . . your carrier to add to my rotation." (*Id*. at 3.)

55.     Another consumer noted "I have been using Wildbird carriers since my son was six months old, while I have loved the brand, now that he is a year and a half it is so difficult to try to get him into those carriers and I found your brand and thought that I would reach out . . . ." (*Id*. at 5.)

56.     These messages, and others, lead the Court to infer that consumers are unlikely to be confused as to affiliation or source with respect to WILDRIDE, recognizing that WILDRIDE is not affiliated with WILDBIRD.

57.     On social media as well, users have discussed both brands when comparing different products, further convincing the Court that consumers likely recognize that WILDRIDE is not affiliated with WILDBIRD. For instance, on one internet forum, a user wrote that she initially hated the "wild bird ring sling," and almost purchased "a side sling from Wild Ride," but on thought twice about it, and decided to give the "ring sling" another try. (DX24.)

## VI.    DEFENDANTS WILL SUFFER SERIOUS HARDSHIP IF A PRELIMINARY INJUNCTION ISSUES

58.     There is substantial evidence that Defendants have built significant goodwill in their WILDRIDE brand.

59.     Defendants have invested substantial sums in, and currently hold significant

value, in the WILDRIDE mark. With every intention of establishing itself as a global brand, Defendants have taken substantial steps to invest in and secure valid trademark rights around the world, including the United States. Defendants furthermore have invested significant time and resources in building meaningful relationships with U.S. retailers, traveling to U.S. exhibitions and trade shows in order to build relationships with U.S. retailers and buyers. (DX28 ¶ 38.)

60.    Defendants intend to continue offering their products in the United States under its WILDRIDE Mark. They have already built a brand that is popular in the United States and have generated millions of dollars in revenue from the sales of WILDRIDE-branded carriers in the United States. (*Id.* ¶ 39.) Defendants have invested significantly in the continued growth of its brand in the United States, including by incorporating Wildride USA as a legitimate U.S. entity and opening a warehouse in the United States to facilitate distribution. Defendants have furthermore developed relationships with major U.S. big-box retailers in the past year, including Nordstrom and Target, to sell their products in their brick-and-mortar locations. (*Id.* ¶¶ 36-37.)

61.    Because Defendants are a global company, there is great value in it being able to ensure that its name and brand stays consistent across all jurisdictions within which Defendants offer their products. Among other things, an injunction, even if limited to Defendants' conduct in the United States, would necessarily have a detrimental effect on Defendants' direct-to-consumer website and social media presence and brand engagement, which have a global presence. Additionally, because consumers in the United States and around the world already recognize WILDRIDE as Defendants' brand, an injunction which requires Defendants to sell the same product under two different brand names could create confusion among Defendants' consumer base, add significantly more complexity to Defendants' distribution chains, and fundamentally dilute and weaken Defendants' brand identity.

62.     Finally, Defendant could face significant financial losses due to the need to divert inventory to other territories and halt sales in the United States in order to engage in rebranding, which could lead to further lost opportunities.

## CONCLUSIONS OF LAW

### I.      LEGAL STANDARD

63.     Preliminary injunctions require showing "(1) a likelihood of success on the merits or sufficiently serious questions going to the merits to make them a fair ground for litigation" and that the balance of hardships tips "decidedly in the plaintiff's favor; (2) a likelihood of irreparable injury in the absence of an injunction; (3) that the balance of hardships tips in the plaintiff's favor; and (4) that the public interest would not be disserved by the issuance of an injunction." *Benihana, Inc. v. Benihana of Tokyo, LLC*, 784 F.3d 887, 895 (2d Cir. 2015) (internal citations and alteration omitted).

64.     "[I]njunctive relief [is] an extraordinary remedy" that requires "a clear showing that the plaintiff is entitled to such relief." *Salinger v. Colting*, 607 F.3d 68, 79 (2d Cir. 2010) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). Issuing preliminary injunctions requires that "the movant, *by a clear showing*, carries the burden of persuasion." *Woodstock Ventures, LC v. Woodstock Roots LLC*, 837 F. App'x 837, 838 (2d Cir. 2001) (citation omitted, emphasis in original).

65.     Courts must ensure any injunctive relief ordered is "no broader than necessary to avert the alleged irreparable harm . . . ." *Nordic Windpower USA, Inc. v. Jacksonville Energy Park, LLC*, 2012 U.S. Dist. LEXIS 55552, at *53 (D. Vt. Apr. 18, 2012).

### II.     PLAINTIFF'S LANHAM ACT CLAIMS ARE LIKELY TO FAIL ON THE MERITS

66.     To prevail on its Lanham Act claims,[3] Plaintiff was required to demonstrate that it is "entitled to protection," and Defendants' use of its marks is "likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co.*, 897 F.3d 413, 417 (2d Cir. 2018).

67.     This burden cannot be met by mere confusion. *Wizkids/NECA, LLC v. TIII Ventures, LLC*, 2019 WL 1454666, at *4 (S.D.N.Y. Mar. 31, 2019) (quoting *Estee Lauder Inc. v. The Gap, Inc.*, 108 F.3d 1503, 1510 (2d Cir. 1997)). In other words, to prevail, a "large number of purchasers likely will be confused as to the source of the goods in question." *Id.* (citation omitted).

68.     In this case, even assuming, for purposes of this Motion[4], that Plaintiff is the senior user of a mark that is entitled to protection, Plaintiff's claims are still unlikely to succeed because it has failed to adduce evidence to support a likelihood of confusion.

**A.  Plaintiff Has Not Proven Any Likelihood of Confusion**

69.     To assess likelihood of confusion, courts in this Circuit apply the eight-factor balancing test described in *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir. 1961). Those factors "are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of

---

[3] The same standards apply under both 15 U.S.C. §§ 1114 and 1125. *See Nike, Inc. v. B&H Customs Servs.*, 565 F. Supp. 3d 498, 508 (S.D.N.Y. 2021) ("[I]t is well-established that claims under Sections 1114 and 1125(a) are treated the same.").

[4] Defendants do not concede that Plaintiff is the senior user of a valid mark, but are not challenging that assertion for the purpose of assessing Plaintiff's request for a preliminary injunction.

consumers in the relevant market." *Time, Inc. v. Petersen Pub. Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999).

70.    "The evaluation of the *Polaroid* factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins. Rather, a court should focus on the ultimate question of whether consumers are likely to be confused." *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 85 (2d Cir. 2020) (citing *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000)) (internal quotation marks omitted).

71.    Based on the Court's finding of fact in this matter, the *Polaroid* factors weigh against a likelihood of confusion, and therefore against Plaintiff's entitlement to injunctive relief.

