UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------- X
                                        :
WILDBIRD LLC,                        :
                                          :
                        Plaintiff,      :
                      -v-               :     25cv5993 (DLC)
                                          :
                                          :     OPINION AND
WILDRIDE B.V., et al.,         :         ORDER
                                          :
                        Defendants.    :
                                          :
--------------------------------------- X

APPEARANCES:

For plaintiff Wildbird LLC:

Jonathan W. Thomas
Greenberg Traurig, LLP
One Vanderbilt Avenue
New York, NY 10017

Molly Littman-Johnson
Greenberg Traurig, LLP
90 South 7th Street, Suite 3500
Minneapolis, MN 55402

For Defendants Wildride B.V. and Wildride USA Corp.:

Leo M. Lichtman
James M. Slater
ESCA Legal LLC
1177 6th Avenue, 5th Floor
New York, NY 10036

DENISE COTE, District Judge:

     Wildbird LLC ("Wildbird"), a manufacturer of wearable baby

carriers, has moved for a preliminary injunction against

Wildride B.V. and its U.S.-based subsidiary, Wildride USA Corp.

(together, "Wildride").  Wildbird asserts that Wildride, which

manufactures wearable carriers for toddlers, is infringing on its "WILDBIRD" trademarks and seeks to enjoin Wildride from using its "WILDRIDE" marks to conduct business in the United States pending trial.  For the following reasons, the motion is denied.

## Procedural History

Wildbird filed this action against Wildride and moved for a preliminary injunction on July 22, 2025.  Wildbird brings two claims for relief under the federal Lanham Act: trademark infringement under 15 U.S.C. § 1114(1), and false association, false designation of origin, and unfair competition under 15 U.S.C. § 1125(a)(1)(A).  Wildbird also brings three claims under New York law: a claim for dilution and injury to its business reputation under New York General Business Law § 360-l and two common-law claims for trademark infringement and unfair competition.  The motion is supported by declarations from Nathaniel Gunn, Wildbird's Chief Executive Officer and co-founder, as well as many exhibits.  Wildbird requests a preliminary injunction that would enjoin Wildride from

> using the trademark 'WILDRIDE' (or any other
> mark(s) confusingly similar to Plaintiff's
> 'WILDBIRD' trademark) in United States
> commerce for, on, and/or in connection with
> the manufacture, distribution, advertising,
> promoting, offering for sale, and/or sale of
> any goods or services, including, without

2

limitation, children's accessories and
clothing.

On September 11, a hearing on the preliminary injunction motion
was adjourned to October 30, pursuant to the parties' joint
request.

Meanwhile, on September 19, Wildbird brought a motion for a
temporary restraining order ("TRO"). Wildbird explained that it
had learned two days prior that Wildride planned to begin
selling their toddler carriers in Target's U.S. retail
locations, where Wildbird products were already being sold. The
requested TRO would temporarily restrain Wildride from using the
trademark "WILDRIDE" for the sale of children's carriers in any
Target location or on any third-party website in the United
States, although it excluded Nordstrom and Nordstrom's website
from the "third-party" bar, as Wildride had already been selling
its carrier at Nordstrom for months. In its opposition,
Wildride clarified that it "do[es] not intend to sell WILDRIDE-
branded carriers in Target stores until March 2026," months
after the preliminary injunction hearing scheduled for October
30, 2025. After hearing from the parties on September 22, the
Court denied the TRO on the ground that Wildbird failed to
establish that, absent a TRO, it would be irreparably harmed
prior to the October 30 preliminary injunction hearing.

As for the motion for a preliminary injunction, Wildride filed its opposition papers on October 3.  The opposition to the preliminary injunction included a declaration from Ms. Britt Schoorl, Wildride's co-founder and Creative Director, as well as many exhibits.  Wildride included a consumer study commissioned by Wildbird in 2014, which indicates that only 28% of Wildbird's target consumers recognized Wildbird as a "brand[] of wearable baby carrier(s)."

Wildbird filed its reply on October 10.  It was accompanied by a second declaration from Mr. Gunn and additional exhibits. Finally, Wildride filed a proposed sur-reply, moving for leave to submit it, on October 15.

A preliminary injunction hearing was held on October 30. The declarations of Mr. Gunn and Ms. Schoorl were received, pursuant to this Court's procedures and without objection by the parties, as the direct testimony of the two witnesses, who were subject to cross-examination at the hearing.  Both parties entered various exhibits into evidence.  Only one set of proffered exhibits was excluded.  Wildride objected to the unauthenticated social media screenshots Wildbird submitted as evidence of consumer confusion.