     1.    <u>Plaintiff's Mark is Inherently and Commercially Weak</u>

72.    As to the first *Polaroid* factor, the strength of the trademark "refers to its ability to identify the source of the goods being sold under its aegis" and has two components: "its inherent distinctiveness and the distinctiveness it has acquired in the marketplace." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130-31 (2d Cir. 2004). "[A] mark's registered status . . . does not affect the plaintiff's ultimate burden of proof in an infringement action." *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 626 (8th Cir. 1987); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 12 (2d Cir. 1976) (observing that marks "with some descriptive qualities" cannot be used to exclude certain competing uses "even when the mark is properly on the register."). "Even an inherently distinctive mark can, in its commercial context, lack strength as a mark." *Nora Beverages, Inc. v. Perrier Grp. Amer., Inc.*, 269 F.3d 114, 123 (2d Cir. 2001).

73.    Here, Plaintiff's trademark—WILDBIRD—is inherently and commercially weak, meriting narrow protection.

74.    <u>First</u>, Plaintiff's WILDIRD mark is weak because it exists in a crowded field. Specifically, the parties' respective trademarks share a single commonality—the word "wild." The evidentiary record demonstrates that so-called "wild"-formative trademarks are common with respect to goods tailored towards children, such as the parties here. Such extensive third-party use "can dilute the strength of a mark," *24 Hour Fitness USA, Inc. v. 24/7 Tribeca Fitness, LLC*, 447 F. Supp. 2d 266, 273 (S.D.N.Y. 2006), *aff'd*, 247 F. App'x 232 (2d Cir. 2007), as is the case here. Indeed, courts in this Circuit routinely reject trademark infringement claims where the mark exists in a crowded field. *See, e.g., Jackpocket, Inc. v. Lottomatrix NY LLC*, 645 F. Supp. 3d 185, 243 (S.D.N.Y. 2022) aff'd, 2024 U.S. Dist. LEXIS 6383 (2d Cir. Mar. 18, 2024) (widespread use of "jackpot" in gaming markets "further underlines the weakness of the mark"); *Limited v. Macy's Merch. Grp. Inc.*, 2016 U.S. Dist. LEXIS 101151, at *18 (S.D.N.Y. Aug. 2, 2016), aff'd, 695 F. App'x 633 (2d Cir. 2017) (JOULES "further weakened by the existence of a number of other trademark registrations and websites"); *Giggle, Inc. v. netFocal Inc.*, 856 F. Supp. 2d 625, 633 (S.D.N.Y. 2012) (third-party use of GIGGLE with children's goods and services demonstrated mark was weak); *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 698 (S.D.N.Y. 1999) aff'd, 220 F.3d 43, 47 (2d Cir. 2000) (ICE BREAKERS for mints "further weakened by extensive third party use of the term 'Ice' within the confections field").

75.    The Court finds the Second Circuit's decisions in *RiseandShine Corp. v. PepsiCo, Inc.* instructive. 41 F.4th 112, 121 (2d Cir. 2022). The first panel held, following issuance of injunctive relief, that the district court erroneously failed to consider that the word "RISE" was already ubiquitous among coffee drinks and similar products. *Id.* at 122–24. This was confirmed on a more fulsome summary judgment record in that case when the Second Circuit noted that "'RISE' was, as a matter of law, an inherently weak mark for a coffee product

because of the mark's logical association with the product." 2024 U.S. App. LEXIS 32182, at *7 (2d Cir. Dec. 19, 2024). The same is true here where there are active registrations and applications for "wild"-formative trademarks for children's wear, toys, and other goods. In addition, the evidence demonstrated that Plaintiff sells its products through stores that also play on the word "wild." Plaintiff so much confirmed that its mark was weak, when it testified that "wild" was "obviously generic" in this context.

76.    Second, Plaintiff has failed to demonstrate that its mark has acquired distinctiveness in the marketplace. Courts in this Circuit analyze acquired distinctiveness by considering six factors: "advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 329 (2d Cir. 2020). "There is no single yardstick or metric for acquired strength" and "a mark can attain secondary meaning, while still being commercially weak." *Jackpocket*, 645 F. Supp. 3d at 245. Each factor is addressed in turn.

77.    To begin with, Plaintiff failed to demonstrate any evidence linking its advertising expenditure to consumer recognition. *Easy Spirit, LLC v. Skechers USA, Inc.*, 571 F. Supp. 3d 185, 203-05 (S.D.N.Y. Nov. 16, 2021) ("Simply showing that a certain amount was spent on advertising provides little support for secondary meaning absent some demonstration that the advertisements caused consumers to associate the mark with [Plaintiff]."); *see also Jackpocket*, 645 F. Supp. 3d at 246. (same). It has also not produced any consumer studies showing that consumers associate the word "wild" with Plaintiff. Indeed, Plaintiff's only survey demonstrated that most of its target customers do not recognize Plaintiff's trademark. These factors weigh against marketplace distinctiveness.

78.     Next, Plaintiff's press coverage holds little weight. While Plaintiff explained that it obtained organic media, the press Plaintiff presented as evidence consists of affiliate marketing, or promotional advertising, which Plaintiff admitted is "part of the game." *See, e.g., Bobcar Media, LLC v. Aardvark Event Logistics*, 554 F. Supp. 3d 606, 618 (S.D.N.Y. 2021) (rejecting press articles because plaintiff did not meet burden to show they were unsolicited); *Gameologist Grp., LLC v. Sci Games Int'l, Inc.*, 838 F. Supp. 2d 141, 159 (S.D.N.Y. 2011) ("[I]t is unclear whether these articles were unsolicited or instead solicited by [plaintiff] as part of a promotional strategy."); *Nat'l Distillers Prods. Co. v. Refreshment Brands, Inc.*, 198 F. Supp. 2d 474, 481 (S.D.N.Y. 2002) (evidence of media coverage did not favor plaintiff where solicited). While Plaintiff argues that its advertising is largely organic and not bought, the Court is not persuaded that it has met its evidentiary burden.

79.     The Court also finds that Plaintiff's sales evidence is neutral at best. While Plaintiff provided evidence of robust sales, the Court notes that most of those sales were in the past two years, after Defendants had entered the U.S. market.

80.     Plaintiff provides no evidence of attempts to plagiarize its mark. *Lopez v. Gap, Inc.*, 883 F. Supp. 2d 400, 427 (S.D.N.Y.  2012) ("Evidence that a mark has been widely copied is persuasive evidence of secondary meaning because it demonstrates that the mark has become a 'strong source identifier in the eyes of the purchasing public.'"). Indeed, Plaintiff has only taken one enforcement action prior to filing this lawsuit, in connection with a domain name that contained the entirety of Plaintiff's WILDBIRD trademark. Plaintiff admittedly had never taken any enforcement measure with respect to any party using the word "wild" without "bird" prior to this lawsuit. Thus, this factor weighs against Plaintiff.

81.     Finally, the Court finds that the last factor—the length and exclusivity of the

mark's use—weighs against Plaintiff due to the common use of "wild," on which Plaintiff's claim is premised. *See Lopez*, 883 F. Supp. 2d at 429 ("With respect to exclusivity, however, numerous companies use the term 'Lower East Side' in their business name and on apparel."); *Jackpocket*, 645 F. Supp. 3d at 251 ("[T]he Second Circuit has advised . . . that whatever the length of use by one party, use of part or all of a mark by third parties weakens the mark's overall strength.") (citation omitted). Because the evidence demonstrates that "wild" is a common word choice with respect to children's goods, Plaintiff cannot be the exclusive user.