The findings of fact for this preliminary injunction appear throughout the Opinion but are set forth in detail in the

following section.  The findings are drawn from the declarations filed by the parties and the exhibits received into evidence at the hearing.  Most of the facts recited here are not disputed. Any disputes material to this motion are noted.

## Findings of Fact

Founded in 2014, Wildbird is a company that sells clothing and accessories for children and their parents.  Wildbird's founders, parents Tayler and Nathaniel Gunn, developed their first product, a "ring-sling carrier" that allows parents to carry their babies on their chest.

To identify its products in the marketplace, Wildbird uses the Wildbird word mark and the Wildbird logo (together, the "Wildbird marks") as U.S. Trademark Registration No. 4,892,777. The Wildbird word mark was originally registered on January 26, 2016.  The U.S. Patent and Trademark Office, however, cancelled the Wildbird word mark six years later on August 5, 2022, after Wildbird failed to file a required document.  Wildbird ultimately re-registered its word mark on May 20, 2025 as U.S. Trademark Registration No. 7,798,495.  In this registration, Wildbird specified that the word mark would be applied to goods in Class 18 for "[b]ack packs for carrying babies" and "baby carriers worn on the body," and Class 35 for "[o]n-line retail

store services featuring baby related consumer products," among others.

As for the logo, Wildbird applied to register it as a design mark on March 5, 2025 as U.S. Trademark Application No. 99,068,040.  In its application, Wildbird again specified that the logo would be applied to goods in Classes 18 and 35, among others.  The logo is shown below:



The logo consists of the word "WILDBIRD" in large, capital letters, written in a simple sans-serif font with spacing between each letter.  In addition, the silhouette of a small, round bird is perched on the "D."  Outlines of the bird's beak, legs, and tail are visible in the silhouette.

Wildbird displays these marks on its products, packaging, website, and social media accounts.  Wildbird also uses taglines such as "A HAPPY PLACE FOR YOUR LITTLE BIRD," "KEEP YOUR LITTLE BIRD CLOSE," and "WELCOME TO THE FLOCK!" in its marketing and on its packaging.  For example, the packaging for Wildbird's baby carrier prominently features its logo and taglines.  The top panel on the outside of the package includes Wildbird's logo (its name and the bird silhouette), as well as a large version

of the bird silhouette in its logo, which covers the vast majority of the panel.  Other outer panels also feature the logo and the "KEEP YOUR LITTLE BIRD CLOSE" tagline.  And the same large bird silhouette and the "welcome to the flock!" tagline appears on the inside of the package as well.  As for Wildbird's baby carrier itself, it appears rectangular in the product photos.

Wildride was founded in 2021 in the Netherlands with the purpose of "offering a smart, safe, and fashionable product for young parents to carry their toddlers who have physically outgrown or aged out of the traditional front or back baby carriers typically sold."  Wildride's co-founders, Joost Hultink and Britt Schoorl, designed and created its flagship product, "the WILDRIDE toddler swing carrier," in April 2021.  The product was designed for "children who can hold their head up and sit on their own, generally children from nine months to four years of age or children weighing 18 to 44 lbs."  As such, Wildride's carrier is "not designed, marketed, or recommended for newborns, infants, or babies."

Wildride's name originated from the name of a children's clothing brand that Ms. Schoorl, one of the co-founders, had created independently in 2019, "Wildrose."  To identify its

products, Wildride uses the following two stylized marks featuring a cheetah head (together, the "Wildride marks"):

 

In the marks, the word "WILDRIDE" appears in large, capital letters, written in a bold, chunky serif font.  Both marks also feature a large, stylized chetah head, complete with details for the cheetah's ears, spots, eyes, nose, and mouth.  Wildride's marks also often appear with one of its taglines, such as "ENJOY THE RIDE!" and "THE TODDLER SWING CARRIER."  Wildride displays its marks on its products, packaging, website, and social media accounts.  On the toddler carrier itself, which appears triangular with curved sides in the product photos, Wildride's logo and name appear either on the strap or on a standalone tag.