82.     For all these reasons, the first *Polaroid* factor, when applied to the circumstances of this case, weighs against a likelihood of confusion

### 2.     The Parties' Marks are Not Similar in their Marketplace Contexts

83.     The second *Polaroid* factor addresses the similarity of the marks in their marketplace contexts. "The similarity of the marks is a key factor in determining likelihood of confusion." *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 454 F.3d 108, 117 (2d Cir. 2006). The threshold question is whether two marks "appear similar enough that a consumer concludes that they come from the same source." *Giggle*, 856 F. Supp. 2d at 635.

84.     Marks are considered similar "when they are the same in appearance, sound and meaning." *Easy Spirit*, 571 F. Supp. 3d at 205 (citation omitted). "[I]n determining whether two marks are confusingly similar," courts must "appraise the overall impression created by the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers." *Nabisco*, 220 F.3d at 47; *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.* 426 F.3d 532, 538 (2d Cir. 2005) (citation omitted) (courts must analyze in "light of the way in which the marks are actually displayed in their purchasing context"). "The size, logos, typefaces, and package designs may be relevant to analyzing the

similarity of the marks." *Easy Spirit*, 571 F. Supp. 3d at 205.

85.    Here, Plaintiff has failed to meet its burden, because the two marks are not

similar enough for source confusion.

86.    As a threshold matter, Plaintiff contends that the "wild" portion of the marks is

dominant. Not so. WILDRIDE and WILDBIRD are both made up of two components—"wild"

plus another word. In this case, "wild" is a common word that serves little function as a source

indicator, which even Plaintiff itself admitted during deposition. It goes hand in hand with

products and services directed towards children, given the common association between the

word "wild" and young children.  In the context of the marks as a whole, the fact that both of

the parties' marks begin with "wild" carries little weight. *See, e.g., RiseandShine*, 41 F.4th at

124-25 (shared use of term "Rise" in large bold letters not probative because "the word 'Rise'

in this context is not distinctive."); *Jackpocket*, 645 F. Supp. 3d at 256 ("If the common element

in the conflicting marks is suggestive or descriptive of the goods or services, this lessons the

likelihood of confusion.") (citation omitted); *c.f. USPTO v. Booking.com B.V.*, 591 U.S. 549,

562 (2020) ("When a mark incorporates generic or highly descriptive components, consumers

are less likely to think that other uses of the common element emanate from the mark's

owner.").

87.    Because Plaintiff's complaint as to the similarity of the marks is only about them

"sharing one word in common," the Court finds that the marks are dissimilar, and that this

factor weighs heavily in favor of Defendants. *Giggle*, 856 F. Supp. 2d at 835 ("Defendant's

mark only shares a single word—'giggle'—in common . . . and as discussed above, GIGGLE

on its own is an extremely weak mark due to the extensive third-party use . . . ."); *MidCap Bus.*

*Credit, LLC v. MidCap Fin. Trust*, 2023 U.S. Dist. LEXIS 17953, at *22 (S.D.N.Y. Feb. 2,

2023) (MIDCAP BUSINESS CREDIT and MICAP FINANCIAL not confusingly similar, notwithstanding "sharing one word in common").

88.     The Court's conclusion is further supported by evidence demonstrating that the parties maintain vastly different brand identities, which put significant focus on the second component in their respective marks—"bird" and "ride"—including through marketing strategies and brand imagery. As demonstrated in Plaintiff's branding, the mark WILDBIRD is almost always featured with a stylized silhouette of a bird, placed over the word "bird." WILDRIDE, instead, is often paired with the logo of a cheetah, which Defendants explained plays into the sense of wild movement that inspired the company. Similarly, Defendants evidence establishes that it often uses the tagline "ENJOY THE RIDE" with the WILDRIDE mark, emphasizing the "ride" component. In contrast, Plaintiff uses its bird logo prominently on its packaging and includes phrases on its packaging like "A HAPPY PLACE FOR YOUR LITTLE BIRD" and "WELCOME TO THE FLOCK," signifying that the consumer is joining a community of "wild birds," as Plaintiff testified in deposition. Further, Plaintiff admitted that it never used the word "wild" in its slogans.

89.     Beyond that, the parties' marks, even by themselves, appear differently in the marketplace. *See Jackpocket*, 645 F. Supp. 3d at 256 ("Analyzing the two logos in context there is a low likelihood of confusion between the source of the two products."). Plaintiff's brand guidelines evidence showed that "WILDBIRD" uses a clean, sans-serif typeface, and when not stylized is intended to be written with a capitalized "W + B" (*i.e.* "WildBird"). Defendants, on the other hand, demonstrated that they use "WILDRIDE" with a serif typeface with thicker letters, and there is no capitalization rule when not stylized (*i.e.* "Wildride"). Such differences further diminish any likelihood of confusion. *Easy Spirit*, 571 F. Supp. 3d at 206-07

(TRAVELTIME and Commute Time not similar, considering that the marks appeared in different typefaces and accompanying logos, and the words "travel" and "commute" create different connotations).

90.    Finally, turning to the marks' respective meanings, when considering the dominant portion of the marks, there is little similarity. For starters, Plaintiff admits, as it must, that "bird" and "ride" have completely different meanings. As Plaintiff admitted in its deposition, the word "bird" refers to a living animal, and in the context of Plaintiff's brand, it evokes the image of a mother bird caring for her newborn. In contrast, "ride" can be a noun or verb. As Defendants testified in their deposition, the word evokes a sense of movement, independence, and adventure more commonly associated with toddlers. Plaintiff offered no contrary evidence. Even when considering the "wild" component of the marks, the meaning there diverges too. For example, "wild" in connection with "bird" might mean "living in a state of nature and not ordinarily tame or domesticated," or "of or relating to wild organisms," whereas "wild" in connection with "ride" might mean "not subject to restraint or regulation," or "going beyond normal or conventional bounds." *See Wild*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/wild.

91.    Considering the marks by appearance, sight, and meaning, the Court finds that the second *Polaroid* factor weighs against a finding of likelihood of confusion. *See, e.g.*, *Fed. Express Corp. v. Fed. Espresso, Inc.*, 201 F.3d 168, 172 (2d Cir. 2000) (FEDERAL ESPRESSO and FEDERAL EXPRESS "somewhat similar in content and sound" but "those similarities are far outweighed by the dissimilarities evident in the parties' use of the marks"); *Wizkids/NECA*, 2019 U.S. Dist. LEXIS 56555, at *20 ("Although 'at first blush, the use of the same word appears to weigh . . . in favor of similarity, the use of the same words is far from dispositive.'").

23

3. <u>The Proximity of the Products and Speculative Possibility of Bridging the Gap Does not Support a Likelihood of Confusion</u>

92.     The third and fourth *Polaroid* factors focus on the proximity of parties' respective goods and services and the possibility of the senior user "bridging the gap" and entering the junior user's market.