Wildride first filed a registration for its word mark with the European Union Intellectual Property Office (EUIPO) on August 19, 2021.  This registration, which noted that the mark would be applied to goods in Classes 18 and 35, among others, matured to registration on January 12, 2022.  On May 12, 2023, Wildride applied to extend its international registration of the word mark to the United States as U.S. Application No. 79,375,825.  Wildride also filed an EUIPO registration for its

logo-only mark on April 15, 2024 for goods in Class 18, which matured to registration on August 13, 2024. Wildride then applied to register the logo-only mark with the USPTO directly on May 20, 2024 as U.S. Application No. 98,558,373. As of 2025, Wildride's toddler carrier has been sold in over 5,000 stores in more than 90 countries across the globe.

Wildride began selling its toddler carrier internationally to consumers on its website, wildridecarrier.com, in June 2021. In particular, Wildride began selling its carrier in the United States online, using its trademarks, on June 18, 2021. In January 2024, responding to U.S. demand for its toddler carriers, Wildride incorporated a separate entity, Wildride USA Corp. In September 2024, Wildride first offered the carrier for sale in person in the United States, in boutique brick-and-mortar stores. In December 2024, Wildride activated the us.wildridecarrier.com subdomain of its international website to provide faster shipping and no import duties or fees to its U.S. customers. Wildride also continued to expand its options for U.S.-based customers to buy its toddler carrier in person. In February 2025, Wildride began selling the carrier in Nordstrom. And, around May 2025, Wildride entered into discussions with Target to carry the carrier in its retail stores, with plans to launch in hundreds of Target stores by March 2026.

In May 2025, Wildride had a booth at the ABC Kids Expo in Las Vegas, Nevada, an annual trade show for children's brands. Wildbird representatives attended the Expo, wearing name tags identifying them with Wildbird. Wildbird contends that, at the Expo, it first became aware that Wildride was doing business in the United States and that a buyer for Nordstrom and multiple suppliers approached Mr. Gunn to inquire whether Wildbird or Mr. Gunn himself were associated with Wildride.

In June 2025, both parties attended a brand showcase at a Nordstrom in Seattle. Mr. Gunn claims that, during the showcase which only featured 8 to 10 brands total, at least four category leads for Nordstrom stores asked him if Wildbird was affiliated with Wildride.

## Conclusions of Law

"A preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant, by a clear showing, carries the burden of persuasion." St. Joseph's Hosp. Health Ctr. v. Am. Anesthesiology of Syracuse, P.C., 131 F.4th 102, 106 (2d Cir. 2025) (citation omitted). The movant must show:

> (1) irreparable harm; (2) either a likelihood of success on the merits or both serious questions on the merits and a balance of hardships decidedly favoring the moving party; and (3) that a preliminary injunction is in the public interest.

Id. (citation omitted).  "Where a mark warrants protection under the Lanham Act, both the likelihood of success on the merits and the potential for irreparable harm in the absence of preliminary relief may be demonstrated by a showing that a significant number of consumers are likely to be misled or confused as to the source of the products in question."  RiseandShine Corp. v. PepsiCo, Inc., 41 F.4th 112, 119 (2d Cir. 2022) (citation omitted).

I.   Likelihood of Success on the Merits

To succeed on its trademark infringement claims, Wildbird must demonstrate that (1) its mark "is entitled to protection" and that (2) Wildride's use of its own mark "is likely to cause consumers confusion as to the origin or sponsorship" of Wildride's goods.  Excelled Sheepskin & Leather Coat Corp. v. Oregon Brewing Co., 897 F.3d 413, 417 (2d Cir. 2018) (citation omitted).  Wildride does not dispute for purposes of this motion that Wildbird's marks are entitled to protection.[1]

---

[1] Wildbird brings federal claims against Wildride for trademark infringement and false association, false designation of origin, and unfair competition under the Lanham Act.  Wildbird also brings a dilution claim under New York state law and trademark infringement and unfair competition claims under New York common law.  We analyze these claims together, as they each, with the exception of the New York dilution claim, require finding a likelihood of consumer confusion.  See Car-Freshner Corp. v. Am. Covers, LLC, 980 F.3d 314, 335 (2d Cir. 2020) (explaining that both the federal Lanham Act claims, as well as the parallel New York state claims for trademark infringement and unfair

Plaintiffs in trademark infringement cases, like Wildbird, must demonstrate "a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers." Star Indus., Inc. v. Bacardi & Co. Ltd., 412 F.3d 373, 383 (2d Cir. 2005) (citation omitted).  To evaluate this likelihood of consumer confusion, courts apply the eight factors established in Polaroid Corp. v. Polarad Electronics Corp., 287 F.2d 492 (2d Cir. 1961).  These factors are:

> (i) the strength of the senior user's marks; (ii) the similarity of the parties' marks; (iii) the market proximity of their products; (iv) the likelihood that the senior user will bridge any gap separating the parties' current markets; (v) the existence of actual consumer confusion; (vi) whether the junior user acted in bad faith in adopting its mark; (vii) the quality of the junior user's products; and (viii) the sophistication of the relevant consumer group.