93.      These two factors "focus on the degree to which the products currently compete with each other or are likely to compete with each other in the future." *Mobileye, Inc. v. Picitup Corp.*, 928 F.Supp.2d 759, 780 (S.D.N.Y. Mar. 5, 2013). "In examining this factor, the courts compare all aspects of the products, including price, style, intended use, target clientele, typical distribution channels, and others." *Paco Sport, Ltd. v. Paco Rabanne Parfums,* 86 F.Supp.2d 305, 316 (S.D.N.Y. 2000). The Court will address these factors together.

94.     These factors similarly do not favor a finding of likelihood of confusion.

95.     <u>First</u>, "[t]he fact that two products are in the same general field does not by itself mean that they are in competitive proximity." *Swanson v. Georgetown Collection*, 1995 WL 72717, at *12 (N.D.N.Y. Feb. 14, 1995); *Sunenblick v. Harrell*, 101 F.3d 684 (2d Cir. 1996) (proximity of products factor favored defendant, notwithstanding that the parties both used their mark on products sold in the same retail outlets, cities, and format); *see also Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) ("[T]he fact that both parties' products exist within the same industry is not enough.").

96.     Here, the evidence demonstrates that Plaintiff markets and sells a baby carrier, intended for newborns and infants. Defendants on the other hand sell what they market as a toddler carrier, the "TODDLER SWING CARRIER," for children who can sit upright without neck or head support. While Plaintiff pointed to the fact that Nordstrom had advertised one of Defendants' carriers as a "baby carrier" on its website, Defendants explained that the carrier

advertised there was marketed for toddlers, not babies, was the Defendants' toddler carrier, and that the product page was inadvertently styled a "baby carrier" by Nordstrom, which Nordstrom has now fixed.

97.    The evidence also demonstrates that the parties' other product lines cabin them in separate camps: products for babies and products for toddlers. For example, Plaintiff also offers products under the marks "WILDBIRD BABY," as well as "CLOUDBLEND," the latter of which is used in connection with Plaintiff's proprietary Tencel fabric, which Plaintiff advertises as "the closest thing to actually sleeping on a cloud for your little bird!" This includes a number of options for baby pajamas and sleepsacks. Defendants, by contrast, do not offer clothing apart from a few token accessories such as a leopard scarf and leopard-print sunglasses "made for bold little explorers," which are "*Perfect for sunny days, wild rides, and everything in between.*"

98.    Additionally, the parties' core products are resolvedly different. Plaintiff's primary product is its ring sling carrier, which uses fabric to hold a newborn at chest level. And Defendants' primary product is a side sling, with strap and buckle, designed to hold a toddler to the side of the parent, just above hip level. A consumer is unlikely to confuse these products. *See Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 306 (S.D.N.Y. 2021) (no market proximity because plaintiff failed to "provide[] any evidence to suggest that consumers view the restaurants as competitors, the plaintiff has not sufficiently demonstrated market proximity").

99.    In sum, the Court finds that Plaintiff has not presented sufficient evidence to demonstrate competitive proximity.

100.    <u>Second</u>, to the extent Plaintiff believes that the parties' markets overlap, it has

presented nothing beyond speculation in support of "bridging the gap." Indeed, Plaintiff has

presented no evidence of its intent to enter Defendants' market, or that it intends to target

Defendants' consumer base, or that its consumers knew that it intends to bridge the gap. *see*

*Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 590 (S.D.N.Y. 2018)

("'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's

market in the future, or that consumers will perceive the senior user as likely to do so."). All it

provided was speculative testimony about a general "overlapping consumer base," but this is

insufficient. *Lebewohl v. Heart Attack Grill LLC*, 890 F. Supp. 2d 278, 295 (S.D.N.Y. 2012)

("A speculative intention is insufficient to demonstrate that bridging the gap is likely; a litigant

should provide evidence of a concrete expansion plan."). While it may be true that parents of

newborns will eventually become parents of toddlers, it does not follow that Plaintiff's

marketing of "baby carriers" necessarily overlaps in consumers' minds with Defendants'

marketing of "THE TODDLER SWING CARRIER."

> 4.    <u>Plaintiff Has Not Offered Any Meaningful Evidence of Actual Confusion.</u>
> <u>Instead, the Evidentiary Record Suggests a Lack of Confusion.</u>

101.    The fifth *Polaroid* factor addresses whether evidence of actual confusion exists.

This factor "is not necessary to establish a likelihood of confusion but can often provide highly

probative evidence of this likelihood." *Henegan Constr. Co. v. Heneghan Contracting Corp.,*

2002 U.S. Dist. LEXIS 10545, at *20 (S.D.N.Y. May 31, 2002).

102.    Here, Plaintiff has sold baby carriers under its WILDBIRD trademark for more

than a decade. Despite this, it provides only anecdotal evidence of confusion, and no survey

evidence. *Reply All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir. 2021) ("the

absence of surveys is evidence that actual confusion cannot be shown"). And when considering

the evidence presented by Plaintiff, and Defendants' arguments as to the admissibility and

reliability of that evidence, the Court finds that it is not *consumer* confusion, and *de minimis* at

best. *See Mr. Water Heater Enterprises, Inc. v. 1–800–Hot Water Heater, LLC,* 648 F.Supp.2d

576, 588 (S.D.N.Y. 2009); *see Giggle*, 856 F. Supp. 2d at 636 ("[T]he record reflects no

evidence that consumers' purchasing decisions have been affected by Defendant's use of its

mark.").

103.    <u>First</u>, Plaintiff offers a number of instances in which an industry representative

purportedly questioned the relationship between Plaintiff and Defendants, or spoke to Plaintiff

as if it was under the impression Plaintiff was Defendants. With one exception, none of these

representatives were identified.

104.    At the outset, the Court does not find a "handful of anecdotes, including a

number of hearsay statements by unidentified and unidentifiable declarants" to be particularly

persuasive. *See Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005).

105.    But such evidence faces another hurdle. None of the accounts offered actually

evidence *consumer* confusion, and courts repeatedly have held centered around perceived

industry misunderstandings are not consumer confusion. *See, e.g., Johns v. Winners Circle Ent.,

Inc.*, 2025 U.S. Dist. LEXIS 13081, at *16-17 (E.D.N.Y. Jan. 24, 2025) (actual confusion

favored defendants where none of the anecdotal evidence "reflects that a consumer, intending to

purchase services of one party, is at risk of purchasing the services of the other"); *Riseandshine

Corp. v. PepsiCo, Inc.*, 2024 U.S. App. LEXIS 32182, at *11 n.3 (2d Cir. Dec. 19, 2024)

(anecdotal evidence "largely centered on the perceptions of industry professionals, does little to

show likelihood of *consumer* confusion") (emphasis in original); *Giggle, Inc. v. netFocal Inc.*,

856 F. Supp. 2d 625, 636 (S.D.N.Y. 2012) (explaining, "[f]irst and foremost, the actual

confusion factor assesses *consumer* confusion" and that the "confusion that matters here is confusion that affects consumer purchases," and concluding that anecdotal evidence in which two vendors and one manufacturer inquired about the association between defendant and plaintiff is not "evidence that consumers' purchasing decisions have been affected by Defendant's use of its mark") (emphasis in original); *Biosafe-One, Inc. v. Hawks*, 524 F. Supp. 2d 452, 465 (S.D.N.Y. 2007) ("Plaintiffs' conclusory statements that consumers are confused do not prove actual confusion, and plaintiffs have cited no credible instances of actual confusion."); *Windsor, Inc. v. Intravco Travel Ctrs., Inc.*, 799 F. Supp. 1513, 1525 (S.D.N.Y. 1992) (anecdotal confusion evidence of "another supplier within the travel industry rather than of a consumer who purchases the services in question" not persuasive).