Car-Freshner Corp. v. Am. Covers, LLC, 980 F.3d 314, 327 (2d Cir. 2020).  "[T]he evaluation of the Polaroid factors is not a mechanical process where the party with the greatest number of factors weighing in its favor wins."  Nabisco, Inc. v. Warner-Lambert Co., 220 F.3d 43, 46 (2d Cir. 2000) (citation omitted).

---

competition, "turn[] on a likelihood of consumer confusion").  As for the New York dilution claim, it requires finding a "likelihood of dilution," N.Y. Stock Exchange, Inc. v. New York, New York Hotel LLC, 293 F.3d 550, 557 (2d Cir. 2002), which requires finding that the marks are "substantially similar." Starbucks Corp. v. Wolfe's Borough Coffee, Inc., 588 F.3d 97, 108 (2d Cir. 2009).  Thus, the analysis for the state dilution claim parallels part of the analysis for the other claims.

Nor is any one factor generally dispositive, although the first factor is regarded as "often the most important." RiseandShine Corp., 41 F.4th at 119.  Instead, during the balancing process, "a court should focus on the ultimate question of whether consumers are likely to be confused."  Nabisco, 220 F.3d at 46 (citation omitted).

Wildbird has not met its burden to prove that it is likely to succeed on the merits of its claims because it has failed to prove that Wildride's use of its own marks is likely to cause consumer confusion between their two brands.  Thus, Wildbird is not entitled to a preliminary injunction.

A.   Strength of the Mark

1.   Legal Standard

The first Polaroid factor, the strength of the mark, is often considered "the most important factor" and focuses on the mark's "distinctiveness, or its origin-indicating quality, in the eyes of the purchasing public."  RiseandShine Corp., 41 F.4th at 119-20 (citation omitted).  A mark's distinctiveness is assessed based on either or both of two components: (i) its "inherent strength," or "the degree to which it is inherently distinctive" and (ii) its "acquired strength," or "the degree to which it has achieved public recognition in the marketplace." Id. at 120.

Turning first to a mark's inherent strength, this is where many strength inquiries end. Trademark law favors the use of inherently distinctive marks that have little to no "logical relationship to the products or services on which they are used," both "because such distinctive marks make it easier for the public to avoid confusion and because allowing the owner a broad exclusivity for such a mark detracts little from free expression." Id. For the same reasons, trademark law disfavors "marketers who seek to bar others from using words that describe or suggest the products or the virtues of their products." Id. As such, "[w]eak marks are entitled to only an extremely narrow scope of protection, unless a convincing combination of other Polaroid factors militates strongly in favor of likelihood of confusion." Id. at 124 (citation omitted). These policy considerations are reflected in the law's categorization and treatment of marks of varying degrees of inherent distinctiveness.

Trademark law uses four categories to describe the degree to which a mark is inherently distinctive. From least distinctive (weakest) to most distinctive (strongest), they are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. Id. at 120.

14

A generic mark is a common word that simply identifies a kind of product, such as "car" or "water bottle." See id. Generic marks "receive[] no protection from the law of trademark," even if they were used first or have "acquired public recognition as identifying the source of the product," as neither justifies "denying others the right to refer to their product as what it is." Id. at 120-21. Thus, if a mark is found to be generic, the strength inquiry ends there -- a court does not need to evaluate the mark's acquired strength. See id.

Next, a descriptive mark "tell[s] something about a product, its qualities, ingredients or characteristics." Id. at 121. Descriptive marks are "presumptively unprotectable," but, unlike generic marks, they "can acquire a degree of protection if they have acquired secondary meaning, i.e. an acquired public recognition as a mark identifying the source." Id.