106.    Rather, such evidence, at best demonstrates a few misunderstandings, which Plaintiff admits were immediately cleared up. *See, Trustees of Columbia Univ. v. Columbia/HCA Healthcare Corp.*, 964 F. Supp. 733, 747 (S.D.N.Y. 1997) (explaining that "isolated expressions of momentary confusion" are not evidence of actual confusion). And some of the interactions identified were not misunderstandings at all, but simply questions as to the relationship between the parties, which actually evidences a *lack* of confusion. *See Reply All*, 843 F. App'x at 398 ("Inquiries about the relationship between an owner of a mark and an alleged infringer . . . . are arguably premised upon a *lack* of confusion . . . such as to inspire the inquiry itself.'") (citing *Nora Bevs., Inc. v. Perrier Grp. Of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001)) (emphasis in original)

107.    <u>Second</u>, Plaintiff identified a small handful of posts on Instagram where a user apparently "tagged" @wildbird while appearing to hold Defendants' product. During the years-long span in which Plaintiff has admittedly been tagged a practically incalculable number of

times, Plaintiff identified only five instances in which someone mistakenly tagged Plaintiff.

Plaintiff could not identify any of these users, nor could it authenticate the posts, which is

notable given that some of the screen captures had been transparently modified. Even if

admitted, these posts similarly are not probative. *See Star Indus.*, 412 F.3d at 388.

108.    But in any event, Plaintiff faces the same issue here as it does with respect to its

conversations with industry representatives: none of these posts evidence *consumer* confusion.

The critical question is whether such posts "actively divert[ed] consumers away" from Plaintiff.

*See, e.g., Reply All Corp. v. Gimlet Media, Inc.*, 2020 U.S. Dist. LEXIS 265985, at *17

(E.D.N.Y. Feb. 12, 2020) *aff'd* 843 F. App'x 392 (2d Cir. 2021) ("Misdirected social media

posts and unsolicited emails praising Defendant's podcast" held little weight because they did

not evidence "mistaken purchasing decisions, damage to goodwill, or loss of control of

reputation"); *LVL XIII Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 674

(S.D.N.Y. 2016) (finding actual confusion evidence to be *de minimis*, notwithstanding evidence

that a few social media posts appeared to confuse the parties, because none of the posts

"indicates that the speaker made a purchasing decision based on his confusion"); *Trustees of

Columbia Univ.*, 964 F. Supp. at 747 (anecdotal evidence of expressions of confusion, without

any evidence that such evidence lead to purchasing decisions, carried little weight); *Lang v.

Retirement Living Publ'g Co.*, 949 F.2d 576, 583 (2d Cir. 1991) (noting that while hundreds of

phone calls received by plaintiff from people attempting to reach defendant's magazine

"obviously reflect some sort of confusion," it was not the type of confusion the Lanham Act

was designed to protect, given that "no evidence links the confusion evinced by the calls to any

potential or actual effect on consumers' purchasing decisions").

109.     Here, the fact that a few users of Instagram misdirected social media posts does not demonstrate that Defendants are actively diverting consumers away from Plaintiff. To the contrary, these posts demonstrate that users *interacted with Plaintiff. See Reply All*, 2020 U.S. Dist. LEXIS 265985, at *16-17. Furthermore, because Plaintiff could not identify any of the posters, it is unclear whether any is even a customer or prospective customer of Plaintiff or even located in the United States.

110.     <u>Third</u>, Plaintiff argues that Nordstrom's search results are confusing the parties. Plaintiff has not provided any evidentiary basis for this assertion[5], but even if it had, this would not constitute evidence of actual confusion. *See Playtex Prods. v. Georgia-Pacific Corp.*, 390 F.3d 158, 166 (2d Cir. 2004) (a search engine's failure to distinguish between marks does not amount to consumer confusion).

111.     <u>Fourth</u>, Plaintiff claimed for the first time on reply that consumer confusion is continuing, based on an interaction with a store associate at a physical brick-and-mortar location for Nordstrom, who directed Plaintiff to Defendants' product after Plaintiff informed the store associate that WILDBIRD products would soon be launching in Nordstrom. (DX33.) But for the reasons identified above, this is not evidence of *consumer* confusion.

112.     Notwithstanding Plaintiff's arguments, the record actually suggests that consumers are not confused, for reasons noted in the Court's factual findings above. *Supra*, ¶¶ 43–51.

### 5.   Defendants Did Not Adopt WILDRIDE in Bad Faith

---

[5] Plaintiff argued that Nordstrom's website was pulling Defendants' product in the search results for "WILDBIRD," yet the screenshot which Plaintiff itself produced demonstrated that Defendants' product did *not* appear in the search results. (DX24.)

113.    The sixth *Polaroid* factor is bad faith, which concerns "whether the defendant adopted its mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between his and the senior user's product." *Lang v. Ret. Living Pub. Co., Inc.,* 949 F.2d 576, 583 (2d Cir. 1991).

114.    "Where the junior user's mark is not fully identical to the senior mark, the Second Circuit has 'upheld findings of bad faith' where the junior user knew of the prior mark and the junior mark showed 'similarities so strong that it seems plain that deliberate copying has occurred.'" *Capri Sun GmbH v. Am. Beverage Corp.*, 595 F. Supp. 3d 83, 172 (S.D.N.Y. 2022) (quoting *Paddington Corp. v. Attiki Importers & Distribs., Inc.*, 996 F.2d 577, 585 (2d Cir. 1993)).

115.    Importantly, bad faith requires an intent to deceive, not simply an intent to copy. *Capri Sun*, 595 F. Supp. 3d at 172. And where the junior user "'prominently displays' its own mark and 'uses a trade dress dissimilar to' the senior user's, such efforts 'negate[ ] an inference of intent to deceive consumers as to the source of the product.'" *Id.* at 172–73 (quoting *Kind LLC v. Clif Bar & Co.*, 2014 U.S. Dist. LEXIS 81097, at *38-39 (S.D.N.Y. June 12, 2014)).

116.    Here, Plaintiff has failed to meet its burden. It has provided no evidence that Defendants intended to trade off Plaintiff's goodwill or that it intended deceive consumers. Defendants presented evidence that their mark was born from a prior children's brand created by one of the co-founders called WILDROSE, and that Defendants were unaware of Plaintiff's Mark until October 2024. Plaintiff has offered no evidence to rebut this.