Moving higher on the scale, suggestive marks "suggest (rather than directly describe) the product on which they are employed, or its attributes, sometimes requiring imagination to grasp the linkage." Id. They are "the weakest marks that are protectable without need to show acquired secondary meaning." Id. In other words, although suggestive marks are inherently distinctive, they are "at best moderately strong" "[i]n the

absence of any showing of secondary meaning." <u>Star Indus.</u>, 412
F.3d at 385.

Finally, arbitrary and fanciful marks are most distinctive
and receive the most protection from trademark law.  They are
marks that "make no logical reference to the product or service
on which they are used, such as Google for a search engine,
Kodak for cameras, or Quilted Giraffe for a restaurant."
<u>RiseandShine Corp.</u>, 41 F.4th at 121.  These receive the
strongest protection because "other marketers of the same
products or services have no justification or cognizable
interest in using the same terms in referring to their own
market offerings."  <u>Id.</u>

If a mark is suggestive, as is the case here, a court must
also determine whether the mark is weak or strong.  This is
because "suggestive marks, by their nature, seek to suggest the
qualities of the product" and "strong logical associations . . .
represent weakness."[2]  <u>Id.</u>  Thus, to determine the strength of a
suggestive mark, courts consider "the inherent inventiveness of

---

[2] For this reason, even though the "suggestive" category is
listed as "higher" than the "descriptive" category, "it does not
necessarily follow that every suggestive mark is stronger than
every descriptive mark."  <u>RiseandShine Corp.</u>, 41 F.4th at 122.
If, for example, a suggestive mark suggests an essential aspect
of the product and a descriptive mark describes a relatively
insignificant part of the product, then that suggestive mark
could be deemed weaker than the descriptive mark.  <u>See</u> <u>id.</u>

the mark itself and the amount of third-party usage of the term as a mark, especially in the market in question." Star Indus., 412 F.3d at 385 (citation omitted).

The Second Circuit conducted this analysis recently in RiseandShine Corp. v. PepsiCo, Inc. when evaluating the inherent strength of "RISE Brewing Co.," a suggestive mark used on ready-to-drink coffee and tea-based beverages. The court first evaluated the mark's inherent inventiveness by asking whether it had "strong logical associations" with the perceived virtues of the product. 41 F.4th at 121. The court next considered whether the mark exists in a "crowded field of similar marks," as "[e]xtensive third-party usage of a mark in related products" indicates weakness. Id. at 122-23 (citation omitted). The court ultimately found that the "RISE" portion of the mark is so commonly used in the market "to allude to increased energy, particularly in the morning hours" and "so tightly linked with the perceived virtues of coffee" that it is inherently weak. Id.

Lastly, a court evaluates a mark's acquired strength if it was determined to be descriptive or suggestive. Acquired strength, sometimes called acquired distinctiveness or secondary meaning, is determined by analyzing six factors: "advertising expenditures, consumer studies linking the mark to a source,

unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and the length and exclusivity of the mark's use." Car-Freshner Corp., 980 F.3d at 329.

2. Application

As noted, Wildbird's marks are suggestive. The Wildbird marks do not directly describe or identify the baby carriers to which they are applied. Instead, as Mr. Gunn explained, the founders adopted the name "Wildbird" to evoke "the nurturing and protective nature of a mother bird." In doing so, the Wildbird marks merely "suggest[]" that their baby carriers are nurturing and protective "through the use of imagination, thought, and perception." RiseandShine Corp., 41 F.4th at 121 (citation omitted).

Both parties seem to claim that some logical association exists between Wildbird's marks and the baby carriers it sells. Wildbird focuses on associations with the "BIRD" portion of the marks, as described above. To the extent that any such logical association exists, it weakens the strength of Wildbird's suggestive marks. So too do the hundreds of trademark registrations and applications for children and newborn-related goods that are formed with the word "WILD." The list of trademarks includes, among others, "WILD ACORN" for "[c]lothing for children and babies"; "WILD BABY" for "[i]nfant, baby, and

18

toddler clothing" and "[i]nfant toys"; "WILD DOVES" for
"[c]hildren's wear, namely, infant and toddler bodysuits";
"WILDVIBE" for "[c]hildren's and infant's apparel"; and
"WILDWOVEN" for "[i]nfant and toddler one piece clothing."  The
fact that many of these products likely use the word "wild" to
refer to the same child-like qualities that Wildbird does only
provides further evidence of the weakness of Wildbird's mark.
See id. at 123 (explaining that each mark "[i]n a crowded field
of similar marks" is "relatively weak," "especially . . . where
both the plaintiff's product and the other products use the word
to signify the same ordinary meaning" (citation omitted)).