117.    Plaintiff instead relies on the doctrine of "constructive notice," arguing that the '459 Registration gave Defendants constructive notice of Plaintiff's trademark rights. *See* 15 U.S.C. § 1072. This argument is unavailing.

118.    Notably, the '495 Registration, on which Plaintiff premises its trademark infringement claim, was registered only this year. (DX26.) The application was not filed until March 22, 2024, years after Defendants began using their trademark. (*Id.*)

119.    This also means that when Defendants first applied to extend their international marks to the United States in 2023 (*see* DX34), Plaintiff had no live registration for WILDRIDE. While Plaintiff did have a previous registration, it was cancelled, due to Plaintiff's failure to file a declaration of use. (DX25.)

120.    Furthermore, while Defendants' subsequent application for a U.S. registration for WILDRIDE in 2024 came after Plaintiff's application for WILDBIRD two months earlier (*see* DX36), it is worth noting that the USPTO did not cite Plaintiff's WILDBIRD mark as a source of likely confusion. (DX37.) Accordingly, even if Defendants were aware of Plaintiff's Mark, they had no reason to believe that their actions were infringing.

121.    On these bases, the Court finds that Plaintiff has not provided competent evidence of constructive notice.

122.    However, even if Plaintiff had provided competent evidence of constructive notice, this alone would still not support a finding of bad faith. Rather, the Second Circuit has made clear that bad faith does not rest merely constructive notice, noting that even where a trademark search results in knowledge of the earlier mark, "in the absence of additional evidence indicating an intent to promote confusion or exploit good will or reputation, this Court has found the junior user to be in good faith." *Star Indus.*, 412 F.3d at 388–89. Plaintiff has provided no such evidence.

123.    Accordingly, the Court finds that Defendants acted in good faith.

      6.    <u>The Quality of the Parties' Respective Products Does Not Support a Likelihood of Confusion</u>

124.    The seventh *Polaroid* factor pertains to the quality of the parties' respective products. Under this factor, courts must, on one hand, determine "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two," and on the other, "whether defendant's products or services are inferior to plaintiff's, thereby tarnishing plaintiff's reputation if consumers confuse the two." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 340 (S.D.N.Y. 2013).

125.    Plaintiff provides no evidence or substantive argument that Defendants offer an inferior product. This factor therefore does not favor Plaintiff. *Medici Classics Prods., LLC v. Medici Grp., LLC*, 683 F. Supp. 2d 304, 313 (S.D.N.Y. 2010) (assigning "no weight" to quality factor); *see also Star Indus.*, 412 F.3d at 389 (finding quality factor "evenly balanced" where "[t]he record [was] insufficient to support a finding that either product is markedly superior in quality to the other").

### 7.    Customers Are Likely to Exercise a High Degree of Care

126.    The final *Polaroid* factor "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." *Star Indus.*, 412 F.3d at 390. "Generally, the more inexpensive the product, the less careful the retail consumer is presumed to be." *CJ Prod. LLC v. Snuggly Plushez LLC*, 809 F. Supp. 2d 127, 156 (E.D.N.Y. 2011). Confusion is therefore more likely "where the goods are cheap and bought casually." *Malletier v. Dooney & Bourke*, 561 F. Supp. 2d 368, 389 (S.D.N.Y. 2008) (quoting McCarthy on Trademarks § 23:96) (internal quotation marks omitted). "Courts generally assume that more sophisticated purchasers are less likely to be confused." *Gen. Cigar Co. v. G.D.M. Inc.*, 988 F. Supp. 647, 664 (S.D.N.Y. 1997).

127.    Here, there is no dispute that the relevant consumer base is "careful and discerning," as Plaintiff states in its motion. (ECF No. 9, at 22) ("Plaintiff acknowledges that, generally speaking, parents purchasing accessories and clothing for their children are careful and discerning.") Indeed, Plaintiff testified that its products are in the "premium space," and is intended to appeal to "a higher income, discretionary income . . . customer base." (ECF No. 50-6, at 128:14-129:10.) This is consistent with the pricing of the parties' products, which generally starts at over one hundred dollars, with many being offered for several hundred.

████████████████████████████████████████████████████████

██████████████████████████████████

128.    Because the relevant retail consumer is sophisticated and is likely to exercise a high degree in purchasing care, this factor weighs against Plaintiff.

8.  <u>Balancing the Polaroid Factors, Plaintiff Has Not Established a Likelihood of Confusion Between the Marks</u>

129.    For the reasons identified above, the majority of the *Polaroid* factors weigh in Defendants' favor, leading the Court to conclude that Plaintiff is unlikely to demonstrate a likelihood of confusion among consumers as to the source, affiliation, or sponsorship of the parties' respective products.

130.    Plaintiff has failed to, among other things, demonstrate that its mark is strong (particularly to the extent that its claims are premised on the shared use of the word "wild"), failed to demonstrate that the marks are confusingly similar, failed to demonstrate a close enough proximity between the products to support a finding of confusion, and failed to demonstrate that any actual *consumer* confusion exists. Additionally, Defendants' good faith, and the sophistication of the relevant consumers, weighs against a finding of likelihood of confusion. Finally, the quality of the parties' products supports neither party on the current record.

131.    Considering the evidence and evaluating the *Polaroid* factors, Plaintiff is unlikely to succeed on the merits with its Lanham Act claims

**B.  Plaintiff's Claim for Dilution Under State Law Is Likely to Fail on the Merits**

132.    Plaintiff also seeks injunctive relief under New York state law for dilution. A claim under New York General Business Law ("GBL") § 360-l requires showing (1) ownership of a distinctive mark, and (2) a likelihood of dilution. *Easy Spirit*, 515 F. Supp. 3d at 76.

133.    While a mark need not be famous to qualify for protection under GBL § 360-l, courts have explained that a plaintiff still must be able to show that its mark is "extremely strong." *New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 328 (S.D.N.Y. 2015) (under section 360-l, the plaintiff's mark "must be an extremely strong mark either because of its inherently distinctive qualities or the fact that it has acquired secondary meaning."). Furthermore, "New York law does not permit a dilution claim unless the marks are "similar enough that a substantial segment of the target group of customers sees the two marks as essentially the same." *Easy Spirit*, 515 F. Supp. 3d at 77; *Capri Sun*, 595 F. Supp. 3d at 186 ("Unlike the Lanham Act, New York law requires the marks be substantially similar.") (citation omitted).

134.    Based on the Court's finding above, Plaintiff is not entitled to injunctive relief on this claim. While Plaintiff is correct in its reply that it is not required to demonstrate "fame" for purposes of dilution under New York law, its mark must nonetheless be "extremely strong" to prevail.[6] For the reasons previously stated, Plaintiff's Mark does not meet this standard.