     Wildbird's arguments to the contrary are not persuasive.
Wildbird contends that the list of third-party trademarks formed
with the word "WILD" is irrelevant because Wildride has not
shown that those trademarks were actually used, much less used
on baby or toddler carriers.  But the single case Wildbird cites
for this proposition did not undertake this analysis in the
context of assessing the strength of a suggestive mark.  See
Scarves by Vera, Inc. v. Todo Imports Ltd. (Inc.), 544 F.2d
1167, 1173 (2d Cir. 1976).  As the Second Circuit has expressly
stated when analyzing a suggestive mark, "[e]xtensive third-
party usage of a mark in related products generally weighs

against a finding that a trademark is strong." RiseandShine
Corp., 41 F.4th at 122-23 (emphasis added).

Lastly, turning to acquired strength, Wildbird cites its
advertising expenditures of "millions of dollars each year,"
notes its "over $20 million in annual sales," and presents a
single online magazine article.  Wildbird has not demonstrated,
however, that such expenditures, sales, or media coverage have
achieved sufficient acquired strength for its marks to
counterbalance their inherent weakness.  See RiseandShine Corp.,
41 F.4th at 124; Car-Freshner Corp., 980 F.3d at 329.  Notably,
Wildbird has not submitted any consumer study linking its marks
to a single source.  In fact, the only consumer study available
(commissioned by Wildbird in 2014, but submitted by Wildride)
indicates that only 28% of Wildbird's target consumers recognize
Wildbird as a "brand[] of wearable baby carrier(s)."  Thus,
Wildbird's suggestive marks remain relatively weak.

B.   Similarity of the Marks

1.   Legal Standard

To evaluate the similarity of the marks, "courts must
analyze the mark's overall impression on a consumer, considering
the context in which the marks are displayed and the totality of
factors that could cause confusion among prospective
purchasers."  Louis Vuitton Malletier v. Dooney & Bourke, Inc.,

454 F.3d 108, 117 (2d Cir. 2006) (citation omitted).  To do so, courts often compare the appearance of the marks and the products on which they appear side-by-side, looking to the colors and typefaces used in the marks and the design and dimensions of the product packaging, among other details.  See RiseandShine Corp., 41 F.4th at 124-25; Louis Vuitton Malletier, 454 F.3d at 117.

During this process, courts may conclude that similarities between two marks that share a single word or letter are outweighed by significant differences in the products' packaging or labels.  After all, "the use of a single word from a suggestive mark, coupled with differences in the appearance of the packaging, tends to weigh the similarity factor in favor of [the defendant]."  Car-Freshner Corp., 980 F.3d at 332 (evaluating similarity of plaintiff's "Bayside Breeze" mark and defendant's "Boardwalk Breeze" mark, although ultimately finding that similarities in packaging weighed factor in favor of plaintiff).  For example, in Star Industries, Inc. v. Bacardi & Co. Ltd., the Second Circuit evaluated whether two liquor brands utilizing an "O"-based mark to market orange-flavored hard liquor -- "Star O" and "Bacardi O" -- were similar.  412 F.3d at 386.  The court ultimately found no clear error in the district court's conclusion that, "while the two 'O' marks appear very

similar when viewed in isolation, this similarity . . . is undercut by the dissimilarity of the products' respective labels as a whole," citing differences in the label backgrounds and the addition of broader brand logos and symbols. Id.; see also King Research, Inc. v. Shulton, Inc., 454 F.2d 66, 68 (2d Cir. 1972) (finding similarity factor weighed against finding likelihood of confusion despite similarity of marks themselves because packaging was very dissimilar).

2. Application

Wildbird raises only two arguments to contend that its marks are so similar to Wildride's as to create a likelihood of consumer confusion: first, that both marks "begin with 'W-I-L-D,'" and second, that "WILDBIRD" and "WILDRIDE" "sound similar when spoken aloud." Hearing no such similarity, the second argument fails. As for the first argument, although it is true that both marks begin with the term "WILD" in all capital letters, their similarities start and end there.