---

[6] In its reply brief, Plaintiff claims that Defendants cite the wrong standard, apparently believing that Defendants were citing to the standard for dilution under Section 43(c) of the Lanham Act, which requires a showing that a mark is famous (ECF No. 57, at 8-9 n.1.) It is unclear how Plaintiff reached this conclusion, given that Defendants explicitly acknowledged that the standard for a state law dilution claim *does not* require fame to qualify for protection under GLB § 360-l. (ECF Nos. 25-26.) In any event, Defendants are correct, and Plaintiff offers no rebuttal, for the observation that courts in New York have

Furthermore, Plaintiff cannot demonstrate similarity as explained above. *Car-Freshner Corp. v. Am. Covers, LLC*, 980 F.3d 314, 335 (2d Cir. 2020) (no dilution for "Bayside Breeze" and "Boardwalk Breeze" as only "moderately similar"); *see also id.* (differences in product packaging can demonstrate dissimilarity).

135.    Accordingly, Plaintiff is not entitled to injunctive relief on this claim.

### C.  Plaintiff's Claims for Trademark Infringement and Unfair Competition Under State Law Are Likely to Fail on the Merits

136.    Last, Plaintiff seeks relief on the basis of common law trademark infringement under New York law. Because "New York common law claims for trademark infringement are analyzed under the same framework as . . . Lanham Act claims," Plaintiff's request for injunctive relief here fails as well. *Reply All*, 843 F. App'x at 400.

## III.    PLAINTIFF HAS NOT ESTABLISHED ANY OTHER CRITERIA NECESSARY TO AWARD A PRELIMINARY INJUNCTION

### A.  Plaintiff Has Not Demonstrated Irreparable Harm, Nor is the Requested Injunction Properly Tailored to Address the Irreparable Harm Alleged

137.    Under the Trademark Modernization Act of 2020 (the "TMA"), a plaintiff seeking a preliminary injunction is entitled to a rebuttable presumption of irreparable harm upon a court's finding a likelihood of success on the merits. 15 U.S.C. § 1116(a). "Thus, if (1) the plaintiff establishes that it has a likelihood of success on the merits (that is, it establishes both the validity of its mark and a likelihood of confusion), <u>and</u> (2) the defendant fails to rebut the presumption, the plaintiff satisfies its burden of showing irreparable harm." *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 300 (S.D.N.Y. 2021) (emphasis in original).

---

repeatedly explained that a mark qualifying for protection under GBL § 360-l must be "an extremely strong mark." *New World*, 150 F. Supp. 3d at 328; *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1049 (2d Cir. 1992) ("In interpreting this New York statute, we have held that it 'protects only extremely strong marks.'") (citing *Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir. 1983)).

138.     Plaintiff is not entitled to this presumption under the TMA because, as explained above, it has failed to meet its burden to demonstrate a likelihood of confusion. *Id.* (citing *Engine Cap. Mgmt., LP v. Engine No. 1 GP LLC*, No. 21-cv-149, 2021 U.S. Dist. LEXIS 70374, at *12 (S.D.N.Y. Apr. 12, 2021)).

139.     Plaintiff has otherwise failed to demonstrate irreparable harm. "To demonstrate irreparable harm, the movant must show 'an injury that is neither remote nor speculative, but actual and imminent." *Engine Capital Mgmt.*, 2021 WL 1372658, at *4 (citation omitted).

140.     Courts routinely find that preliminary injunctions are unwarranted due to the moving party's delay in seeking them. "There is no bright-line rule for how much delay is too much, but courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months*." Coscarelli v. ESquared Hosp. LLC*, 364 F. Supp. 3d 207, 222 (S.D.N.Y. 2019) (internal quotations and citations omitted) (collecting cases); *accord Weight Watchers Int'l, Inc. v. Luigino's, Inc.*, 423 F.3d 137, 144 (2d Cir. 2005) ("delays of as little as ten weeks" can "defeat the presumption of irreparable harm"); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276–77 (2d Cir. 1985) (ten-week delay rebutted claim of irreparable injury).

141.     Here, while Plaintiff asserted that Defendants entered the U.S. market early this year, the evidence presented demonstrates that Defendants have sold their products in the United States as early as 2021. Plaintiff also acknowledges that it has been aware of Defendants and their brand for years. To demonstrate irreparable harm, Plaintiff argues that while it was aware of Defendants, it only became aware of their "physical presence" in the United States this summer. This is a distinction without a difference. Whether Defendants moved its physical operations to the United States in the last year does not negate the fact that it has been selling in the U.S.

market and advertising its products to U.S. consumers for several years. And even if the Court were to agree with Plaintiff's contention, Plaintiff knew about Defendants' attendance at exhibitions in the United States in early May 2025 but did not seek an injunction—on a nonemergency basis—until more than two months later. On this basis, the Court finds that Plaintiff's delay in bringing its motion is fatal to its claim of irreparable harm.

142.    Nor does the progressive encroachment doctrine save Plaintiff's untimely request. (*See* ECF No. 57, at 9.) "To determine whether the doctrine of progressive encroachment excuses a delay, the court compares the likelihood of confusion from the earlier use of the mark of which the plaintiff was aware from the use of the mark at the time the plaintiff brings suit." *Algood Casters, Ltd. v. Caster Concepts, Inc.*, 2020 U.S. Dist. LEXIS 162532, at *10 (S.D.N.Y. Sept. 4, 2020). A delay may be excused upon a showing that "defendant, after beginning its user of the mark, redirected its business so that it more squarely competed with plaintiff." *Black Diamond Sportswear, Inc. v. Black Diamond Equip., Ltd.*, 2007 U.S. App. LEXIS 23515, at *6 (2d Cir. Oct. 5, 2007) (citation omitted).

143.    Here, Plaintiff does not argue that Defendants have made any changes to their mark, branding, or product offerings, or otherwise made strides to market themselves in a way that places them more directly in competition with Defendants. Rather, Plaintiff argues that the progressive encroachment is Defendants' entry into the U.S. market. Plaintiff's argument, however, relies on a faulty characterization of the record.

144.    Among other things, Plaintiff claims that Defendants only sold a *de minimis* number of products into the United States between 2021 and December 2024, but in reliance thereof, Plaintiff cites to deposition testimony in which Defendants repeatedly clarify that while sales through the *United States subdomain* for their website started more recently (upon the

launch of that subdomain last year—months before Plaintiff filed suit), Defendants had sold to customers in the United States through the main website, wildridecarrier.com since 2021. (ECF No. 57, at 9-10.) Plaintiff has provided nothing to rebut the evidence adduced by Defendants indicating that they have already generated substantial revenue from sales in the United States. Furthermore, Plaintiff argues that Defendants ramped up their advertising in the United States more recently (*id.*), yet Defendants themselves have noted that they have maintained a network of brand ambassadors with a combined millions of social media followers in the United States since 2021. (DX28 ¶ 43.) Plaintiff additionally argues that Defendants did not sell their products through any third-party sites, or enter into any relationship with a U.S. distributor, until May 2025 (ECF No. 57, at 9-10), but the very deposition testimony Plaintiff points to suggests, at most, that one distributor did not start carrying Defendants' products until 2025. Indeed, a close reading of the same testimony cited, even in a view favorable to Plaintiff, suggests that Defendants' products were in fact being distributed by others in the U.S. for years, with distribution to brick-and-mortar retailers beginning in 2024. (DX28 ¶ 35.)