A comparison of the two marks reveals that their differences are more salient than that single similarity. Of most significance, the parties use different words in the second half of their mark ("BIRD" and "RIDE") and their logos incorporate different icons: the Wildbird logo includes the silhouette of a small bird perched on top of the final letter of

22

its name, whereas the Wildride logo features a large, detailed cheetah head before the first letter of its name. The typeface used in the marks also differs. Wildbird uses a simple sans-serif font, with spacing between each letter, whereas Wildride uses a bold, chunky serif font with less spacing between each letter. Thus, even limiting our comparison to the marks themselves, there is little in their appearance that would suggest to a consumer that they came from the same source.

Reviewing the products and packaging only confirms that consumers are unlikely to confuse the two parties. Wildbird's baby carrier appears rectangular in its product photos and its packaging prominently features its logo, a larger version of the bird silhouette, and the phrases "KEEP YOUR LITTLE BIRD CLOSE" and "welcome to the flock!," emphasizing the "bird" portion of its marks. By contrast, Wildride's toddler carrier appears like a triangle with curved sides in its product photos and its packaging displays its cheetah logo and uses the phrase "ENJOY THE RIDE!," emphasizing the "ride" portion of its marks.

In summary, the only notable similarity between Wildbird and Wildride's marks is the shared use of the term "WILD" in large, capital letters. And, as in RiseandShine Corp., "without more striking visual similarities, the shared use of this ordinary word . . . is not enough to render the two [marks]

confusingly similar." 41 F.4th at 125 (citation omitted); see also Car-Freshner Corp., 980 F.3d at 332. Thus, the second Polaroid factor also weighs against finding a likelihood of consumer confusion.

C.    Proximity of the Products

1.    Legal Standard

To determine the competitive proximity of the parties' products, courts consider whether they are "marketed to the same consumers in the same [retail locations]." Star Indus., 412 F.3d at 387; see also Car-Freshner Corp., 980 F.3d at 332 (finding factor favors plaintiff where products "directly compete with each other" and "are often displayed side-by-side on retailers' shelves"). If products "reside in distinct submarkets" of a broader shared market, however, the finding of competitive proximity may be slightly tempered. Star Indus., 412 F.3d at 387.

2.    Application

The competitive proximity factor weighs in favor of finding a likelihood of consumer confusion. Although it is true that Wildbird's carriers are marketed for babies and Wildride's carriers are marketed for toddlers ages 9 months to 4 years, the products are closely related. In fact, the same consumers could purchase both carriers to perform the same function -- i.e.,

24

allow them to carry their young children, hands-free -- at different stages of their child's life.  A customer who had previously purchased a Wildbird baby carrier could, mere weeks later, be in the market for a Wildride toddler carrier.  The differences in the products' construction or submarkets do not negate the conclusion that they are otherwise in significant competitive proximity to each other.  Thus, this third <u>Polaroid</u> factor weighs in favor of Wildbird.

    D.   Actual Confusion

         1.   Legal Standard

    "[E]vidence of actual confusion is very helpful to an infringement claimant."  <u>Car-Freshner Corp.</u>, 980 F.3d at 332. Although a plaintiff's failure to present such evidence is "not fatal" to its claims, <u>id.</u>, a failure to present consumer surveys in particular "weighs against a finding of consumer confusion." <u>Star Indus.</u>, 412 F.3d at 388.  And courts have generally viewed anecdotal evidence of confusion, especially from unidentified declarants, as "extremely weak."  <u>Id.</u> at 387.

    For example, in <u>Star Industries v. Bacardi & Co. Ltd.</u>, the plaintiff presented testimony from two of its employees that they "once" overheard or saw an unidentified individual confusing the parties' products, as well as testimony from one of its distributor's employees that he spoke with a retailer

about the potential of consumer confusion.  Id. at 380.  The
Second Circuit found no clear error in the district court's
conclusion that "testimony by several interested witnesses
recounting a handful of anecdotes, including a number of hearsay
statements by unidentified and unidentifiable declarants" was
weak evidence of confusion.  Id. at 388.

      2.   Application

The actual confusion factor weighs against finding a
likelihood of consumer confusion.  Wildbird did not present any
evidence of actual consumer confusion here.  Wildbird failed to
provide any consumer surveys indicating confusion, which "weighs
against a finding of consumer confusion."  Star Indus., 412 F.3d
at 388.  Nor did Wildbird provide admissible evidence of a
single customer who expressed confusion.  Instead, Wildbird
cited brief, in-person conversations with unidentified suppliers
and Nordstrom employees at business-to-business events.  Like in
Star Industries, "a number of hearsay statements by unidentified
and unidentifiable declarants" constitutes "extremely weak"
evidence of confusion here.  Id.  Thus, the "actual confusion"
factor favors Wildride.