145.    It is furthermore worth noting that, in lieu of offering any evidence that consumers' purchasing decisions were affected by Defendants' use of WILDRIDE, Plaintiff instead relies on a small handful of instances in which a user mistakenly "tagged" Plaintiff's social media account in 2025. But it is undisputed that the parties have maintained the same social media accounts for years, and Plaintiff has admittedly been aware of Defendants' social media account for years.

146.    At bottom, Plaintiff does not identify any basis in the record that would excuse its delay.

147.    Even if such delay was excusable, the Court concludes that Plaintiff's requested

relief is inappropriate given that Plaintiff has not identified any harm that would justify the sweeping measures it seeks. While there could be a multitude of ways to further differentiate the brands and mitigate the harm alleged other than a complete name change and rebranding in the United States, Plaintiff's request would ultimately force Defendants to abandon the WILDRIDE mark entirely in the United States, effectively forcing Defendants to create an entirely separate house brand for the U.S. market. In other words, even if injunctive relief was appropriate here, it is not remotely tailored to address the harm alleged. *See, e.g., Nordic Windpower USA, Inc. v. Jacksonville Energy Park, LLC*, 2012 U.S. Dist. LEXIS 5552, at *53 (D. Vt. Apr. 18, 2012) (injunctive relief must "be no broader than necessary to aver the alleged irreparable harm").

148.    It is furthermore unclear how Plaintiff intends its proposed injunction to be implemented, considering the significant *online* presence of the WILDRIDE mark, which is, and at all relevant times has been, accessible around the world, both through Defendants' website wildridecarrier.com, and through Defendants' official social media accounts.

149.    Indeed, while Plaintiff claims, as it must, that it seeks only to enjoin alleged infringement in the United States, *see Abitron Austria GmbH v. Hetronic Int'l, Inc.*, 600 U.S. 412, 426 (2023), Plaintiff premises its requested relief on instances in which a user allegedly tagged Plaintiff's social media account by mistake, which necessarily stems from the parties' respective social media presences and alleged similarities in social media handles. By Plaintiff's own logic, Defendants' use of WILDRIDE in online channels, including on the website wildridecarrier.com and social media, is *not* conduct directed towards the United States, given that Defendants have maintained the same website and social media handles for years, well before when Plaintiff characterizes their U.S. market entrance.

150.    Plaintiff's request that Defendants abandon the WILDRIDE mark in the United

States would create a quandary for which Plaintiff has offered no solution. Rather than mitigate

harm, the requested injunction risks creating even greater confusion, by forcing Defendants to

bifurcate their brand by territory. Defendants would continue to market WILDRIDE through

their social media and website, which has always been accessible worldwide, including in

territories for which Defendants are the senior user ahead of Plaintiff, while simultaneously

being forced to educate U.S. consumers, suppliers, and retailers that their house brand has

changed, and that WILDRIDE—as they have come to know it—is now something else.

151.    This would only be further exacerbated if the Court grants the injunction and

Defendants later prevail, given that they very well could, and likely would, wish to change their

name in the United States back to WILDRIDE, forcing them to re-educate the consuming public

once again. *See Long Island-Airports Limousine Serv. Corp. v. New York Airport Servs. Corp.*,

641 F. Supp. 1005, 1012 (E.D.N.Y. 1986) (balance of hardships weighed against requiring

trademark defendant to "devise a new name" because if defendant prevailed, Defendant would

have to "restore its former name and reeducate the public," which could cause more confusion).

152.    Finally, it is worth noting that the Court is troubled by Plaintiff's admissions that

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████, even though it seeks a ruling

from this Court that WILDBIRD and WILDRIDE cannot coexist in the marketplace. It strains

credulity for Plaintiff to suggest that Defendants' use of WILDRIDE in the United States

alongside WILDBIRD constitutes "trademark infringement" and "unfair competition," while

apparently seeing no issue with ███████████████████████████████████████

████████████████████████████████.

153.    In the end, Plaintiff has not carried its burden to demonstrate why the requested relief is necessary and how it is appropriately tailored to address the alleged harm.

**B.  The Balance of Hardships Weighs Heavily Against Granting An Injunction**

154.    Similarly, the Court, when balancing the hardships, concludes that the proposed injunction should not be granted. Here, Plaintiff seeks an injunction that would, as Defendants explained under oath, cripple Defendants' business.

155.    Defendants have amassed significant goodwill in WILDRIDE, including in the United States, and they have done so while already taking steps to distinguish their brand from Plaintiff's. Defendants furthermore explained that they have heavily invested in the U.S. market, including building infrastructure in the United States and entering into relationships with major U.S. retailers for their products to be sold in brick-and-mortar stores nationally. This would all be threatened if the injunction issues. On the other hand, Plaintiff has testified that the perceived harm, if an injunction is not issued, is that would effectively have to make an "extra effort" to distinguish its brand, which it does not wish to do. (DX8 at 165:22-166:14.) Because the Court has concluded that Plaintiff has failed to demonstrate real, identifiable evidence of actual confusion, forcing Defendants to entirely rebrand in the United States is not appropriate.

156.    Furthermore, as explained above, the relief requested by Plaintiff does not, pragmatically, appear to be cabined to Defendants' operations in the United States based on the global nature of their business. As such, the Court finds that an adverse decision here would affect Defendants' brand globally. *See Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.,* 58 F.3d 27, 35 (2d Cir.1995) ("Plaintiff seeks to enjoin an entire product line, which would cause [the defendant] considerable hardship far outweighing any speculative possibility that [plaintiff's] goods would be harmed by consumer confusion.").

157.    For all these reasons, the balance of hardships weighs in Defendants' favor.

**C.  An Injunction Would Not Serve the Public Interest**

158.    Plaintiff has failed to demonstrate that Defendants' conduct is "anything but legitimate competition," and "any reduction in competition must be considered against the public interest." *Steelite Int'l U.S.A., Inc. v. McManus*, 2021 U.S. Dist. LEXIS 80528, at *30 (S.D.N.Y. Apr. 27, 2021). On this basis, Plaintiff's requested injunction is not merited.

<u>**CONCLUSION**</u>

159.    For the reasons discussed above, Plaintiff Wildbird, LLC's motion for preliminary injunction is DENIED.

IT IS SO ORDERED this ___ day of _____, 2025.

_____
DENISE L. COTE
United States District Judge

Dated: October 17, 2025

Respectfully submitted,

*/s/ Leo M. Lichtman*
Leo M. Lichtman
James M. Slater (admitted *pro hac vice*)
ESCA Legal LLC
1177 6th Avenue, 5th Floor
New York, NY 10036
Tel.: 347-745-2535
leo@esca.legal
james@esca.legal

*Attorneys for Defendants Wildride B.V. and
Wildride USA Corp*