    E.   Remaining Polaroid Factors

Four Polaroid factors remain: "the likelihood that the
[plaintiff] will bridge the gap," any bad faith by the defendant

"in adopting its mark," "the quality of defendant's product," and "the sophistication of the buyers."  Wildbird has conceded that the first of the remaining factors, "the likelihood that the [plaintiff] will bridge the gap," does not apply because the products are sufficiently similar that there is no gap to bridge.[3]  And Wildbird has failed to establish that any of the remaining three factors weighs in its favor.

Wildbird has not presented any evidence that Wildride adopted its mark in bad faith.  "Bad faith generally refers to an attempt by a junior user of a mark to exploit the good will and reputation of a senior user by adopting the mark with the intent to sow confusion between the two companies' products." Star Indus., 412 F.3d at 388.  Wildbird only makes one argument to contend that Wildride acted in bad faith.  It asks this Court to infer bad faith because Wildride had constructive notice of Wildbird's registered trademark and decided to enter the U.S. marketplace anyway "with nearly identical marks for identical and closely related products."  But, as discussed earlier, the parties' marks are not "nearly identical."  And, even if we assume that they are, Wildride correctly points out that it did

---

[3] "'Bridging the gap' refers to the likelihood that the senior user will enter the junior user's market in the future, or that consumers will perceive the senior user as likely to do so." Star Indus., 412 F.3d at 387.

not have constructive notice of Wildbird's registered word mark
at the time that it applied to extend its international mark to
the United States.  Although the U.S. Patent and Trademark
Office originally registered Wildbird's word mark on January 26,
2016, it cancelled the mark six years later on August 5, 2022,
after Wildbird failed to file a required document.  Wildbird
only re-registered its word mark on May 20, 2025.  As a result,
when Wildride applied to extend its international word mark to
the United States on May 12, 2023, and when Wildride applied to
register its logo-only mark with the USPTO directly on May 20,
2024, Wildbird's only registered mark had been cancelled.

The quality factor does not support either party.  The
record does not support a finding that either Wildbird or
Wildride's products are superior in quality to the other.

Lastly, the consumer sophistication factor militates
against finding a likelihood of consumer confusion.  Under this
factor, courts "consider[] the general impression of the
ordinary purchaser, buying under the normally prevalent
conditions of the market and giving the attention such
purchasers usually give in buying that class of goods."  Star
Indus., 412 F.3d at 390 (citation omitted).  Wildbird concedes
that "generally speaking, parents purchasing accessories and
clothing for their children are careful and discerning."

28

Moreover, both Wildbird and Wildride have described their
products as "premium," given that they are priced in the
hundreds of dollars.  It is well-established that consumers of
more expensive products are generally more sophisticated.  See
id.

     F.   Balancing

To summarize the findings from above: five factors
(strength of mark, similarity, actual confusion, bad faith, and
consumer sophistication) weigh against a finding of likelihood
of consumer confusion, one factor (competitive proximity) favors
finding a likelihood of consumer confusion, and two factors do
not apply or are neutral (bridging the gap and quality).  As
explained earlier, Wildbird's marks are relatively weak
suggestive marks and "[w]eak marks are entitled to only an
extremely narrow scope of protection, unless a convincing
combination of other Polaroid factors militates strongly in
favor of likelihood of confusion."  RiseandShine Corp., 41 F.4th
at 124 (citation omitted).  In particular, the material
dissimilarities between the marks and lack of evidence showing
actual consumer confusion weigh strongly against a finding that
Wildbird is likely to succeed on its trademark infringement
claims.

II.   Remaining Preliminary Injunction Factors

Wildbird's arguments regarding the remaining preliminary

injunction factors -- irreparable harm, the balance of equities,

and the public interest -- also fail because Wildbird's

arguments in connection with each of these factors are

contingent on a finding of consumer confusion.  Because Wildbird

did not establish a likelihood of consumer confusion, its

arguments as to the remaining preliminary injunction factors

fail as well.

## Conclusion

Wildbird's July 22 motion for a preliminary injunction is

denied.

Dated:    New York, New York
          November 5, 2025

DENISE COTE
United States District Judge

30